# EXHIBIT 1A

# CERTIFICATE OF COPYRIGHT REGISTRATION



This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.

REGISTER OF COPYRIGHTS
United States of America

**OFFICIAL SEAL**

**FORM PA**
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

PAu  1 053 089

PA                    PAU

EFFECTIVE DATE OF REGISTRATION

| Month | Day | Year |
|---|---|---|
| 1 | 22 | 88 |

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

## 1

**TITLE OF THIS WORK ▼**

Don't Worry, Be Happy

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**NATURE OF THIS WORK ▼** See instructions

Words & music

## 2

**a**

**NAME OF AUTHOR ▼**
Robert Keith McFerrin, Jr.

**DATES OF BIRTH AND DEATH**
Year Born ▼ 1950    Year Died ▼ —

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ United States
{ Domiciled in ▶ San Francisco

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?  ☐ Yes ☒ No
Pseudonymous?  ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼
Words & music

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire"

**b**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
{ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?  ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**c**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
{ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?  ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed. ▼

## 3

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
◀ Year 1987

**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month ▶ _____ Day ▶ _____ Year ▶ _____ ◀ Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Robert Keith McFerrin, Jr.

**TRANSFER** If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

See instructions before completing this space.

**APPLICATION RECEIVED**
JAn 22.1988
**ONE DEPOSIT RECEIVED**
Jan 26.1988
**TWO DEPOSITS RECEIVED**

**REMITTANCE NUMBER AND DATE**

DO NOT WRITE HERE
OFFICE USE ONLY

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page
• See detailed instructions        • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

PAu 1 053 089

EXAMINED BY

CHECKED BY

□ CORRESPONDENCE
   Yes

□ DEPOSIT ACCOUNT
   FUNDS USED

FORM PA

FOR
COPYRIGHT
OFFICE
USE
ONLY

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
□ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
□ This is the first published edition of a work previously registered in unpublished form.
□ This is the first application submitted by this author as copyright claimant.
□ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number** ▼        **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**

See instructions
before completing
this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                              Account Number ▼

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼
Original Artists
129 West 69th Street
New York, NY 10023
attn: Linda Goldstein
Area Code & Telephone Number ▶ 212-580-7747

Be sure to
give your
daytime phone
◀ number

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the
Check only one ▼
□ author
□ other copyright claimant
□ owner of exclusive right(s)
☒ authorized agent of ___Robert Keith McFerrin, Jr.___
                      Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this is a published work, this date must be the same as or later than the date of publication given in space 3.
Linda Goldstein                                    date ▶ January 14, 1988

Handwritten signature (X) ▼
_Linda Goldstein_

**8**

**MAIL
CERTIFI-
CATE TO**

Certificate
will be
mailed in
window
envelope

Name ▼
Original Artists

Number/Street/Apartment Number ▼
129 West 69th Street

City/State/ZIP ▼
New York, NY 10023

Have you:
• Completed all necessary
  spaces?
• Signed your application in space
  8?
• Enclosed check or money order
  for $10 payable to Register of
  Copyrights?
• Enclosed your deposit material
  with the application and fee?
MAIL TO: Register of Copyrights,
Library of Congress, Washington,
D.C. 20559

**9**

* 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

○ U.S. GOVERNMENT PRINTING OFFICE: 1985—461-584/10,022                    April 1985—200,000

# DON'T WORRY, BE HAPPY



Words and Music by
BOBBY McFERRIN

© Copyright 1988 Probnoblem Music
All Rights Reserved   International Copyright Secured









**Spoken Ad Lib. Over Repeat and Fade:**

Don't worry. Don't worry. Don't do it.
Be happy. Put a smile on your face.
Don't bring everybody down. Don't
worry. It will soon pass, whatever it is.
Don't worry. Be happy. I'm not worried.

I'm happy.

Choreography
Linda Goldstein/Original Artists

Henry Marquez

Carol Friedman

Artwork Courtesy of

PROB HOBLEM MUSIC

**HAL LEONARD PUBLISHING CORPORATION**

0888-0489
HL00353498

$2.95
U.S.A.

AGREEMENT made on .......... May 24, 1982 .......... between BROADCAST MUSIC, INC.

("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019 and

ROBERT MC FERRIN, JR.

a .. n .. Individual .......... doing business as .......... PROBNOBLEM MUSIC

.......... ("Publisher"), whose address is .... c/o Jon Waxman Esq., 111 W. 57th Street,

Suite 1120, New York, N.Y. 10019

## WITNESSETH:

**FIRST:** The term of this agreement shall be the period of five (5) years from .......... April 1, 1982

to .......... March 31, 1987 .......... and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of such initial period, or any such additional five (5) year period, upon notice by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any such term.

**SECOND:** As used in this agreement, the word "works" shall mean:

**A.** All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

**B.** All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership or copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

**THIRD:** Except as otherwise provided herein. Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

**A.** All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, any part or all of the works.

**B.** The non-exclusive right to record, and to license others to record, any part or all of any of the works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such work publicly by means of radio and television or for archive or audition purposes and not for sale to the public or for synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations.

**C.** The non-exclusive right to adapt or arrange any part or all of any of the works for performance purposes, and to license others to do so.

**FOURTH:**

**A.** The rights granted to BMI by subparagraph A of paragraph THIRD hereof shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta, or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

**B.** Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof performances of works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for and performed as part of a theatrical or television film, (2) a score originally written for and performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

**C.** Publisher retains the right to issue non-exclusive licenses for performances of a work or works (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license BMI is given written notice of the titles of the works and the nature of the performances so licensed by Publisher.

**FIFTH:**

**A.** As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the works in which BMI has performing rights:

(1) For performances of works on broadcasting stations in the United States, its territories and possessions BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

It is acknowledged that BMI licenses the works of its affiliates for performance by non-broadcasting means, but that unless and until such time as feasible methods can be devised for tabulation of and payment for such performances, payment will be based solely on broadcast performances. In the event that during the term of this agreement BMI shall establish a system of separate payment for non-broadcasting performances, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of works outside of the United States, its territories and possessions BMI will pay to Publisher all monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the works after the deduction of BMI's then current handling charge applicable to its affiliated publishers.

(3) In the case of works which, or rights in which, are owned by Publisher jointly with one or more other publishers who have granted performing rights therein to BMI, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

**B.** Notwithstanding the foregoing provisions of this paragraph FIFTH, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such work referred to in subparagraph A of paragraph TENTH hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph FOURTEENTH hereof, or (2) any performance as to which a direct license as de-

scribed in subparagraph C of paragraph EIGHTH hereof has been granted to Publisher its co-publisher or its

SIXTH: BMI will furnish statements to Publisher at least twice during each year of the term showing the number of performances of the works as computed pursuant to subparagraph A(1) of paragraph FIFTH hereof, and at least once during each year of the term showing the monies received by BMI referred to in subparagraph A(2) of paragraph FIFTH hereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for advances or amounts due to BMI from Publisher.

**SEVENTH:**

A. Nothing in this agreement requires BMI to continue to license the works subsequent to the termination of this agreement. In the event that BMI continues to license any or all of the works, however, BMI shall continue to make payments to Publisher for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such works to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails to so inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly on demand. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by any of the works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers.

C. In the event that BMI has reason to believe that Publisher will receive or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the works during a period when such works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI of the amount so paid to Publisher by such other organization or that Publisher has not been so paid. In the event that Publisher has been so paid, the monies payable by BMI to Publisher for such performances during such period shall be reduced by the amount of the payment from such other organization. In the event that Publisher does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such works during such period.

**EIGHTH:** In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

**NINTH:**

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any work which in BMI's opinion (1) is similar to a previously existing composition and might constitute a copyright infringement, or (2) has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition, or (3) is offensive, in bad taste or against public morals, or (4) is not reasonably suitable for performance.

B. In the case of works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such work from this agreement, or (2) to classify any such work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any work is excluded from this agreement pursuant to subparagraph A or B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such work, to terminate all rights in such work granted to BMI herein and all such rights of BMI in such work shall revert to Publisher thirty (30) days after the date of such notice from Publisher to BMI.

**TENTH:**

A. With respect to each of the works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) Two copies of a completed clearance sheet in the form supplied by BMI, unless a cue sheet with respect to such work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2) If such work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other works, such copy need be furnished only if requested by BMI pursuant to subsection (c) of subparagraph D(2) of this paragraph TENTH.

(3) If such work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, composers, publisher and nature and duration of the use of the work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each clearance sheet or cue sheet shall constitute a warranty by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the works listed thereon has been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is

(2) At BMI's request:

(a) To register each unpublished and published work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To record in the United States Copyright Office in accordance with the Copyright Law of the United States any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish any of the works.

(c) To obtain and deliver to BMI copies of: unpublished and published works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any of the documents referred to in sub-section (b) above.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any work shall revert to the writer or the writer's representative, or (2) copyright protection of any work shall terminate.

ELEVENTH: Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance sheet or cue sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has exclusive performing rights in each of the works by virtue of written grants thereof to Publisher signed by all the authors and composers or other owners of such work.

TWELFTH:

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any work by BMI or its licensees.

B. Upon the receipt by any of the parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

THIRTEENTH: Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of the said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit.

FOURTEENTH:

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein-after called "foreign territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the works for any foreign territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such foreign territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the works in any foreign territory as part of an agreement for the publication, exploitation or representation of such works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the works are granted for any foreign territory. Such notice shall set forth the title of the work, the country or countries involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the foreign territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any foreign territory.

C. In the event that BMI transmits to Publisher performance royalties designated as the writer's share of performance royalties earned by any of the works in any foreign territory, Publisher shall promptly pay such royalties to the writer or writers of the works involved. If Publisher is unable for any reason to locate and make payment to any of the writers involved within six (6) months from the date of receipt, the amounts due such writers shall be returned to BMI.

FIFTEENTH:

A. Publisher agrees that Publisher, its agents, employees, representatives or affiliated companies, will not directly or indirectly during the term of this agreement:

(1) Solicit or accept payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

payment by BMI on behalf of such composer, author or involving, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permit Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH.

(4) Submit to BMI, as one of the works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher agrees that Publisher, its agents, employees or representatives will not directly or indirectly during the term of this agreement make any effort to ascertain from, or offer any inducement or consideration to, anyone, including but not limited to any broadcasting licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C. Publisher agrees to notify BMI promptly in writing (1) of any change of firm name of Publisher, and (2) of any change of twenty percent (20%) or more in the ownership thereof.

D. In the event of the violation of any of the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall have the right, in its sole discretion, to terminate this agreement by giving Publisher at least thirty (30) days' notice by registered or certified mail. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH: In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by it pursuant to paragraph TWENTIETH hereof shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher pursuant to paragraph TWENTIETH hereof and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH: Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold absolute title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all works for which clearance sheets shall have theretofore been submitted to BMI and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said works in accordance with the terms and conditions of this agreement.

EIGHTEENTH: Any controversy or claim arising out of, or relating to, this agreement or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. Such award shall include the fixing of the expenses of the arbitration, including reasonable attorney's fees, which shall be borne by the unsuccessful party.

NINETEENTH: Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH: Publisher agrees to notify BMI's Department of Performing Rights Administration promptly in writing of any change in its address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address so furnished by Publisher.

TWENTY-FIRST: This agreement cannot be changed orally and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND: In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC.

By ..............

PROBNOBLEM MUSIC

By ..............
(Title of Signer) .......... Owner ..........

ROBERT MC FERRIN, JR.

5-81

# CERTIFICATE OF COPYRIGHT REGISTRATION

PA 0 0 2 0 1 1 9 8 0 0 0

# FORM PA

UNITED STATES COPYRIGHT OFFICE

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.

*David L. Ladd*

**REGISTER OF COPYRIGHTS**
*United States of America*

**REGISTRATION NUMBER**

PA - - **119-230**

(PA) PAU

**EFFECTIVE DATE OF REGISTRATION:**

October ..23, 1981.
(Month) (Day) (Year)

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE CONTINUATION SHEET (FORM PA/CON)**

**(1) Title**

**TITLE OF THIS WORK:**
"EDGE OF SEVENTEEN"
As recorded on "BELLA DONNA" LP - STEVIE NICKS

**NATURE OF THIS WORK:** (See Instructions)
WORDS & MUSIC
(Phonorecord LP)

**PREVIOUS OR ALTERNATIVE TITLES:**
"EDGE OF 17"

---

**(2) Author(s)**

**IMPORTANT:** Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions) If any part of this work was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates blank.

**1**

**NAME OF AUTHOR:** STEPHANIE NICKS p/k/a STEVIE NICKS
Was this author's contribution to the work a "work made for hire"? Yes .... No X

**DATES OF BIRTH AND DEATH:**
Born ...... Died ......
(Year) (Year)

**AUTHOR'S NATIONALITY OR DOMICILE:**
Citizen of ............ (Name of Country) } or { Domiciled in ......U.S.A....... (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes .... No X
Pseudonymous? Yes .... No X
If the answer to either of these questions is "Yes," see detailed instructions attached

**AUTHOR OF:** (Briefly describe nature of this author's contribution)
WORDS & MUSIC

**2**

**NAME OF AUTHOR:**
Was this author's contribution to the work a "work made for hire"? Yes .... No ......

**DATES OF BIRTH AND DEATH:**
Born . , Died .......
(Year) (Year)

**AUTHOR'S NATIONALITY OR DOMICILE:**
Citizen of .............. (Name of Country) } or { Domiciled in ...... (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes .... No ...
Pseudonymous? Yes .... No ...
If the answer to either of these questions is "Yes," see detailed instructions attached

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

**3**

**NAME OF AUTHOR:**
Was this author's contribution to the work a "work made for hire"? Yes .... No ....

**DATES OF BIRTH AND DEATH:**
Born . , Died .......
(Year) (Year)

**AUTHOR'S NATIONALITY OR DOMICILE:**
Citizen of .............. (Name of Country) } or { Domiciled in ...... (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes .... No ..
Pseudonymous? Yes .... No ..
If the answer to either of these questions is "Yes," see detailed instructions attached

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

---

**(3) Creation and Publication**

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED:**
Year ..1980...
(This information must be given in all cases.)

**DATE AND NATION OF FIRST PUBLICATION:**
Date ....... July 27 . 1981
(Month) (Day) (Year)
Nation ..... United States...
(Name of Country)
(Complete this block ONLY if this work has been published.)

---

**(4) Claimant(s)**

**NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S):**
WELSH WITCH MUSIC
c/o Gelfand, Rennert & Feldman
1880 Century Park East #900
Los Angeles, CA. 90067

**TRANSFER:** (If the copyright claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright) WELSH WITCH MUSIC is a fictitious business name for STEPHANIE NICKS.

---

- Complete all applicable spaces (numbers 5-9) on the reverse side of this page
- Follow detailed instructions attached   • Sign the form at line 8

DO NOT WRITE HERE
Page 1 of ... pages

PA 119-230

| | EXAMINED BY: | APPLICATION RECEIVED. |
| | CHECKED BY: | 23 OCT 1931 |
| CORRESPONDENCE. ☐ Yes | DEPOSIT RECEIVED. 23 OCT 1931 |
| DEPOSIT ACCOUNT FUNDS USED: ☐ | REMITTANCE NUMBER AND DATE 25419 OCT 2331 |

FOR COPYRIGHT OFFICE USE ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED ADDITIONAL SPACE, USE CONTINUATION SHEET (FORM PA/CON)**

**PREVIOUS REGISTRATION:**

- Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?  Yes ...**X** ..... No .........

- If your answer is "Yes," why is another registration being sought?  (Check appropriate box)

  ☒ This is the first published edition of a work previously registered in unpublished form.

  ☐ This is the first application submitted by this author as copyright claimant.

  ☐ This is a changed version of the work, as shown by line 6 of the application.

- If your answer is "Yes," give: Previous Registration Number ......**Pending** .......Year of Registration ...**1981**..............

Previous Registration

**COMPILATION OR DERIVATIVE WORK:** (See instructions)

PREEXISTING MATERIAL: (Identify any preexisting work or works that the work is based on or incorporates.)

...............................................................................

...............................................................................

...............................................................................

...............................................................................

Compilation or Derivative Work

MATERIAL ADDED TO THIS WORK: (Give a brief, general statement of the material that has been added to this work and in which copyright is claimed.)

...............................................................................

...............................................................................

...............................................................................

**DEPOSIT ACCOUNT:** (If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.)

Name. ...............................................................

Account Number.....................................................

**CORRESPONDENCE:** (Give name and address to which correspondence about this application should be sent.)

Name Babbie Green — WELSH WITCH MUSIC
c/o Gelfand, Rennert & Feldman
Address 1880 Century Park East .... #900.
(Apt)
... Los Angeles, .. CA. ........ 90067
(City)          (State)          (ZIP)

Fee and Correspondence

**CERTIFICATION:** ✳ I, the undersigned, hereby certify that I am the: (Check one)

☐ author ☐ other copyright claimant ☐ owner of exclusive right(s) ☒ authorized agent of ... **Copyright claimant**
(Name of author or other copyright claimant, or owner of exclusive right(s))

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature: (X) _Marshall M. Gelfand_

Typed or printed name...... **Marshall M. Gelfand** .............. Date **10-20-81** ......

Certification (Application must be signed)

**MAIL CERTIFICATE TO**

(Certificate will be mailed in window envelope)

......... Babbie Green — WELSH WITCH MUSIC.................
c/o Gelfand, Rennert & Feldman
......... 1880 Century Park East ... #900.................
(Number, Street and Apartment Number)
......... Los Angeles, ....... CA. ...... 90067.................
(City)          (State)          (ZIP code)

Address For Return of Certificate

* 17 U.S.C. §506(e): FALSE REPRESENTATION—Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

☆ U.S. GOVERNMENT PRINTING OFFICE: 1981-341-279/7

Case 3:16-cv-00049  Document 18-2  Filed on 03/20/17 in TXSD  Page 17 of 182

# EDGE OF SEVENTEEN

WORDS AND MUSIC BY
STEPHANIE NICKS (aka STEVIE NICKS)

**CHORUS**



COPYRIGHT © 1981 WELSH WITCH MUSIC (BMI). ALL RIGHTS RESERVED.

Alpheus Music Corp
V-38-7




Alpheus Music Corp
Hollywood Cal
V-39-B



Alpheus Music Corp

V-39-8

RIDER TO AGREEMENT DATED ___August 20, 1984___ BETWEEN
                                (Date of basic)
BMI AND ___WELSH WITCH MUSIC___
            (BMI contract name of publisher)


   Paragraph FIRST of the Agreement to which this Rider

is attached is hereby deemed deleted and replaced with the

following:

   FIRST:  The term of this agreement shall be the period

from ___July 1, 1983___ to ___June 30, 1985___, and

continuing thereafter unless terminated by either party as of

said date, upon notice by registered or certified mail not more

than six months or less than sixty (60) days prior to said date,

or as of the end of any additional six-month period upon not less

than sixty (60) days' prior notice by registered or certified

mail.


PUBLISHER            BMI SIGNATORY
INITIAL HERE:         INITIAL HERE:


SN


6-month extension
for new publisher affiliate
or current publisher affiliate
being given new basic

P 6-MD/R--8/83

**BMI**®

AGREEMENT made on May 18, 2003 between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019-3790 and Stephanie Nicks an individual doing business as WELSH WITCH MUSIC ("Publisher"), whose address is c/o Sony Songs Inc., P.O. Box 415000, LKBX 30578, Nashville, TN 37241-5000

## WITNESSETH:

1. The term of this agreement shall be the period from   July 1, 2003
to   June 30, 2008   , and continuing thereafter for additional periods of two (2) years each unless terminated by either party at the end of said initial period or any additional period, upon notice sent by registered, certified or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such period.

2. As used in this agreement, the word "Work" or "Works" shall mean:

A. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

3. Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors . or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

C. The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

4. Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

A. The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,   .

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1) For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by . BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3) In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6. In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.

Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7.

A. Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8. In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9.

A. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

B. The termination of this agreement shall be made subject to any rights or obligations existing between BMI and its licensees under licenses theretofore effective as a result thereof, notwithstanding such termination, BMI shall have the right to continue to license all of Publisher's Works in all media with respect to which such licenses exist as of the date of termination until such licenses expire.

10. Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which may continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A. With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B. Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15. Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and to its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder. In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by

any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

17.  BMI shall have the right, in its sole discretion, to terminate this agreement if:

A.  Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

(1)  Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2)  Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3)  Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (1) and A (2) of this paragraph 17.

(4)  Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (1) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B.  Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

C.  Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

18.  In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

19.  Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against

Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20. All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21. Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22. Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's postal or electronic ("e-mail") address, or facsimile number. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last postal or electronic address or facsimile number so furnished by Publisher.

23. This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24. Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder. approved approved

25. Publisher authorizes the inclusion of Publisher's name/likeness and/biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26. This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27. In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28. Any prior agreements, as modified, between Publisher and BMI are canceled and superseded as of the effective date of this agreement. All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

**BROADCAST MUSIC, INC**

By .......................................................................................................................................................
OUST ,Vice President

---

**"PUBLISHER"**

By .............................................................         Stephanie Nicks, Owner
(Authorized Signatory)            (Print Name and Title of Signer)

**If your company structure is a PARTNERSHIP, all other partners must sign below:**

By ..........................................................................................................................................................
Partner                   Printed Name

By ..........................................................................................................................................................
Partner                   Printed Name

By ..........................................................................................................................................................
Partner                   Printed Name

By ..........................................................................................................................................................
Partner                   Printed Name

By ..........................................................................................................................................................
Partner                   Printed Name

**THIS PAGE INTENTIONALLY LEFT BLANK**

**FORM RE**

UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

RE 196-374

EFFECTIVE DATE OF RENEWAL REGISTRATION

13 FEB 1984 (Year)

DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY

**1** Renewal Claimant(s)

**RENEWAL CLAIMANT(S), ADDRESS(ES), AND STATEMENT OF CLAIM: (See Instructions)**

1
Name...... John R. Cash
Address...
Claiming as ... author & composer
(Use appropriate statement from instructions)

2
Name....
Address....
Claiming as ...
(Use appropriate statement from instructions)

3
Name....
Address....
Claiming as ...
(Use appropriate statement from instructions)

**TITLE OF WORK IN WHICH RENEWAL IS CLAIMED:**

GET RHYTHM

**RENEWABLE MATTER:**

**CONTRIBUTION TO PERIODICAL OR COMPOSITE WORK:**

Title of periodical or composite work:
If a periodical or other serial, give: Vol.... No.... Issue Date....

**3** Author(s)

**AUTHOR(S) OF RENEWABLE MATTER:**

W & M - John R. Cash

**4** Facts of Original Registration

**ORIGINAL REGISTRATION NUMBER:** EU-435120

**ORIGINAL COPYRIGHT CLAIMANT:** HI LO MUSIC, INC.

**ORIGINAL DATE OF COPYRIGHT:**
• If the original registration for this work was made in published form, give:
DATE OF PUBLICATION: (Month) (Day) (Year)

OR

• If the original registration for this work was made in unpublished form, give:
DATE OF REGISTRATION: April 26, 1956 (Month) (Day) (Year)

02-13-84 1704 *4844178445*

RE 196-375

EXAMINED BY
CHECKED BY
RENEWAL APPLICATION RECEIVED 13 FEB 1984
DEPOSIT ACCOUNT FUNDS USED ☑
REMITTANCE NUMBER AND DATE 13 FEB 1984

FOR COPYRIGHT OFFICE USE ONLY

**DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY**

**RENEWAL FOR GROUP OF WORKS BY SAME AUTHOR:** To make a single registration for a group of works by the same individual author (see instructions), give full information about each contribution. If more space is needed, request continuation sheet (Form RE/CON).

**5**
Renewal for Group of Works

1. Title of Contribution:
   Title of Periodical: ............ Vol. .... No. .... Issue Date ............
   Date of Publication: (Month) (Day) (Year)   Registration Number: ............

2. Title of Contribution:
   Title of Periodical: ............ Vol. .... No. .... Issue Date ............
   Date of Publication: (Month) (Day) (Year)   Registration Number: ............

3. Title of Contribution:
   Title of Periodical: ............ Vol. .... No. .... Issue Date ............
   Date of Publication: (Month) (Day) (Year)   Registration Number: ............

4. Title of Contribution:
   Title of Periodical: ............ Vol. .... No. .... Issue Date ............
   Date of Publication: (Month) (Day) (Year)   Registration Number: ............

5. Title of Contribution:
   Title of Periodical: ............ Vol. .... No. .... Issue Date ............
   Date of Publication: (Month) (Day) (Year)   Registration Number: ............

6. Title of Contribution:
   Title of Periodical: ............ Vol. .... No. .... Issue Date ............
   Date of Publication: (Month) (Day) (Year)   Registration Number: ............

7. Title of Contribution:
   Title of Periodical: ............ Vol. .... No. .... Issue Date ............
   Date of Publication: (Month) (Day) (Year)   Registration Number: ............

**DEPOSIT ACCOUNT:** (If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.)

Name: THE SONGWRITERS GUILD
Account Number: 019577

**CORRESPONDENCE:** (Give name and address to which correspondence about this application should be sent.)
Name: ............
Address: ............ (Apt)
(City) (State) (ZIP)

**6**
Fee and Correspondence

**CERTIFICATION:** I, the undersigned, hereby certify that I am the: (Check one)
☐ renewal claimant   ☑ duly authorized agent of: John R. Cash (Name of renewal claimant)
of the work identified in this application, and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature: (X) Marianne Conlin
Typed or printed name: Marianne Conlin
Date: January 1984

**7**
Certification (Application must be signed)

**8**
Address for Return of Certificate

MAIL CERTIFICATE TO

THE SONGWRITERS GUILD
(Name)
276 FIFTH AVENUE
(Number, Street and Apartment Number)
NEW YORK, NY 10001
(City) (State) (ZIP code)

(Certificate will be mailed in window envelope)

☆ U.S. GOVERNMENT PRINTING OFFICE: 1978—261-022/10   Apr. 1978—300,000

FORM RE

UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

196-283

RE

EFFECTIVE DATE OF RENEWAL REGISTRATION

1 3 FEB 1984
(Month)   (Day)      (Year)

DO NOT WRITE ABOVE THIS LINE.   FOR COPYRIGHT OFFICE USE ONLY

**① Renewal Claimant(s)**

RENEWAL CLAIMANT(S), ADDRESS(ES), AND STATEMENT OF CLAIM: (See Instructions)

1
Name...... John R. Cash
Address ....
Claiming as  author & composer
(Use appropriate statement from instructions)

2
Name
Address
Claiming as
(Use appropriate statement from Instructions)

3
Name
Address
Claiming as
(Use appropriate statement from instructions)

TITLE OF WORK IN WHICH RENEWAL IS CLAIMED:

GET RHYTHM

RENEWABLE MATTER:

02-33-84-1755*
556*
417
8

CONTRIBUTION TO PERIODICAL OR COMPOSITE WORK:

Title of periodical or composite work:

If a periodical or other serial, give: Vol. .......... No ........... Issue Date

**③ Author(s)**

AUTHOR(S) OF RENEWABLE MATTER:

W & M - John R. Cash

**④ Facts of Original Registration**

ORIGINAL REGISTRATION NUMBER:              ORIGINAL COPYRIGHT CLAIMANT:

................ EP-100011              HI LO MUSIC, INC.

ORIGINAL DATE OF COPYRIGHT:

• If the original registration for this work was made in published form, give:

DATE OF PUBLICATION: June 6, 1956
(Month)  (Day)  (Year)

OR

• If the original registration for this work was made in unpublished form, give:

DATE OF REGISTRATION:
(Month)    (Day)    (Year)

RE  196-283

EXAMINED BY:
CHECKED BY:
DEPOSIT ACCOUNT
FUNDS USED:

RENEWAL APPLICATION RECEIVED
1 FEB 1984
REMITTANCE NUMBER AND DATE:
13 FEB 1984

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY**

**RENEWAL FOR GROUP OF WORKS BY SAME AUTHOR:** To make a single registration for a group of works by the same individual author published as contributions to periodicals (see instructions), give full information about each contribution. If more space is needed, request continuation sheet (From RE/CON).

**(5)** Renewal for Group of Works

**1**
Title of Contribution: ...........................................................................
Title of Periodical: .................................... Vol. ...... No. ...... Issue Date ...........
Date of Publication: ..... (Month) .... (Day) .... (Year) ..... Registration Number: ...........

**2**
Title of Contribution: ...........................................................................
Title of Periodical: .................................... Vol. ...... No. ...... Issue Date ...........
Date of Publication: ..... (Month) .... (Day) .... (Year) ..... Registration Number: ...........

**3**
Title of Contribution: ...........................................................................
Title of Periodical: .................................... Vol. ...... No. ...... Issue Date ...........
Date of Publication: ..... (Month) .... (Day) .... (Year) ..... Registration Number: ...........

**4**
Title of Contribution: ...........................................................................
Title of Periodical: .................................... Vol. ...... No. ...... Issue Date ...........
Date of Publication: ..... (Month) .... (Day) .... (Year) ..... Registration Number: ...........

**5**
Title of Contribution: ...........................................................................
Title of Periodical: .................................... Vol. ...... No. ...... Issue Date ...........
Date of Publication: ..... (Month) .... (Day) .... (Year) ..... Registration Number: ...........

**6**
Title of Contribution: ...........................................................................
Title of Periodical: .................................... Vol. ...... No. ...... Issue Date ...........
Date of Publication: ..... (Month) .... (Day) .... (Year) ..... Registration Number: ...........

**7**
Title of Contribution: ...........................................................................
Title of Periodical: .................................... Vol. ...... No. ...... Issue Date ...........
Date of Publication: ..... (Month) .... (Day) .... (Year) ..... Registration Number: ...........

**DEPOSIT ACCOUNT:** (If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.)

Name: THE SONGWRITERS GUILD
Account Number: 019577

**CORRESPONDENCE:** (Give name and address to which correspondence about this application should be sent.)
Name: ...........................................................................
Address: ............................................................. (Apt.)
............... (City) .......... (State) .......... (ZIP)

**(6)** Fee and Correspondence

**CERTIFICATION:** I, the undersigned, hereby certify that I am the: (Check one)
☐ renewal claimant   ☒ duly authorized agent of John R. Cash
(Name of renewal claimant)
of the work identified in this application, and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature: (X) [signature]

Typed or printed name: Marianne Conlin

Date: January 1984

**(7)** Certification (Application must be signed)

THE SONGWRITERS GUILD
(Name)
276 FIFTH AVENUE
(Number, Street and Apartment Number)
NEW YORK     NY     10001
(City)     (State)     (ZIP code)

**MAIL
CERTIFICATE
TO**

(Certificate will be mailed in window envelope)

**(8)** Address for Return of Certificate

U.S. GOVERNMENT PRINTING OFFICE: 1978—261-022/18

Apr. 1978—500,000

**BMI**

AGREEMENT made on ........October 17, 1994.............................. between BROADCAST MUSIC, INC. ("BMI"), a

New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019-3790 and ................................................

.........................................HOUSE OF CASH, INC............................................................................................................

a ...Tennessee corporation....................... ◄............................................................................................................

................................................ ("Publisher"), whose address is ...................P.O. Box 508.......................................

..........................................................................Hendersonville, TN 37077...................................................

### WITNESSETH:

FIRST: The term of this agreement shall be the period from .....January 1, 1994.......................................

to....December 31, 1997.......................................... and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of such initial period or any additional such period, upon notice by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any such period.

SECOND: As used in this agreement, the word "Work" or "Works" shall mean:

   A.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

   B.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

THIRD: Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

   A.  All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, any part or all the Works.

   B.  The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

   C.  The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

FOURTH: Notwithstanding the provisions of subparagraph A of paragraph THIRD hereof:

   A.  The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

   B.  Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

   C.  Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license BMI is given written notice thereof and a copy of the license is supplied to BMI.

FIFTH:

   A.  As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

      (1)  For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

         Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

      (2)  For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

      (3)  In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share equal to the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

   B.  Notwithstanding the provisions of subparagraph A of this paragraph FIFTH, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from

Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph TENTH hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph FOURTEENTH hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph FOURTH hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of such statement.

**SIXTH:** In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph FIFTH hereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions. If any, for taxes, advances or amounts due to BMI from Publisher.

**SEVENTH:**

**A.** Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails to to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

**B.** BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

**C.** In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

**EIGHTH:** In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

**NINTH:**

**A.** BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

**B.** In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

**C.** In the event that any Work is excluded from this agreement pursuant to subparagraphs A or B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

**TENTH:**

**A.** With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed clearance form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D(2) of this paragraph TENTH.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

**B.** Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

**C.** The submission of each clearance form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

**D.** Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish any of the Works.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

ELEVENTH: Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

TWELFTH:

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B. Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the Work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

THIRTEENTH: Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph THIRTEENTH requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder. In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder, shall not constitute an infringement of Publisher's Works on BMI's part.

FOURTEENTH:

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect as part or all of the publishers' performance royalties earned by any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

FIFTEENTH: BMI shall have the right, in its sole discretion, to terminate this agreement if:

A. Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

(1) Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2) Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3)  Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH.

(4)  Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B.  Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C.  Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH:  In the event that during the term of this agreement (1) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (2) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI.  In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH:  Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder.  In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

EIGHTEENTH:  All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows:

Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator.  If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator.  If two arbitrators are so appointed, they shall appoint a third arbitrator.  If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator.  The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party.  Judgement may be entered in New York State Supreme Court or any other court having jurisdiction.

NINETEENTH:  Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder.  No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH:  Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address furnished in writing by Publisher to BMI's Department of Writer/Publisher Administration.

TWENTY-FIRST:  This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND:  In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

TWENTY-THIRD:  This agreement, as of its effective date, cancels and supersedes the agreement between the parties dated ........February 17, 1981............................ and all modifications thereof (herein called the "Superseded Agreement"). All Works embraced by the Superseded Agreement shall be deemed embraced by this agreement.

It is agreed that any part of any advances heretofore made to Publisher pursuant to the Superseded Agreement which shall not have been recouped by performances of Works up to the effective date of this agreement shall be deemed to be an advance against all monies which may become payable to Publisher pursuant to this agreement and any extensions or modifications thereof or substitutions therefor.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

HOUSE OF CASH, INC.

By.................................................... President
John R. Cash

BROADCAST MUSIC, INC.

By....................................................
Roger W. Sovine

(Title of Signer)....Vice President....

Y0715

**AGREEMENT** made on ....April 4, 1984...................... between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019 and ..........SLATER-PICHINSON MUSIC, INC................................................................................

a ....New Jersey corporation.................... doing business as ........SLARICH MUSIC..................
.................................("Publisher"), whose address is.............9200 Sunset Boulevard #916,....
.......................................................................... Los Angeles, California 90062

## WITNESSETH :

**FIRST:** The term of this agreement shall be the period from ........April 1, 1984............................
to ....March 31, 1989................., and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of such initial period, or any such additional five (5) year period, upon notice by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any such term.

**SECOND:** As used in this agreement, the word "works" shall mean:

A. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership or copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

**THIRD:** Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, any part or all of the works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of the works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such work publicly by means of radio and television or for archive or audition purposes and not for sale to the public or for synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations.

C. The non-exclusive right to adapt or arrange any part or all of any of the works for performance purposes, and to license others to do so.

**FOURTH:**

A. The rights granted to BMI by subparagraph A of paragraph THIRD hereof shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta, or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof performances of works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for and performed as part of a theatrical or television film, (2) a score originally written for and performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher retains the right to issue non-exclusive licenses for performances of a work of works (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license BMI is given written notice of the titles of the works and the nature of the performances so licensed by Publisher.

**FIFTH:**

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the works in which BMI has performing rights:

(1) For performances of works on broadcasting stations in the United States, its territories and possessions BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

It is acknowledged that BMI licenses the works of its affiliates for performance by non-broadcasting means, but that unless and until such time as feasible methods can be devised for tabulation of and payment for such performances, payment will be based solely on broadcast performances. In the event that during the term of this agreement BMI shall so elect, which a system of separate payment for non-broadcasting performances, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of works outside of the United States, its territories and possessions BMI will pay to Publisher all monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the works after the deduction of BMI's then current handling charge applicable to its affiliated publishers.

(3) In the case of works which, or rights in which, are owned by Publisher jointly with one or more other publishers who have granted performing rights therein to BMI, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the foregoing provisions of this paragraph FIFTH, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a work which ... on which BMI shall have received from Publisher all of the ... paragraph A of paragraph "r...."

scribed in subparagraph C of paragraph FOURTH hereof has been granted by Publisher, its co-publisher or the writer.

SIXTH:. BMI will furnish statements to Publisher at least twice during each year of the term showing the number of performances of the works as computed pursuant to subparagraph A(1) of paragraph FIFTH hereof, and at least once during each year of the term showing the monies received by BMI referred to in subparagraph A(2) of paragraph FIFTH hereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for advances or amounts due to BMI from Publisher.

SEVENTH:

A. Nothing in this agreement requires BMI to continue to license the works subsequent to the termination of this agreement. In the event that BMI continues to license any or all of the works, however, BMI shall continue to make payments to Publisher for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such works to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly on demand. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions shall be dependent upon BMI's receipt in the United States of payments designated for foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by any of the works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers.

C. In the event that BMI has reason to believe that Publisher will receive or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the works during a period when such works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI of the amount so paid to Publisher by such other organization or that Publisher has not been so paid. In the event that Publisher has been so paid, the monies payable by BMI to Publisher for such performances during such period shall be reduced by the amount of the payment from such other organization. In the event that Publisher does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such works during such period.

EIGHTH: In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

NINTH:

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any work which in BMI's opinion (1) is similar to a previously existing composition and might constitute a copyright infringement, or (2) has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition, or (3) is offensive, in bad taste or against public morals, or (4) is not reasonably suitable for performance.

B. In the case of works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such work from this agreement, or (2) to classify any such work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any work is excluded from this agreement pursuant to subparagraph A or B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such work, to terminate all rights in such work granted to BMI herein and all such rights of BMI in such work shall revert to Publisher thirty (30) days after the date of such notice from Publisher to BMI.

TENTH:

A. With respect to each of the works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) Two copies of a completed clearance sheet in the form supplied by BMI, unless a cue sheet with respect to such work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2) If such work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other works, such copy need be furnished only if requested by BMI pursuant to subsection (c) of subparagraph D(2) of this paragraph TENTH.

(3) If such work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, composers, publisher and nature and duration of the use of the work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each clearance sheet or cue sheet shall constitute a warranty by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the works listed thereon has been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is

afforded; and to give BMI prompt written notice of the date and number of copyright registration and/or renewal of each work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To record in the United States Copyright Office in accordance with the Copyright Law of the United States any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish any of the works.

(c) To obtain and deliver to BMI copies of: unpublished and published works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any of the documents referred to in sub-section (b) above.

F. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any work shall revert to the writer or the writer's representative, or (2) copyright protection of any work shall terminate.

ELEVENTH: Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance sheet or cue sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has exclusive performing rights in each of the works by virtue of written grants thereof to Publisher signed by all the authors and composers or other owners of such work.

TWELFTH:

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any work by BMI or its licensees.

B. Upon the receipt by any of the parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

THIRTEENTH: Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of the said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit.

FOURTEENTH:

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (hereinafter called "foreign territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the works for any foreign territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such foreign territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the works in any foreign territory as part of an agreement for the publication, exploitation or representation of such works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the works are granted for any foreign territory. Such notice shall set forth the title of the work, the country or countries involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the foreign territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any foreign territory.

C. In the event that BMI transmits to Publisher performance royalties designated as the writer's share of performance royalties earned by any of the works in any foreign territory, Publisher shall promptly pay such royalties to the writer or writers of the works involved. If Publisher is unable for any reason to locate and make payment to any of the writers involved within six (6) months from the date of receipt, the amounts due such writers shall be returned to BMI.

FIFTEENTH:

A. Publisher agrees that Publisher, its agents, employees, representatives or affiliated companies, will not directly or indirectly during the term of this agreement:

(2) Solicit or accept manuscripts from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permit Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH.

(4) Submit to BMI, as one of the works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher agrees that Publisher, its agents, employees or representatives will not directly or indirectly during the term of this agreement make any effort to ascertain from, or offer any inducement or consideration to, anyone, including but not limited to any broadcasting licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C. Publisher agrees to notify BMI promptly in writing (1) of any change of firm name of Publisher, and (2) of any change of twenty percent (20%) or more in the ownership thereof.

D. In the event of the violation of any of the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall have the right, in its sole discretion, to terminate this agreement by giving Publisher at least thirty (30) days' notice by registered or certified mail. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH: In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by it pursuant to paragraph TWENTIETH hereof shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher pursuant to paragraph TWENTIETH hereof and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH: Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold absolute title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all works for which clearance sheets shall have theretofore been submitted to BMI and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said works in accordance with the terms and conditions of this agreement.

EIGHTEENTH: Any controversy or claim arising out of, or relating to, this agreement or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. Such award shall include the fixing of the expenses of the arbitration, including reasonable attorney's fees, which shall be borne by the unsuccessful party.

NINETEENTH: Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH: Publisher agrees to notify BMI's Department of Performing Rights Administration promptly in writing of any change in its address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address so furnished by Publisher.

TWENTY-FIRST: This agreement cannot be changed orally and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND: In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC.

By ...............................................

Assistant Vice President

Slater-Pichinson Music Inc. d/b/a
SLAPICH MUSIC
.....................................................

By ...............................................
(Title of Signer) President
Martin Pichinson

5/81

**SLATER PICHINSON MUSIC, INC.**

9200 Sunset Boulevard
Suite 916
Los Angeles, California 90069
(213) 858-0295

May 1, 1984

Mr. Howard Balsam
Harry Fox Agency
110 East 59th St.
New York, New York 10022

Dear Howard,

Please find enclosed copies of the certificate of renewal
registration for songs that reverted to Johnny Cash as of the
below dates. As per our agreement dated March 2, 1984, Slater
Pichinson Music Inc. now controlls these copyrights and are
empowered to receive all monies as of effective dates. Please
amend your records and credit our account as appropriate.

```
        CRY CRY CRY------------------Jan. 25, 1984
      * GET RHYTHM-------------------Feb. 13, 1984
        I WALK THE LINE--------------Feb. 13, 1984
        ROCK N' ROLL RUBY-----------Feb. 13, 1984
        SO DOGGONE LONESOME----------Feb. 13, 1984
        ALL MAMA'S CHILDREN----------Feb. 13, 1984
        FOLSOM PRISON BLUES----------Feb. 9, 1984
        COME IN STRANGER-------------Feb. 13, 1984
        THERE YOU GO-----------------Feb. 13, 1984
        TRAIN OF LOVE----------------Feb. 13, 1984
        YOU'RE MY BABY---------------Feb. 13, 1984
        ALL MAMA'S CHILDREN----------Feb. 13, 1984
        GET RHYTHM-------------------Feb. 13, 1984
        I WALK THE LINE--------------Feb. 13, 1984
        ROCK N'ROLL RUBY-------------Feb. 7, 1984
```

Sincerely yours,

Colin Slater
Slater Pichinson Music Inc.

CS/be
encl.

03790309004 3 7 9 0 5 0 9 0 0 4

July 14, 1989

The Harry Fox Agency
205 East 42nd Street
New York, NY 10017

    RE: House of Cash, Inc.
        Slapich
        Slater-Pichinson Music, Inc.
        Song of Cash, Inc.
        Family of Man Music, Inc.

Gentlemen:

    The above-listed music publishing catalogues have been
re-acquired by House of Cash, Inc. The Administration Agreement
with Screen Gems and Colgems has been terminated effective
December 31, 1988. Please direct all future royalties,
accountings and correspondence to the following:

        House of Cash, Inc.
        Post Office Box 508
        Hendersonville, TN 37077
        ATTENTION: Karen Adams
        (615) 824-5110

SCREEN GEMS-EMI MUSIC, INC.      HOUSE OF CASH, INC.

By: _____      By: _____
SR. VICE PRESIDENT

COLGEMS MUSIC, INC.         SONG OF CASH, INC.

By: _____      By: _____
SR VICE PRESIDENT

SLATER-PICHINSON MUSIC, INC.    FAMILY OF MAN MUSIC, INC.

By: _____      By: _____
        VICE PRESIDENT

Registration Number

PA 1-887-677

**Effective date of registration:**

December 9, 2013

## Title

Title of Work: LONELY EYES (As recorded by Chris Young on "A.M." #888837326421)

## Completion/Publication

Year of Completion: 2013

Date of 1st Publication: September 17, 2013     Nation of 1st Publication: United States

## Author

■     Author: Johnny Bulford

Author Created: music, lyrics

Citizen of: United States          Domiciled in: United States

■     Author: Laura Veltz

Author Created: music, lyrics

Citizen of: United States          Domiciled in: United States

■     Author: Jason Matthews

Author Created: music, lyrics

Citizen of: United States          Domiciled in: United States

## Copyright claimant

Copyright Claimant: Warner-Tamerlane Publishing Corp.

20 Music Square East, Nashville, TN, 37203, United States

Transfer Statement: By written agreement

Copyright Claimant: 3JB Music

c/o Warner-Tamerlane Publishing Corp., 20 Music Square East, Nashville, TN, 37203, United States

Transfer Statement: By written agreement

**Copyright Claimant:** Fresh Baked Cookies

c/o Warner-Tamerlane Publishing Corp., 20 Music Square East, Nashville, TN, 37203, United States

**Transfer Statement:** By written agreement

## Certification ─────────────────────────────

**Name:** Lu Ann Inman

**Date:** November 26, 2013

**Registration #:**   PA0001887677
**Service Request #:**   1-1032672151

Warner Bros. Music
Lu Inman
20 Music Square East
Nashville, TN 37203  United States

# BMI®

#361763

AGREEMENT made on February 25, 2004, between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019-3790 and Warner-Tamerlane Publishing Corp., a California corporation ("Publisher"), whose address is c/o Warner Chappell Music, Inc., 10585 Santa Monica Boulevard, Los Angeles, CA 90025.

## W I T N E S S E T H :

1.  The term of this agreement shall be the period from April 1, 2004 to March 31, 2007, and continuing thereafter for additional periods of three (3) years each unless terminated by either party at the end of said initial period or any additional period, upon notice sent by registered, certified or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such period.

2.  As used in this agreement, the word "Work" or "Works" shall mean:

A.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

3.  Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A.  All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

B.  The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

C.  The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

4.  Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

A.  The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,

*THIS PAGE INTENTIONALLY LEFT BLANK*

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1) For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3) In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6. In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.

Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7.

A.   Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B.   BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8.   In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9.

A.   In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

B.   The termination of this agreement shall be deemed subject to any rights or obligations existing between BMI and its licensees under licenses then in effect. As a result thereof, notwithstanding such termination, BMI shall have the right to continue to license all of Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination, until such licenses expire.

10.   Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which may continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A.   BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

P800

Page 4 of 10

B.  In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C.  In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A.  With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3)  If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B.  Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C.  The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D.  Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2)  At BMI's request:

(a)  To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E.  Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1)  the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or  (2)  copyright protection of any Work shall terminate.

13.   Publisher warrants and represents that:

A.  Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B.  Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A.  Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B.  Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense.  Publisher agrees to cooperate with BMI in all such matters.

C.  In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15.   Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder.  In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A.  It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories").  Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by

any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

    B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

    17. BMI shall have the right, in its sole discretion, to terminate this agreement if:

    A. Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

    (1) Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

    (2) Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

    (3) Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (l) and A (2) of this paragraph 17.

    (4) Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (l) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

    B. Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

    C. Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

    In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

    18. In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

    19. Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against

P800

Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20.  All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21.  Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22.  Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's postal or electronic ("e-mail") address, or facsimile number.  Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last postal or electronic address or facsimile number so furnished by Publisher.

23.  This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24.  Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25.  Publisher authorizes the inclusion of Publisher's name, likeness and biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26.  This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27.  In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28.  Any prior agreements, as modified, between Publisher and BMI are canceled and superseded as of the effective date of this agreement.  All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.

P800                                                                                          Page 8 of 10

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

**BROADCAST MUSIC, INC**

By .................................................................................................................................................
                    Vice President

**"PUBLISHER"**

By ........................................................................... Leslie Bider, President.........................
        (Authorized Signatory)                          (Print Name and Title of Signer)

**If your company structure is a PARTNERSHIP,  all other partners must sign below:**

By ..................................................................................................................................................
                    Partner                                                Printed Name

By ..................................................................................................................................................
                    Partner                                                Printed Name

By ..................................................................................................................................................
                    Partner                                                Printed Name

By ..................................................................................................................................................
                    Partner                                                Printed Name

By ..................................................................................................................................................
                    Partner                                                Printed Name



*THIS PAGE INTENTIONALLY LEFT BLANK*

**BMI**®

001235610

AGREEMENT made on **August 27, 2009** between BROADCAST MUSIC, INC. ("BMI"), a New York
corporation, whose address is 320 West 57th Street, New York, N.Y. 10019-3790 and **John Joseph Bulford III**
an **Individual** doing business as **3JB MUSIC** ("Publisher"), whose address is ███████████████
████████████

# W I T N E S S E T H :

    1.  The term of this agreement shall be the period from **January 1, 2009 to December 31, 2013,**
and continuing thereafter for additional periods of five (5) years each unless terminated by either party
at the end of said initial period or any additional period, upon notice sent by registered, certified, or
Express mail, or other sending method that requires that the date that the item is sent be recorded by the
courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months
prior to the end of any such period.

    2.  As used in this agreement, the word "Work" or "Works" shall mean:

        A.  All musical compositions (including the musical segments and individual compositions written
for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by
Publisher or in which Publisher owns or controls performing rights, and

        B.  All musical compositions (including the musical segments and individual compositions written
for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term
Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date
of the acquisition by Publisher of such ownership or control.

    3.  Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors
or assigns, for the term of this agreement:

        A.  All the rights which Publisher owns or acquires publicly to perform, and to license others to
perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may
be developed, any part or all of the Works.

        B.  The non-exclusive right to record, and to license others to record, any part or all of any of the
Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work
publicly by means of radio and television or for archive or audition purposes. This right does not include recording
for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended
primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations,
cable systems or other similar distribution outlets.

        C.  The non-exclusive right to adapt or arrange any part or all of any of the Works for performance
purposes, and to license others to do so.

    4.  Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

        A.  The rights granted to BMI by said subparagraph A shall not include the right to perform or license
the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,

**THIS PAGE INTENTIONALLY LEFT BLANK**

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1) For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3) In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6. In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.

Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7

A. Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8. In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9

A. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

B. The termination of this agreement shall be deemed subject to any rights or obligations existing between BMI and its licensees under licenses then in effect. As a result thereof, notwithstanding such termination, BMI shall have the right to continue to license all of Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination, until such licenses expire.

10. Notwithstanding the termination of this agreement, all of the terms·and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which may continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

B.  In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C.  In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A.  With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B.  Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C.  The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D.  Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E.  Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

P800                                                                                    Page 5 of  10

13.   Publisher warrants and represents that:

A.   Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B.   Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A.   Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B.   Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense.  Publisher agrees to cooperate with BMI in all such matters.

C.   In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15.   Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder.  In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A.   It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by

any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

   B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory

  17 BMI shall have the right, in its sole discretion, to terminate this agreement if:

   A. Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

    (1) Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

    (2) Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

    (3) Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (1) and A (2) of this paragraph 17

    (4) Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (1) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

   B. Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

   C. Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

   In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17 BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

  18. In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

  19 Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against

P800                          Page 7 of 10

Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works for which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20.  All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party  Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21.  Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22.  Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's postal or electronic ("e-mail") address, or facsimile number.  Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last postal or electronic address or facsimile number so furnished by Publisher.

23.  This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24.  Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25.  Publisher authorizes the inclusion of Publisher's name, likeness and biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26.  This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27   In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28.  Any prior agreements, as modified, between Publisher and BMI are canceled and superseded as of the effective date of this agreement.  All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.

IN WITNESS WHEREOF the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

**BROADCAST MUSIC, INC**

By ........................................................................................................................

      Vice President

---

**"PUBLISHER"**

By ..............................................................     John Bulford

    (Authorized Signatory)         (Print Name and Title of Signer)

**If your company structure is a PARTNERSHIP  all other partners must sign below**

By ..............................................................

    Partner                       Printed Name

By ..............................................................

    Partner                       Printed Name

By ..............................................................

    Partner                       Printed Name

By ..............................................................

    Partner                       Printed Name

By ..............................................................

    Partner                       Printed Name

**THIS PAGE INTENTIONALLY LEFT BLANK**

**BMI**ᵀ

001433462

AGREEMENT made on August 31, 2012 between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 7 World Trade Center, 250 Greenwich Street, New York, N.Y. 10007-0030 and **Patrick Jason Matthews an  Individual** doing business as **FRESH BAKED COOKIES** ("Publisher"), whose address is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## WITNESSETH:

    1.   The term of this agreement shall be the period from  **January 1, 2012 to December 31, 2016,** and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of said initial period or any additional period, upon notice sent by registered, certified, or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such period.

    2.   As used in this agreement, the word "Work" or "Works" shall mean:

        A.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

        B.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

    3.   Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

        A.  All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

        B.  The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

        C.  The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

    4.   Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

        A.  The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,

P800

Page 1 of 10

*THIS PAGE INTENTIONALLY LEFT BLANK*

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B.  Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C.  Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A.  As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1)  For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2)  For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3)  In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B.  Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6.  In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.

Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7.

A. Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8. In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9.

A. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

B. The termination of this agreement shall be deemed subject to any rights or obligations existing between BMI and its licensees under licenses then in effect. As a result thereof, notwithstanding such termination, BMI shall have the right to continue to license all of Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination, until such licenses expire.

10. Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which may continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

P800A                                                                                                    Page 4 of 10

B. In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A. With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

13.   Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B. Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15. Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder. In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B.  Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

17.  BMI shall have the right, in its sole discretion, to terminate this agreement if:

A.  Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

(1)  Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2)  Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3)  Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (l) and A (2) of this paragraph 17.

(4)  Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (l) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B.  Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

C.  Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

18.  In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

19.  Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or  arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other

applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20. All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21. Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22. Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address furnished in writing by Publisher to BMI's Department of Writer/Publisher Administration.

23. This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24. Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25. Publisher authorizes the inclusion of Publisher's name, likeness and biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26. This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27. In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28. All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

**BROADCAST MUSIC, INC**

By ........................................................................................................................................................
Vice President

**"PUBLISHER"**

By ..........................................................................................   Patrick Jason Matthews
(Authorized Signatory)                                    (Print Name and Title of Signer)

If your company structure is a PARTNERSHIP,  all other partners must sign below:

By ........................................................................................................................................................
Partner                                                                Print Name

By ........................................................................................................................................................
Partner                                                                Print Name

By ........................................................................................................................................................
Partner                                                                Print Name

By ........................................................................................................................................................
Partner                                                                Print Name

By ........................................................................................................................................................
Partner                                                                Print Name

THIS PAGE INTENTIONALLY LEFT BLANK

Page 3

# Certificate
## Registration of a Claim to Copyright
in a musical composition the author of which is a citizen or domiciliary of the United
States of America or which was first published in the United States of America

This is To Certify that the statements set forth in this certificate have been made
a part of the records of the Copyright Office. In witness whereof the seal of the
Copyright Office is hereto affixed.

*Abraham L. Kaminstein*

Register of Copyrights
United States of America

**FORM E**

CLASS — **E**

REGISTRATION NO. — **Ep 260746**

DO NOT WRITE HERE



**1. Copyright Claimant(s) and Address(es):**

Name — COMBINE MUSIC CORP.

Address — 812 17th Ave. So.
Nashville, Tenn.

Name —

Address —

**2. Title:** ME AND BOBBY McGEE

(Title of the musical composition)

**3. Authors:**

Name — Kris Kristofferson
(Legal name followed by pseudonym if latter appears on the copies)
Citizenship: U.S.A. **X** Other _____ (Name of country)
Domiciled in U.S.A. Yes **X** No _____ Address Nashville, Tenn. Author of **words & music**
(State which: words, music, arrangement, etc.)

Name — Fred Foster
(Legal name followed by pseudonym if latter appears on the copies)
Citizenship: U.S.A. **X** Other _____ (Name of country)
Domiciled in U.S.A. Yes **X** No _____ Address Nashville, Tenn. Author of **words & music**
(State which: words, music, arrangement, etc.)

Name —
(Legal name followed by pseudonym if latter appears on the copies)
Citizenship: U.S.A. Other _____ (Name of country)
Domiciled in U.S.A. Yes No _____ Address Author of _____
(State which: words, music, arrangement, etc.)

**4. (a) Date of Publication:**

July 17, 1969
(Month) (Day) (Year)

**(b) Place of Publication:**

United States and Canada
(Name of country)

**5. Previous Registration or Publication:**

Was work previously registered? Yes _____ No _____ Date of registration _____ Registration number _____

Was work previously published? Yes _____ No _____ Date of publication _____ Registration number _____

Is there any substantial NEW MATTER in this version? Yes _____ No _____ If your answer is "Yes," give a brief general
statement of the nature of the NEW MATTER in this version.

EXAMINER

Complete all applicable spaces on next page

Deposit account:

Name

Send correspondence to:

Name

Address

Send certificate to:

Type or
Print
name and
Address

| COMBINE MUSIC CORP. |
| 812 17th Ave. So. |
| (Number and street) |
| Nashville, Tenn. 37203 |
| (City) | (State) | (ZIP code) |

## Information concerning copyright in musical compositions

**How To Use Form E.** Form E is appropriate for unpublished and published musical compositions by authors who are citizens or domiciliaries, and for musical compositions first published in the United States.

**What Is a "Musical Composition"?** The term "musical composition" includes compositions consisting of music alone, or of words and music combined. It also includes arrangements and other versions of earlier compositions, if new copyrightable work of authorship has been added.

**Song Lyrics Alone.** The term "musical composition" does not include song poems and other works consisting of words without music. Works of that type are not registrable for copyright in unpublished form.

### Unpublished musical compositions

**How To Register a Claim.** To obtain copyright registration, mail the Register of Copyrights, Library of Congress, Washington, D.C. 20540, one complete copy of the musical composition, an application Form E, properly completed and signed, and a fee of $6. Manuscripts are not returned, so do not send your only copy.

### Published musical compositions

**What Is "Publication"?** Publication, generally, means the placing on sale, or public distribution of copies. Limited distribution of so-called "professional" copies ordinarily would not constitute publication. However, since the dividing line between a preliminary distribution and actual publication may be difficult to determine, it is wise for the author to affix a notice of copyright to copies that are not to be circulated beyond his control.

**How To Secure Copyright in a Published Musical Composition.**
1. Produce copies with copyright notice, by printing or other means of reproduction.
2. Publish the work.
3. Register the copyright claim, following the instructions on page 1 of this form.

**Copyright Notice.** In order to secure and maintain copyright protection for a published work, it is essential that

**—Sound Recordings.** Phonograph records, tape recordings, and other sound recordings are not regarded as "copies" of the musical compositions recorded on them, and are not acceptable for copyright registration. For purposes of deposit, the musical compositions should be written in some form of legible notation. If the composition contains words, they should be written above or beneath the notes to which they are sung.

**Duration of Copyright.** Statutory copyright begins on the date the work was first published, or, if the work was registered for copyright in unpublished form, copyright begins on the date of registration. In either case, copyright lasts for 28 years, and may be renewed for a second 28-year term.

**Procedure To Follow if Work Is Later Published.** If the work is later reproduced in copies and published, it is necessary to make a second registration, following the procedure outlined below. To maintain copyright protection, all copies of the published edition must contain a copyright notice in the required form and position.

all copies published in the United States contain the statutory copyright notice. This notice shall appear on the title page or first page of music and must consist of three elements:
1. The word "Copyright," the abbreviation "Copr.," or the symbol "©." Use of the symbol © may result in securing copyright in countries which are parties to the Universal Copyright Convention.
2. The year date of publication. This is ordinarily the date when copies were first placed on sale, sold, or publicly distributed. However, if the work has been registered for copyright in unpublished form, the notice should contain the year of registration; or, if there is new copyrightable matter in the published version, it should include both dates.
3. The name of the copyright owner (or owners). Example: © John Doe 1968.

NOTE: If copies are published without the required notice the right to secure copyright is lost and cannot be restored.

FOR COPYRIGHT OFFICE USE ONLY

5171 JUL 18 69

Case 3:16-cv-00949 Document 16-3 Filed on 03/23/17 in TXSD Page 80 of 182

ME AND BOBBY McGEE

By KRIS KRISTOFFERSON
and FRED FOSTER

Case 4:14-cv-00010 - Document No. 1 - Filed on 02/10/14 in TXSD - Page 81 of 182





Case 2:16-cr-00XXX   Document 40-1   Filed on 05/XX/17 in TXSD   Page 83 of 182



AGREEMENT made on ......December 1, 1981...... between BROADCAST MUSIC, INC.
("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019 and
.................................... COMBINE MUSIC CORP. ............................

_Maryland corporation_ .............................................

...............................("Publisher"), whose address is ..... 35 Music Square East, Nashville,
_Tennessee 37203_ ....................................

## WITNESSETH:

FIRST: The term of this agreement shall be the period from .....April 1, 1981......
to .....December 31, 1983..., and continuing thereafter for additional periods of five (5) years each unless
terminated by either party at the end of such initial period, or any such additional five (5) year period, upon notice
by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any
such term.

SECOND: As used in this agreement, the word "works" shall mean:

A. All musical compositions (including the musical segments and individual compositions
written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted
by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions
written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during
the term Publisher acquires ownership or copyright or ownership or control of the performing rights, from and
after the date of the acquisition by Publisher of such ownership or control.

THIRD: Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI,
its successors or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others
to perform, anywhere in the world, any part or all of the works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of
the works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such
work publicly by means of radio and television or for archive or audition purposes and not for sale to the public or
for synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs
distributed by means of syndication to broadcasting stations.

C. The non-exclusive right to adapt or arrange any part or all of any of the works for per-
formance purposes, and to license others to do so.

FOURTH:

A. The rights granted to BMI by subparagraph A of paragraph THIRD hereof shall not include
the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-
musical work which is an opera, operetta, or musical show or more than five (5) minutes from a dramatic or dra-
matico-musical work which is a ballet if such performance is accompanied by the dramatic action, costumes or
scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right
jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof
performances of works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but
this right shall not apply to such performances from (1) a score originally written for and performed as part of a
theatrical or television film, (2) a score originally written for and performed as part of a radio or television pro-
gram, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher retains the right to issue non-exclusive licenses for performances of a work or
works (other than to another performing rights licensing organization), provided that within ten (10) days of
the issuance of such license BMI is given written notice of the titles of the works and the nature of the perform-
ances so licensed by Publisher.

FIFTH:

A. As full consideration for all rights granted to BMI hereunder and as security therefor,
BMI agrees to make the following payments to Publisher with respect to each of the works in which BMI has
performing rights:

(1) For performances of works on broadcasting stations in the United States, its terri-
tories and possessions BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of
the then current system generally paid by BMI to its affiliated publishers for similar performances of
similar compositions. The number of performances for which Publisher shall be entitled to payment shall be esti-
mated by BMI in accordance with its then current system of computing the number of such performances.

It is acknowledged that BMI licenses the works of its affiliates for perform-
ance by non-broadcasting means, but that unless and until such time as feasible methods can be devised for tabula-
tion of and payment for such performances, payment will be based solely on broadcast performances. In the event
that during the term of this agreement BMI shall establish a system of separate payment for non-broadcasting per-
formances, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI
to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of works outside of the United States, its territories and pos-
sessions BMI will pay to Publisher all monies received by BMI in the United States from any performing rights
licensing organization which are designated by such organization as the publisher's share of foreign perform-
ance royalties earned by any of the works after the deduction of BMI's then current handling charge applicable to its
affiliated publishers.

(3) In the case of works which, or rights in which, are owned by Publisher jointly with
one or more other publishers who have granted performing rights therein to BMI, the sum payable to Publisher
under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless
BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers
providing for a different division of payment.

B. Notwithstanding the foregoing provisions of this paragraph FIFTH, BMI shall have no
obligation to make payment hereunder with respect to (1) any performance of a work which occurs prior to the date
on which BMI shall have received from Publisher all of the material with respect to such work referred to in sub-
paragraph A of paragraph TENTH hereof, and in the case of foreign performances, the information referred to in
subparagraph B of paragraph FOURTEENTH hereof, or (2) any performance as to which a direct license as de-

scribed in subparagraph C of paragraph FOURTH hereof has been granted by Publisher, its co-publisher or the writer.

SIXTH: BMI will furnish statements to Publisher at least twice during each year of the term showing the number of performances of the works as computed pursuant to subparagraph A(1) of paragraph FIFTH hereof, and at least once during each year of the term showing the monies received by BMI referred to in subparagraph A(2) of paragraph FIFTH hereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for advances or amounts due to BMI from Publisher.

SEVENTH:

A. Nothing in this agreement requires BMI to continue to license the works subsequent to the termination of this agreement. In the event that BMI continues to license any or all of the works, however, BMI shall continue to make payments to Publisher for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such works to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly on demand. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to conform to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by any of the works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers.

C. In the event that BMI has reason to believe that Publisher will receive or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the works during a period when such works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI of the amount so paid to Publisher by such other organization or that Publisher has not been so paid. In the event that Publisher has been so paid, the monies payable by BMI to Publisher for such performances during such period shall be reduced by the amount of the payment from such other organization. In the event that Publisher does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such works during such period.

EIGHTH: In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

NINTH:

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any work which in BMI's opinion (1) is similar to a previously existing composition and might constitute a copyright infringement, or (2) has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition, or (3) is offensive, in bad taste or against public morals, or (4) is not reasonably suitable for performance.

B. In the case of works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such work from this agreement, or (2) to classify any such work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any work is excluded from this agreement pursuant to subparagraph A or B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such work, to terminate all rights in such work granted to BMI herein and all such rights of BMI in such work shall revert to Publisher thirty (30) days after the date of such notice from Publisher to BMI.

TENTH:

A. With respect to each of the works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) Two copies of a completed clearance sheet in the form supplied by BMI, unless a cue sheet with respect to such work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2) If such work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other works, such copy need be furnished only if requested by BMI pursuant to subsection (c) of subparagraph D(2) of this paragraph TENTH.

(3) If such work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, composers, publisher and nature and duration of the use of the work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each clearance sheet or cue sheet shall constitute a warranty by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the works listed thereon has been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is

of such work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To record in the United States Copyright Office in accordance with the Copyright Law of the United States any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish any of the works.

(c) To obtain and deliver to BMI copies of: unpublished and published works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any of the documents referred to in sub-section (b) above.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any work shall revert to the writer or the writer's representative, or (2) copyright protection of any work shall terminate.

ELEVENTH:  Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance sheet or one sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has exclusive performing rights in each of the works by virtue of written grants thereof to Publisher signed by all the authors and composers or other owners of such work.

TWELFTH:

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the right granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any work by BMI or its licensee.

B. Upon the receipt by any of the parties hereto indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

THIRTEENTH:  Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of the said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the works may stand, and is discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit.

FOURTEENTH:

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein after called "foreign territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the works for any foreign territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such foreign territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the works in any foreign territory as part of an agreement for the publication, exploitation or representation of such works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the works are granted for any foreign territory. Such notice shall set forth the title of the work, the country or countries involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the foreign territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any foreign territory.

C. In the event that BMI transmits to Publisher performance royalties designated as the writer's share of performance royalties earned by any of the works in any foreign territory, Publisher shall promptly pay such royalties to the writer or writers of the works involved. If Publisher is unable for any reason to locate and make payment to any of the writers involved within six (6) months from the date of receipt, the amounts due such writers shall be returned to BMI.

FIFTEENTH:

A. Publisher agrees that Publisher, its agents, employees, representatives or affiliated companies, will not directly or indirectly during the term of this agreement:

(1) Solicit or accept payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(4) Subject to BMI as one of the works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(3) of this paragraph FIFTEENTH have been made by or on behalf of a champion or another to any person, firm, corporation or association.

B. Publisher agrees that Publisher, its agents, employees or representatives will not directly or indirectly during the term of this agreement make any effort to ascertain from, or offer any inducement by, consideration to anyone, including but not limited to any broadcasting licensee of BMI or its agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times which any such BMI licensee is to report its performances to BMI or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C. Publisher agrees to notify BMI promptly in writing (1) of any change of firm name of Publisher; and (2) of any change of twenty percent (20%) or more in the ownership thereof.

D. In the event of the violation of any of the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall have the right, in its sole discretion, to terminate this agreement by giving Publisher at least thirty (30) days' notice by registered or certified mail. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH: In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by it pursuant to paragraph TWENTIETH hereof shall be returned by the last office, or (2) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher pursuant to paragraph TWENTIETH hereof and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH: Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold absolute title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupt, BMI shall retain title to the performing rights in all works for which clearance sheets shall have theretofore been submitted to BMI and shall subrogate Publisher's trustee in bankruptcy or relative and any subsequent purchasers from them to Publisher's right to payment of money for said works in accordance with the terms and conditions of this agreement.

EIGHTEENTH: Any controversy or claim arising out of, or relating to, the agreement or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. Such award shall include the fixing of the expenses of the arbitration, including reasonable attorney's fees, which shall be borne by the unsuccessful party.

NINETEENTH: Publisher agrees, that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH: Publisher agrees to notify BMI's Department of Performing Rights Administration promptly in writing of any change in its address. Any notice sent to Publisher at the terms of this agreement shall be valid if addressed to Publisher at the last address so furnished by Publisher.

TWENTY-FIRST: This agreement cannot be changed orally and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND: In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

TWENTY-THIRD: This agreement, as of its effective date, cancels and supersedes the agreement between the parties dated ____March 28, 1980____ and all modifications thereof (herein called the "Superseded Agreement"). All works embraced by the Superseded Agreement shall be deemed embraced by this agreement.

It is agreed that any part of any advances heretofore made to Publisher pursuant to the Superseded Agreement which shall not have been recouped by performances of works up to the effective date of this agreement shall be deemed to be an advance against all monies which may become payable to Publisher pursuant to this agreement and any extensions or modifications thereof or substitutions therefor.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC.

By _____

COMBINE MUSIC CORP.

By _____
              President

GFR:rls

# FORM CORDS

**For a Work of the Performing Arts**
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

## PA 1-167-207

EFFECTIVE DATE OF REGISTRATION

### March 15, 2007

| Application received: | 19Mar07 |
|---|---|
| Fee received: | 19Mar07 |
| Deposit received: | 19Mar07 |

**TITLE OF WORK:**
REHAB as contained in "REHAB"| UNIVERSAL/ISLAND #602517095359

**NATURE OF WORK:**
WORDS AND MUSIC

| Name of Author: | AMY WINEHOUSE |
|---|---|
| "Work made for hire"? | No |
| Anonymous contribution? | No |
| Pseudonymous contribution? | No |
| Citizen of: | UNITED KINGDOM |
| Domiciled in: | |
| Nature of authorship: | WORDS & MUSIC |

**YEAR OF CREATION:**
2006

**PUBLICATION:**
Date: October 24, 2006
Nation: UNITED KINGDOM

**COPYRIGHT CLAIMANT(S):**
Claimant #1:
EMI MUSIC PUB. LTD. (C/O EMI BLACKWOOD MUSIC INC.)
810 7TH AVENUE, 36TH FLOOR
NEW YORK, NY 10019

**TRANSFER:**
BY VIRTUE OF WRITTEN AGREEMENT

**PREVIOUS REGISTRATION: Has registration for this work or for an earlier version of this work already been made in the Copyright Office?**
No.

**DEPOSIT ACCOUNT: The fee for this registration has been charged to the following account:**
Name: EMI MUSIC PUBLISHING (CORDS)
Account Number: 090557

**Copyright Office Annotations:**                                   Examined by:      db
                                                                    Correspondence:  Yes

**CORRESPONDENCE:** Correspondence about this application may be addressed to:
EMI MUSIC PUBLISHING
810 7TH AVENUE, 36TH FLOOR
NEW YORK, NY 10019

| | |
|---|---|
| **Daytime phone number:** | 212-830-5107 |
| **Evening phone number:** | 212-830-5107 |
| **FAX number:** | 212-830-5198 |
| **Email address:** | rcabiltes@emimusicpub.com |

**PERSON TO CONTACT FOR RIGHTS AND PERMISSIONS:**
EMI MUSIC PUBLISHING
Attn: RON CABILTES
810 7TH AVENUE, 36TH FLOOR
NEW YORK, NY 10019

| | |
|---|---|
| **Daytime phone number:** | 212-830-5107 |
| **FAX number:** | 212-830-5198 |
| **Email address:** | rcabiltes@emimusicpub.com |

I, the undersigned, hereby certify that I have the authority to submit this application and that the statements made herein are correct to the best of my knowledge.
/C=US/ST=AL/O=EMI Music Publishing/OU=Copyright/CN=Ronald Cabiltes/
The digital signature of the applicant is on file.

*End of Copyright Registration Data*

*This space is intentionally left blank.*

**MAIL CERTIFICATE TO:**
EMI MUSIC PUBLISHING
ATTN: RON CABILTES
810 7TH AVENUE, 36TH FLOOR
NEW YORK, NY 10019

* 17 U.S.C. § 506(e):Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.



AGREEMENT made on January 23, 2006 between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y.10019-3790 and EMI Blackwood Music Inc., a Connecticut corporation ("Publisher"), whose address is c/o EMI Entertainment World Inc., 810 Seventh Avenue, New York, NY 10019-5818

### W I T N E S S E T H :

1.  The term of this agreement shall be the period from   April 1, 2005  to   December 31, 2008,   and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of said initial period or any additional period, upon notice sent by registered, certified or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such period.

2.  As used in this agreement, the word "Work" or "Works" shall mean:

A.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

3.  Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A.  All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

B.  The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

C.  The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

4.  Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

A.  The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,

THIS PAGE INTENTIONALLY LEFT BLANK

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B.  Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C.  Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A.  As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1)  For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2)  For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3) In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B.  Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6.  In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.

P800

Page 3 of 10

Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7.

A. Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8. In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9.

A. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

~~B. The termination of this agreement shall be deemed subject to any right or obligations existing between BMI and its licensees under licenses then in effect. Accordingly, notwithstanding such termination, BMI shall have the right to continue to license the Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination until such licenses expire.~~ *you may choose to*

10. Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which ~~may~~ continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

P800                                                                                     Page 4 of 10

B. In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A. With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

13. Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B. Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15. Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder. In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by

any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

17.   BMI shall have the right, in its sole discretion, to terminate this agreement if:

A.  Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

(1)  Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2)  Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3)  Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (1) and A (2) of this paragraph 17.

(4)  Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (1) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B.  Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

C.  Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

18.   In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

19.   Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against

Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20. All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21. Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22. Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's postal or electronic ("e-mail") address, or facsimile number. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last postal or electronic address or facsimile number so furnished by Publisher.

23. This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24. Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25. Publisher authorizes the inclusion of Publisher's name, likeness and biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26. This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27. In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28. Any prior agreements, as modified, between Publisher and BMI are canceled and superseded as of the effective date of this agreement. All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC

By ......................................................................................................................................

Vice President

"PUBLISHER"

By ....................................................Martin Bandier, Chairman and CEO....................
   (Authorized Signatory)                  (Print Name and Title of Signer)

If your company structure is a PARTNERSHIP, all other partners must sign below:

By ......................................................................................................................................
   Partner                                     Printed Name

By ......................................................................................................................................
   Partner                                     Printed Name

By ......................................................................................................................................
   Partner                                     Printed Name

By ......................................................................................................................................
   Partner                                     Printed Name

By ......................................................................................................................................
   Partner                                     Printed Name

THIS PAGE INTENTIONALLY LEFT BLANK



AGREEMENT made as of this 2nd day of June 1989 BETWEEN EMI
MUSIC PUBLISHING LIMITED of 127 Charing Cross Road, London WC2H
OEA, England ("the Owner") of the one part and EMI APRIL MUSIC INC.
and EMI BLACKWOOD MUSIC INC. both of 1290 Avenue of the Americas,
New York, NY 10104, U.S.A. ("the Publisher") of the other part.

WHEREAS IT IS AGREED as follows:-

## 1. DEFINITIONS:-

In this Agreement the following terms shall where the context so
requires or admits have the following meanings:-

(a) "the Owner" shall mean EMI Music Publishing Limited together
with all of its subsidiary companies and its and their trading
names as set out in the Schedule hereto and marked Annexure 'A'
including, without limitation, EMI Songs Limited and EMI United
Partnership Limited (together "NewCos"), which list may be added to
or reduced during the Term.

(b) "the Term" shall mean the initial period of 1 (one) month
commencing on the date hereof. The Term shall be automatically
renewed for additional periods of 1 (one) month each from the
expiration of the initial period unless either party shall sent
notice to the other prior to the expiration of any such 1 (one)
month period. In the event that such notice is sent the term will
expire on the last day of the month in which it was given.

(c) "the Compositions" shall mean:

(i) the Prior Compositions, and

(ii) the words and music of all musical compositions
hereafter acquired or controlled by the Owner during the Term
pursuant to agreements entered into on or after 2nd June 1989 other
than in the case of the NewCos insofar as the Owner has acquired
rights therein for the Licensed Territory, and

(iii) the words and music of any other musical compositions
presently owned or controlled by the Owner which the Owner and the
Publisher agree during the Term shall be made available to the
Publisher for the Licensed Territory, and

(iv) notwithstanding anything to the contrary contained
herein the words and music of the musical compositions included or
to be included in the KPM Music Limited Recorded Music Library, the
Berry Music Company Limited Conroy Library, the Themes
International (Music) Limited Recorded Music Library and the
Francis Day and Hunter Limited Mood Music Recorded Library are
excluded from this Agreement.

(d) "the Prior Compositions" shall mean all those musical
compositions which are the subject matter of all agreements between

NewCos and EMI Entertainment World Inc. prior to this Agreement, the rights in which have reverted to the Owner upon the expiry of the said prior agreements.

(e)  "the Licensed Territory" shall mean the territory of the United States of America, Canada and save in the case of Compositions owned and/or controlled by the NewCos, Israel.

(f)  "IMP" shall mean International Music Publications of Southend Road, Woodford Green, Essex IG8 8HN, England.

(g)  "Videogram" shall mean audio visual records or similar contrivances where the audio-visual content is 50% (or more) of the running time of such contrivance (including but without limitation computer software incorporating not only sonic reproduction of the Compositions but also visual reproduction of the lyrics thereto on a screen or by a print out).

2.   GRANT OF RIGHTS:-

In consideration of the royalties hereinafter agreed to be paid and of the obligations on the Publisher's part contained herein the Owner hereby grants by way of licence only to the Publisher subject to the terms and conditions hereof (and in particular to Clauses 4 and 9 hereof) the following rights in and to the Compositions and each of them to the extent that the Owner owns or controls the Compositions for the Licensed Territory for the Term.

(a)  (i)   The non-exclusive right to print publish and sell the same in any and all parts of the Licensed Territory and the non-exclusive right to include any of the Compositions in any album book or folio.  The only third party having the right to print publish and sell copies of the Compositions in the Licensed Territory is IMP.

(ii)  In the event that the Publisher or the Publisher's licensee in the Licensed Territory should reject any particular printed project of the Owner then the Owner shall be free to appoint a third party in place of the Publisher or the Publisher's licensee insofar as it is necessary to comply with Owner's prior contractual commitments with third parties.

(iii) The Owner shall from time to time inform the Publisher of Compositions which may not be included in any album, book, folio, newspaper, magazine or periodical or where such right is limited in which case the Publisher agrees to abide by the direction of the Owner in each case.

(iv)  Subject to any pre-existing arrangements or agreements entered into by the Owner with any third party and sub-clause (i) above the Publisher shall have the exclusive right to import publications containing the Compositions or any of them into the Licensed Territory for sale in the Licensed Territory only.

P.3

(v)   The grant of rights made in this sub-clause (a) does not include the Copyright in the artwork and the compilation (if any) in respect of publications produced by or on behalf of the Owner outside the Licensed Territory.  In the event that the Publisher should wish to use any such artwork and/or compilation in its own publications the Publisher may do so having first obtained the prior written permission of the relevant Copyright owner in each case.

(b)   The exclusive right to collect all monies arising from the local performing right societies in the Licensed Territory from the issuance of licences for public performance, including broadcasting or television (whether by conventional means or by cable or satellite or such other means as may be devised).  For the avoidance of doubt no person firm or company (including but without limitation the Publisher) other than the appropriate performing right societies in the Licensed Territory has any right to deal in performing and broadcast rights.

(c)   The exclusive right to authorise mechanical or electrical reproduction in the making of audio gramophone records or similar contrivances or such other media for audio only reproduction as may be devised or utilised (including any audio-visual record or similar contrivance where the audio-visual content is less than 50% of the running time) for sale to the public in the Licensed Territory and to collect all mechanical royalties and fees payable on audio gramophone records or similar contrivances or such other media for audio only reproduction as may be devised or utilised sold in the Licensed Territory wherever manufactured.

(d)   (i)   The exclusive right to authorise mechanical or electrical reproduction in the manufacture of copies of Videograms in the Licensed Territory and to collect all royalties and fees payable on such Videograms regardless of where the same may be sold, PROVIDED THAT the Publisher shall obtain the Owner's prior written permission in respect of each such licence granted for the use of any of the Compositions and PROVIDED FURTHER THAT the Publisher shall forthwith send to the Owner details of all video licences issued by the Publisher or on its behalf.

(ii)   The Owner reserves unto itself the exclusive right to authorise mechanical or electrical reproduction in the manufacture of copies of Videograms in all countries of the world outside the Licensed Territory for sale to the public (including in the Licensed Territory) and to collect all royalties and fees payable on such Videograms aforesaid.

(e)   The exclusive right to grant non-exclusive world licences for the recording, reproduction and use of the Compositions in and in connection with motion pictures or television productions (including but without limitation commercials and advertisements) intended to be used in any media now known or hereafter devised (including but without limitation cable and satellite television) produced in the Licensed Territory and the making of copies thereof, of exporting such copies to all countries of the world,

COPYRIGHT DEPT

P.4

Publisher. This Agreement constitutes the entire agreement between Owner and Publisher at the date hereof with regard to the sub-publishing of the Compositions and the parties hereto enter into it solely on that basis without reliance on any other representations whatsoever.

24. **PROPER LAW**:-

(a) This Agreement shall be governed by the laws of England and the High Court of Justice in England shall be the Court of Jurisdiction.

(b) Nothing contained in this Agreement shall in any way restrict the Owner's and the Publisher's rights pursuant to the Treaty of Rome and any subsidiary or amending legislation or agreements relating thereto.

SIGNED by )  .......................................
)
)
)
AND by )  .......................................
Directors for and on behalf )
of EMI MUSIC PUBLISHING )
LIMITED )

SIGNED by )  .......................................
)
)
)
AND by )  .......................................
Directors for and on behalf )
of EMI APRIL MUSIC INC. )

SIGNED by )  .......................................
)
)
)
AND by )  .......................................
Directors for and on behalf )
of EMI BLACKWOOD MUSIC INC. )



**CERTIFICATE OF REGISTRATION**

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Barbara Ringer*

ACTING REGISTER OF COPYRIGHTS
United States of America

OFFICIAL SEAL

**FORM PA**
For a Work of the Performing Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**PA 708-854**

PAU

**EFFECTIVE DATE OF REGISTRATION**
MAY 31, 1994
Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

TITLE OF THIS WORK ▼
ROUND HERE

PREVIOUS OR ALTERNATIVE TITLES ▼

NATURE OF THIS WORK ▼ See Instructions
WORDS AND MUSIC

---

**2**

**a**

NAME OF AUTHOR ▼
DURITZ, ADAM          ROLDAN, CHRIS

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ UNITED STATES
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☒ No
Pseudonymous?  ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire"

NATURE OF AUTHORSHIP Briefly describe nature of the material created by this author in which copyright is claimed. ▼
WORDS AND MUSIC

**b**

NAME OF AUTHOR ▼
BRYSON, DAVID          GILLINGHAM, CHARLIE
JANUSCO, DAVE

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ UNITED STATES
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☒ No
Pseudonymous?  ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of the material created by this author in which copyright is claimed. ▼
WORDS AND MUSIC

**c**

NAME OF AUTHOR ▼
MALLEY, MATT          BOHGAN, STEVE
JEWETT, DAN

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ UNITED STATES
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☒ No
Pseudonymous?  ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of the material created by this author in which copyright is claimed. ▼
WORDS AND MUSIC

---

**3**

**a**
YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
1993 ◀ Year

**b**
DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ 09   Day ▶ 14   Year ▶ 1993
UNITED STATES ◀ Nation

---

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼ THIS OUGHT TO GET ME A NEW GUITAR
EMI BLACKWOOD MUS. INC., FREE OHIO MUS., JONES FALLS MUS., PORK CHOPS AND APPLESAUCE PUB.,
810 Seventh Avenue, New York, New York 10019

TRANSFER If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼
BY VIRTUE OF WRITTEN AGREEMENT

APPLICATION RECEIVED
MAY 31 1994

ONE DEPOSIT RECEIVED
MAY 31 1994

TWO DEPOSITS RECEIVED

REMITTANCE NUMBER AND DATE

---

MORE ON BACK ▶  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.   • Sign the form at line 8.

DO NOT WRITE HERE

EXAMINED BY ___UF___   FU.

CHECKED BY _____

☐ CORRESPONDENCE
   Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▼   **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.
a. **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

b. **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

See instructions
before completing
this space.

**6**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
**Name** ▼                                 **Account Number** ▼

EMI BLACKWOOD MUSIC INC.                 DAO 17582

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

KENNETH HIGNEY

EMI MUSIC PUBLISHING

810, 7TH AVENUE - 36TH FLOOR

NEW YORK, NEW YORK, 10019

Area Code & Telephone Number ▶   212-830-2000 (EXT: 4053)

Be sure to
give your
daytime phone
number

**7**

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▼

☐ author

☐ other copyright claimant

☐ owner of exclusive rights

☒ authorized agent of   CLAIMANTS OF SPACE 4

Name of author or other copyright claimant, or owner of exclusive rights ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

**Typed or printed name and date** ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

KENNETH HIGNEY                                date ▶ 05/03/94

Handwritten signature (X) ▼

**8**

MAIL
CERTIFI-
CATE TO

Name ▼   EMI BLACKWOOD MUSIC INC.
          ATTENTION: KENNETH HIGNEY
Number/Street/Apt ▼
810 SEVENTH AVENUE - 36TH FLOOR

Certificate
will be
mailed in
window
envelope

City/State/ZIP ▼
NEW YORK, NEW YORK - 10019

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

# ROUND HERE

Words and Music by ADAM DURITZ, DAVID BRYSON,
MATT MALLEY, STEVE BOWMAN, CHARLIE GILLINGHAM,
CHRIS ROLDAN, DAN JEWETT and DAVE JANUSCO



© 1993 EMI BLACKWOOD MUSIC INC., JONES FALLS PUBLISHING, PORK CHOPS AND APPLESAUCE PUBLISHING.
THIS OUGHT TO GET ME A NEW GUITAR MUSIC and FREE OHIO PUBLISHING.
All Rights Controlled and Administered by EMI BLACKWOOD MUSIC INC.
All Rights Reserved   International Copyright Secured   Used by Permission









IMPD.IT. 53.64 14.02/21 E1/45/NO 8261326165 E.1/8



**BMI**

**AGREEMENT** made on ......December..13,..1993............... between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019 and

Adam..Frederic..Duritz,...David..Lynn..Bryson,...Steve..Bowman,...Matthew..Mark..Malley,...Charles Thomas Gillingham
a "partnership" ......................................... doing business as ...JONES..FALLS..MUSIC.............

................................("Publisher"), whose address is ...c/o..Segal..&..Feldstein..............................
   1900  Bundy  Ste.  200      Los  Angeles,  CA.   90025

### WITNESSETH:

**FIRST:** The term of this agreement shall be the period from ...October..1,..1993.........................

to ....September..30,...1998..........., and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of such initial period, or any such additional five (5) year period, upon notice by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any such term.

**SECOND:** As used in this agreement, the word "works" shall mean:

**A.** All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

**B.** All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership or copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

**THIRD:** Except as otherwise provided herein. Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

**A.** All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, any part or all of the works.

**B.** The non-exclusive right to record, and to license others to record, any part or all of any of the works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such work publicly by means of radio and television or for archive or audition purposes and not for sale to the public or for synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations.

**C.** The non-exclusive right to adapt or arrange any part or all of any of the works for performance purposes, and to license others to do so.

**FOURTH:**

**A.** The rights granted to BMI by subparagraph A of paragraph THIRD hereof shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta, or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

**B.** Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof performances of works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for and performed as part of a theatrical or television film, (2) a score originally written for and performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

**C.** Publisher retains the right to issue non-exclusive licenses for performances of a work or works (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license BMI is given written notice of the titles of the works and the nature of the performances so licensed by Publisher.

**FIFTH:**

**A.** As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the works in which BMI has performing rights:

(1) For performances of works on broadcasting stations in the United States, its territories and possessions BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

It is acknowledged that BMI licenses the works of its affiliates for performance by non-broadcasting means, but that unless and until such time as feasible methods can be devised for tabulation of and payment for such performances, payment will be based solely on broadcast performances. In the event that during the term of this agreement BMI shall es ablish a system of separate payment for non-broadcasting performances, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of works outside of the United States, its territories and possessions BMI will pay to Publisher all monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the works after the deduction of BMI's then current handling charge applicable to its affiliated publishers.

(3) In the case of works which, or rights in which, are owned by Publisher jointly with one or more other publishers who have granted performing rights therein to BMI, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

**B.** Notwithstanding the foregoing provisions of this paragraph FIFTH, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such work referred to in subparagraph A of paragraph TENTH hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph FOURTEENTH hereof, or (2) any performance as to which a direct license as de-

writer.

**SIXTH:**. BMI will furnish statements to Publisher at least twice during each year of the term showing the number of performances of the works as computed pursuant to subparagraph A(1) of paragraph FIFTH hereof, and at least once during each year of the term showing the monies received by BMI referred to in subparagraph A(2) of paragraph FIFTH hereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for advances or amounts due to BMI from Publisher.

**SEVENTH:**

A. Nothing in this agreement requires BMI to continue to license the works subsequent to the termination of this agreement. In the event that BMI continues to license any or all of the works, however, BMI shall continue to make payments to Publisher for so long as Publisher does not make or purport to make directly or in-directly any grant of performing rights in such works to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly on demand. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm its BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant. BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by any of the works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers.

C. In the event that BMI has reason to believe that Publisher will receive or is receiving pay-ment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the works during a period when such works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI of the amount so paid to Publisher by such other organization or that Publisher has not been so paid. In the event that Publisher has been so paid, the monies payable by BMI to Publisher for such performances during such period shall be reduced by the amount of the payment from such other organization. In the event that Publisher does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such works during such period.

**EIGHTH:** In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an un-earned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

**NINTH:**

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any work which in BMI's opinion (1) is similar to a previously existing composition and might consti-tute a copyright infringement, or (2) has a title or music or lyric similar to that of a previously existing composi-tion and might lead to a claim of unfair competition, or (3) is offensive, in bad taste or against public morals, or (4) is not reasonably suitable for performance.

B. In the case of works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such work from this agreement, or (2) to classify any such work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any work is excluded from this agreement pursuant to subparagraph A or B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such work, to terminate all rights in such work granted to BMI herein and all such rights of BMI in such work shall revert to Publisher thirty (30) days after the date of such notice from Publisher to BMI.

**TENTH:**

A. With respect to each of the works which has been or shall be published or recorded com-mercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) Two copies of a completed clearance sheet in the form supplied by BMI, unless a cue sheet with respect to such work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2) If such work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such work setting forth the lyrics, if any, and music correctly metered: pro-vided that with respect to all other works, such copy need be furnished only if requested by BMI pursuant to sub-section (c) of subparagraph D(2) of this paragraph TENTH.

(3) If such work has been or shall be synchronized with or otherwise used in connec-tion with motion picture or television film or tape, a cue sheet showing the title, composers, publisher and nature and duration of the use of the work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the works hereafter so published, recorded, synchronized or likely to be per-formed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each clearance sheet or cue sheet shall constitute a warranty by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the works listed thereon has been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the works pursuant to the Copy-right Law of the United States and pursuant to the laws of such other nations of the world where such protection is

afforded; and to give BMI prompt written notice of the date and number of copyright registration and/or renewal of each work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To record in the United States Copyright Office in accordance with the Copyright Law of the United States any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish any of the works.

(c) To obtain and deliver to BMI copies of: unpublished and published works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any of the documents referred to in sub-section (b) above.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any work shall revert to the writer or the writer's representative, or (2) copyright protection of any work shall terminate.

ELEVENTH: Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance sheet or cue sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has exclusive performing rights in each of the works by virtue of written grants thereof to Publisher signed by all the authors and composers or other owners of such work.

TWELFTH:

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any work by BMI or its licensees.

B. Upon the receipt by any of the parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

THIRTEENTH: Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of the said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyright to any of the works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit.

FOURTEENTH:

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (hereinafter called "foreign territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the works for any foreign territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such foreign territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the works in any foreign territory as part of an agreement for the publication, exploitation or representation of such works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the works are granted for any foreign territory. Such notice shall set forth the title of the work, the country or countries involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the foreign territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any foreign territory.

C. In the event that BMI transmits to Publisher performance royalties designated as the writer's share of performance royalties earned by any of the works in any foreign territory, Publisher shall promptly pay such royalties to the writer or writers of the works involved. If Publisher is unable for any reason to locate and make payment to any of the writers involved within six (6) months from the date of receipt, the amounts due such writers shall be returned to BMI.

FIFTEENTH:

A. Publisher agrees that Publisher, its agents, employees, representatives or affiliated companies, will not directly or indirectly during the term of this agreement:

(1) Solicit or accept payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

to solicit or accept making or join in composing, or authors in collaboration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permit Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH.

(4) Submit to BMI, as one of the works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher agrees that Publisher, its agents, employees or representatives will not directly or indirectly during the term of this agreement make any effort to ascertain from, or offer any inducement or consideration to, anyone, including but not limited to any broadcasting licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C. Publisher agrees to notify BMI promptly in writing (1) of any change of firm name of Publisher, and (2) of any change of twenty percent (20%) or more in the ownership thereof.

D. In the event of the violation of any of the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall have the right, in its sole discretion, to terminate this agreement by giving Publisher at least thirty (30) days' notice by registered or certified mail. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH: In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by it pursuant to paragraph TWENTIETH hereof shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher pursuant to paragraph TWENTIETH hereof and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH: Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold absolute title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all works for which clearance sheets shall have theretofore been submitted to BMI and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said works in accordance with the terms and conditions of this agreement.

EIGHTEENTH: Any controversy or claim arising out of, or relating to, this agreement or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. Such award shall include the fixing of the expenses of the arbitration, including reasonable attorney's fees, which shall be borne by the unsuccessful party.

NINETEENTH: Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH: Publisher agrees to notify BMI's Department of Performing Rights Administration promptly in writing of any change in its address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address so furnished by Publisher.

TWENTY-FIRST: This agreement cannot be changed orally and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND: In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC.

By ....................................................

Rick Riccobono
Vice President

JONES FALLS MUSIC

By ....................................................
(Title of Signer)
Partner

Adam Frederic Duritz

# BMI

November 1, 2002

Free Ohio Pub
Attn: Mr. Dave A. Janusko
44 Albion Street
San Francisco, CA 94103

Dear Mr. Janusko:

**Round Here**          **Pa 708-854**          **May 31, 1994**

**David Janusko, Steve Bowman, Adam Duritz, Dan Jewett, Matthew Malley, Christopher Roldan, David Bryson, and Charles Gillingham**

In reference to above named document, **can you please confirm that Free Ohio Music** and **Free Ohio Pub are one and the same entity.**

Accepted and Agreed to:

Free Ohio Pub                     Very Truly Yours,

please sign name here            Janet Gaines

0 1 7 1 1 2 1 5 1 0 0

R8188

AGREEMENT made on ......April 29, 1993............... between BROADCAST MUSIC, INC.
("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019 and
Dave A. Janusko

....n individual............................... doing business as FREE OHIO PUR........
.....................................("Publisher"), whose address is

## WITNESSETH:

**FIRST:** The term of this agreement shall be the period from ..... April 1, 1993 ..........

to ..... March 31, 1998 .... .., and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of each initial period, or any such additional five (5) year period, upon notice by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any such term.

**SECOND:** As used in this agreement, the word "works" shall mean:

A. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership or copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

**THIRD:** Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, any part or all of the works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of the works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such work publicly by means of radio and television or for archive or audition purposes and not for sale to the public or for synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations.

C. The non-exclusive right to adapt or arrange any part or all of any of the works for performance purposes, and to license others to do so.

**FOURTH:**

A. The rights granted to BMI by subparagraph A of paragraph THIRD hereof shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta, or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof performances of works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for and performed as part of a theatrical or television film, (2) a score originally written for and performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher retains the right to issue non-exclusive licenses for performances of a work or works (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license BMI is given written notice of the titles of the works and the nature of the performances so licensed by Publisher.

**FIFTH:**

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the works in which BMI has performing rights:

(1) For performances of works on broadcasting stations in the United States, its territories and possessions BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar composition. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

It is acknowledged that BMI licenses the works of its affiliates for performances by non-broadcasting means, but that unless and until such time as feasible methods can be devised for tabulation of and payment for such performances, payment will be based solely on broadcast performances. In the event that during the term of this agreement BMI shall establish a system of separate payment for non-broadcasting performances, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of works outside of the United States, its territories and possessions BMI will pay to Publisher all monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the works after the deduction of BMI's then current handling charge applicable to its affiliated publishers.

(3) In the case of works which, or rights in which, are owned by Publisher jointly with one or more other publishers who have granted performing rights therein to BMI, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the foregoing provisions of this paragraph FIFTH, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such work referred to in subparagraph A of paragraph TENTH hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph FOURTEENTH hereof, or (2) any performance as to which a direct license as de-

SIXTH: BMI will furnish statements to Publisher at least twice during each year of the term showing the number of performances of the works as computed pursuant to subparagraph A(1) of paragraph FIFTH hereof, and at least once during each year of the term showing the monies received by BMI referred to in subparagraph A(2) of paragraph FIFTH hereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for advances or amounts due to BMI from Publisher.

SEVENTH:

A. Nothing in this agreement requires BMI to continue to license the works subsequent to the termination of this agreement. In the event that BMI continues to license any or all of the works, however, BMI shall continue to make payments to Publisher for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such works to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly on demand. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by any of the works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers.

C. In the event that BMI has reason to believe that Publisher will receive or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the works during a period when such works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI of the amount so paid to Publisher by such other organization, or that Publisher has not been so paid. In the event that Publisher has been so paid the monies payable by BMI to Publisher for such performances during such period shall be reduced by the amount of the payment from such other organization. In the event that Publisher does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such works during such period.

EIGHTH: In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

NINTH:

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any work which in BMI's opinion (1) is similar to a previously existing composition and might constitute a copyright infringement, or (2) has a title or meter or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition, or (3) is offensive, in bad taste or against public morals, or (4) is not reasonably suitable for performance.

B. In the case of works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such work from this agreement, or (2) to classify any such work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any work is excluded from this agreement pursuant to subparagraph A or B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such work, to terminate all rights in such work granted to BMI herein and all such rights of BMI in such work shall revert to Publisher thirty (30) days after the date of such notice from Publisher to BMI.

TENTH:

A. With respect to each of the works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) Two copies of a completed clearance sheet in the form supplied by BMI, unless a cue sheet with respect to such work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2) If such work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other works, such copy need be furnished only if requested by BMI pursuant to subsection (c) of subparagraph D(2) of this paragraph TENTH.

(3) If such work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, composers, publisher and nature and duration of the use of the work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each clearance sheet or cue sheet shall constitute a warranty by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the works listed thereon has been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is

afforded; and to give BMI prompt written notice of the date and number of copyright registration and/or renewal of each work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To record in the United States Copyright Office in accordance with the Copyright Law of the United States any agreements, assignments, instruments or documents or any kind by which Publisher obtained the right to publicly perform and/or the right to publish, so publish or sub publish any of the works.

(c) To obtain and deliver to BMI copies of: unpublished and published works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any of the documents referred to in sub-section (b) above.

F. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any such shall revert to the writer or the writer's representative, or (2) copyright protection of any work shall terminate.

**ELEVENTH:** Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance sheet or cue sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has exclusive performing rights in each of the works by virtue of written grants thereof to Publisher signed by all the authors and composers or other owners of such work.

**TWELFTH:**

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensors, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any work by BMI or its licensees.

B. Upon the receipt by any of the parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

**THIRTEENTH:** Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of the said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit.

**FOURTEENTH:**

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein after called "foreign territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the works for any foreign territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such foreign territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the works in any foreign territory as part of an agreement for the publication, exploitation or representation of such works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the works are granted for any foreign territory. Such notice shall set forth the title of the work, the country or countries involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the foreign territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing right, and/or the right to collect publisher performance royalties earned in any foreign territory.

C. In the event that BMI transmits to Publisher performance royalties designated as the writer's share of performance royalties earned by any of the works in any foreign territory, Publisher shall promptly pay such royalties to the writer or writers of the works involved. If Publisher is unable for any reason to locate and make payment to any of the writers involved within six (6) months from the date of receipt, the amounts due such writers shall be returned to BMI.

**FIFTEENTH:**

A. Publisher agrees that Publisher, its agents, employees, representatives or affiliated companies, will not directly or indirectly during the term of this agreement:

(1) Solicit or accept payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permit Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH.

(4) Submit to BMI, as one of the works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher agrees that Publisher, its agents, employees or representatives will not directly or indirectly during the term of this agreement make any effort to ascertain from, or offer any inducement or consideration to, anyone, including but not limited to any broadcasting licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C. Publisher agrees to notify BMI promptly in writing (1) of any change of firm name of Publisher, and (2) of any change of twenty percent (20%) or more in the ownership thereof.

D. In the event of the violation of any of the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall have the right, in its sole discretion, to terminate this agreement by giving Publisher at least thirty (30) days' notice by registered or certified mail. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH: In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by it pursuant to paragraph TWENTIETH hereof shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher pursuant to paragraph TWENTIETH hereof and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH: Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold absolute title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all works for which clearance sheets shall have theretofore been submitted to BMI and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said works in accordance with the terms and conditions of this agreement.

EIGHTEENTH: Any controversy or claim arising out of, or relating to, this agreement or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. Such award shall include the fixing of the expenses of the arbitration, including reasonable attorney's fees, which shall be borne by the unsuccessful party.

NINETEENTH: Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH: Publisher agrees to notify BMI's Department of Performing Rights Administration promptly in writing of any change in its address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address so furnished by Publisher.

TWENTY-FIRST: This agreement cannot be changed orally and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND: In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC.

By ... _Evilina Cano_

Vice President

FREE OHIO PUB.

By _[signature]_ Owner

DAVE A. JANUSKO

**BMI**

AGREEMENT made on ....**April 1, 1982**................... between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019 and ....................**BLACKWOOD MUSIC, INC.**.......................................................... a ..**Connecticut corporation** xxxxxxxxxxxx ............................................... ...................................("Publisher"), whose address is ..**1350 Avenue of the Americas,** **New York, New York 10019**.........................................................................

## W I T N E S S E T H :

FIRST: The term of this agreement shall be the period from ......**July 1, 1981**............................... to ....**December 31, 1985**......., and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of such initial period, or any such additional five (5) year period, upon notice by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any such term.

SECOND: As used in this agreement, the word "works" shall mean:

A. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership or copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

THIRD: Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, any part or all of the works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of the works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such work publicly by means of radio and television or for archive or audition purposes and not for sale to the public or for synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations.

C. The non-exclusive right to adapt or arrange any part or all of any of the works for performance purposes, and to license others to do so.

FOURTH:

A. The rights granted to BMI by subparagraph A of paragraph THIRD hereof shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta, or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof performances of works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for and performed as part of a theatrical or television film, (2) a score originally written for and performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher retains the right to issue non-exclusive licenses for performances of a work or works (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license BMI is given written notice of the titles of the works and the nature of the performances so licensed by Publisher.

FIFTH:

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the works in which BMI has performing rights:

(1) For performances of works on broadcasting stations in the United States, its territories and possessions BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

It is acknowledged that BMI licenses the works of its affiliates for performance by non-broadcasting means, but that unless and until such time as feasible methods can be devised for tabulation of and payment for such performances, payment will be based solely on broadcast performances. In the event that during the term of this agreement BMI establishes a system of separate payment for non-broadcasting performances, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of works outside of the United States, its territories and possessions BMI will pay to Publisher all monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the works after the deduction of BMI's then current handling charge applicable to its affiliated publishers.

(3) In the case of works which, or rights in which, are owned by Publisher jointly with one or more other publishers who have granted performing rights therein to BMI, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the foregoing provisions of this paragraph FIFTH, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such work referred to in subparagraph A of paragraph TENTH hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph FOURTEENTH hereof, or (2) any performance as to which a direct license as de-

**SIXTH:**  BMI will furnish statements to Publisher at least twice during each year of the term showing the number of performances of the works as computed pursuant to subparagraph A(1) of paragraph FIFTH hereof, and at least once during each year of the term showing the monies received by BMI referred to in subparagraph A(2) of paragraph FIFTH hereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for advances or amounts due to BMI from Publisher.

**SEVENTH:**

A. Nothing in this agreement requires BMI to continue to license the works subsequent to the termination of this agreement. In the event that BMI continues to license any or all of the works, however, BMI shall continue to make payments to Publisher for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such works to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly on demand. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by any of the works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers.

C. In the event that BMI has reason to believe that Publisher will receive or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the works during a period when such works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI of the amount so paid to Publisher by such other organization or that Publisher has not been so paid. In the event that Publisher has been so paid, the monies payable by BMI to Publisher for such performances during such period shall be reduced by the amount of the payment from such other organization. In the event that Publisher does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such works during such period.

EIGHTH: In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

NINTH:

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any work which in BMI's opinion (1) is similar to a previously existing composition and might constitute a copyright infringement, or (2) has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition, or (3) is offensive, in bad taste or against public morals, or (4) is not reasonably suitable for performance.

B. In the case of works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such work from this agreement, or (2) to classify any such work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any work is excluded from this agreement pursuant to subparagraph A or B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such work, to terminate all rights in such work granted to BMI herein and all such rights of BMI in such work shall revert to Publisher thirty (30) days after the date of such notice from Publisher to BMI.

TENTH:

A. With respect to each of the works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) Two copies of a completed clearance sheet in the form supplied by BMI, unless a cue sheet with respect to such work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2) If such work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other works, such copy need be furnished only if requested by BMI pursuant to subsection (c) of subparagraph D(2) of this paragraph TENTH.

(3) If such work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, composers, publisher and nature and duration of the use of the work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each clearance sheet or cue sheet shall constitute a warranty by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the works listed thereon has been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is

afforded; and to give BMI prompt written notice of the date and number of copyright registration and/or renewal of each work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To record in the United States Copyright Office in accordance with the Copyright Law of the United States any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish any of the works.

(c) To obtain and deliver to BMI copies of: unpublished and published works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any of the documents referred to in sub-section (b) above.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any work shall revert to the writer or the writer's representative, or (2) copyright protection of any work shall terminate.

**ELEVENTH:** Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance sheet or cue sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has exclusive performing rights in each of the works by virtue of written grants thereof to Publisher signed by all the authors and composers or other owners of such work.

**TWELFTH:**

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any work by BMI or its licensees.

B. Upon the receipt by any of the parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

**THIRTEENTH:** Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and/or to recover damages in respect of or for the infringement or other violation of the said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit.

**FOURTEENTH:**

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (hereinafter called "foreign territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the works for any foreign territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such foreign territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the works in any foreign territory as part of an agreement for the publication, exploitation or representation of such works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the works are granted for any foreign territory. Such notice shall set forth the title of the work, the country or countries involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the foreign territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any foreign territory.

C. In the event that BMI transmits to Publisher performance royalties designated as the writer's share of performance royalties earned by any of the works in any foreign territory, Publisher shall promptly pay such royalties to the writer or writers of the works involved. If Publisher is unable for any reason to locate and make payment to any of the writers involved within six (6) months from the date of receipt, the amounts due such writers shall be returned to BMI.

**FIFTEENTH:**

A. Publisher agrees that Publisher, its agents, employees, representatives or affiliated companies, will not directly or indirectly during the term of this agreement:

(1) Solicit or accept payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2) Solicit or accept manuscripts from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permit Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH.

(4) Submit to BMI, as one of the works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher agrees that Publisher, its agents, employees or representatives will not directly or indirectly during the term of this agreement make any effort to ascertain from, or offer any inducement or consideration to, anyone, including but not limited to any broadcasting licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C. Publisher agrees to notify BMI promptly in writing (1) of any change of firm name of Publisher, and (2) of any change of twenty percent (20%) or more in the ownership thereof.

D. In the event of the violation of any of the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall have the right, in its sole discretion, to terminate this agreement by giving Publisher at least thirty (30) days' notice by registered or certified mail. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH: In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by it pursuant to paragraph TWENTIETH hereof shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher pursuant to said paragraph TWENTIETH and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH: Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold absolute title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all works for which clearance sheets shall have theretofore been submitted to BMI and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said works in accordance with the terms and conditions of this agreement.

EIGHTEENTH: Any controversy or claim arising out of, or relating to, this agreement or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. Such award shall include the fixing of the expenses of the arbitration, including reasonable attorney's fees, which shall be borne by the unsuccessful party.

NINETEENTH: Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH: Publisher agrees to notify BMI's Department of Performing Rights Administration promptly in writing of any change in its address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address so furnished by Publisher.

TWENTY-FIRST: This agreement cannot be changed orally and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND: In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

TWENTY-THIRD: This agreement, as of its effective date, cancels and supersedes the agreement between the parties dated....April 9, 1981................and all modifications thereof (herein called the "Superseded Agreement"). All works embraced by the Superseded Agreement shall be deemed embraced by this agreement.

It is agreed that any part of any advances heretofore made to Publisher pursuant to the Superseded Agreement which shall not have been recouped by performances of works up to the effective date of this agreement shall be deemed to be an advance against all monies which may become payable to Publisher pursuant to this agreement and any extensions or modifications thereof or substitutions therefor.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC.

By _____

BLACKWOOD MUSIC, INC.

By _____

(Title of Signer) Vice President

5/81 A



FEB 2 0 F

**BROADCAST MUSIC INC.**

Performing Rights Administration

PERFORMING RI

### PLEASE SUPPLY THE FOLLOWING INFORMATION

Date ...February 8, 1988...

EXACT COMPANY NAME: SBK Blackwood Music Inc.

If this is a new name, indicate former name ...Blackwood Music Inc...

**BUSINESS ADDRESS:**
(include zip code and name of
individual if essential to
proper delivery of mail)

1290 Avenue of the Americas

New York, NY 10104

DATA BASE

**BUSINESS PHONE:** Area Code ...(212) ...975-4886...

ap 2-29-88

COMPLETE A, B or C

### A. INDIVIDUALLY OWNED:

Full Name of Individual ..................................................................... Soc. Sec. No. ___ ___ ___ ____

Home Address and Zip Code ................................................................................................................................

### B. PARTNERSHIP:

Fed. Tax Acct. No. __ __ _____

List of all partners

PCTG.
OF
OWNER-
SHIP

| FULL NAME | HOME ADDRESS AND ZIP CODE | SOC. SEC. NO. | |
|-----------|---------------------------|---------------|---|
| | | ___ ___ ___ ____ | |
| | | | |
| | | ___ __ __ ____ | |
| | | | |
| | | ___ ___ ____ | |
| | | | |
| | | ___ __ ____ | |
| | | | |

**BOTH SIDES MUST BE COMPLETED**

## C. FORMALLY ORGANIZED CORPORATION:

Fed. Tax Acct. No. ▮▮▮▮▮▮▮▮

Indicate State in which incorporated ......Connecticut......

List all Officers

| FULL NAME | TITLE | HOME ADDRESS AND ZIP CODE |
|-----------|-------|---------------------------|
| Stephen C. Swid | Chairman | 1290 Avenue of the Americas<br>New York, NY 10104 |
| Charles A. Koppelman | Presdient | 1290 Avenue of the Americas<br>New York, NY. 10104 |
| Martin N. Bandier | Vice Chairman | 1290 Avenue of the Americas<br>New York, NY 10104 |
| | | |

List all Stockholders

| FULL NAME | HOME ADDRESS AND ZIP CODE | PCTG. OF OWNER-SHIP |
|-----------|---------------------------|---------------------|
| SBK Entertainment World Inc. | 1290 Avenue of the Americas<br>New York, NY 10104 | 100% |
| | | |
| | | |
| | | |

If new corporate name is indicated above, check one:

· Old corporation has changed its name   [X]

New corporation has been formed   [ ]

(Copy of Certificate of Change of Name filed with Secretary of State must be attached.)

NAME OF INDIVIDUAL BMI CAN CONTACT FOR INFORMATION .................................................

PLEASE SIGN AND RETURN TO:

Patrick J. Fabbio
Broadcast Music, Inc.
320 West 57th Street
New York, N.Y. 10019

................................................
Signature of owner or officer     TITLE

Martin N. Bandier, Vice Chairman
................................................
(Please print name of person signing)

For Internal BMI Use Only

Received

Performing Rights
Administration

**BMI**

Performing Rights Administration

For Internal BMI Use Only

Entered Via Scope

By:_____

Verified:_____

## PLEASE SUPPLY THE FOLLOWING INFORMATION

Date ___8/31/89___

EXACT COMPANY NAME:___EMI Blackwood Music Inc.___

If this is a new name, indicate former name ___SBK Blackwood Music Inc.___

**BUSINESS ADDRESS:**
(include zip code and name of
individual if essential to proper
delivery of mail)

c/o EMI Entertainment World, Inc.

1290 Ave. of the Americas, 42nd Fl.

New York, N.Y. 10104

**BUSINESS PHONE:**

212    492-1200
area code

SEP    1 1989

PERFORMING RIGHTS
ADMINISTRATION

## COMPLETE ONE SECTION ONLY
### A, B or C

**A. INDIVIDUALLY OWNED**

Full Name of Individual _____  Soc. Sec. No. ___ ___ ___

Home Address _____

_____
Zip Code

**B. PARTNERSHIP**

Fed. Tax Acct. No. ___ _____
(If not available request form S.S. #4 from IRS)

**List all Partners**

FULL NAME

HOME ADDRESS

Soc. Sec. No.

Pctg of
Ownership

_____
Zip Code

_____
Zip Code

_____
Zip Code

101-7/88/mc

CONTINUED ON REVERSE SIDE

## C. FORMALLY ORGANIZED CORPORATION:

Fed. Tax Acct. No. ▉▉▉▉▉▉▉▉

(If not available request form S.S. #4 from IRS)

Indicate State in which incorporated __Connecticut__

### List all Officers

| FULL NAME | TITLE | HOME ADDRESS |
|---|---|---|
| Irwin Z. Robinson | President | ▉▉▉▉▉▉▉▉▉▉ |
| | | Zip Code |
| Steven E. Fret | Assistant Secretary | ▉▉▉▉▉▉▉▉▉▉ |
| | | Zip Code |
| | | Zip Code |

### List all Stockholders

| FULL NAME | HOME ADDRESS | | Pctg of Ownership |
|---|---|---|---|
| FMI Catalogue Partnership | 1290 Ave. of the Americas, 42nd Fl. | | 100 |
| | New York, N.Y. | 10104 Zip Code | |
| | | Zip Code | |
| | | Zip Code | |

## If new corporate name is indicated on reverse side, check one:

Old corporation has changed its name [X]  (Copy of Certificate of Change of Name filed with Secretary of State must be attached)

New corporation has been formed [ ]  (Copy of Certificate of Incorporation filed with Secretary of State must be attached)

PLEASE <u>SIGN</u> AND <u>RETURN</u> TO:
Patrick J. Fabbio
BMI
320 West 57th Street
New York, N.Y. 10019

_(signature)_  President

Signature of owner, partner or officer          TITLE

_Irwin Z. Robinson_
(Please print name of person signing)

101-7/88

R8187

AGREEMENT made on ...**Apr11.29, 1993**........... between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019 and **Dan Ryan Jewett**

a ...n. **individual** ....................... doing business as ...**THIS OUGHT TO GET ME A NEW GUITAR** ................. ("Publisher"), whose address is

## WITNESSETH:

FIRST: The term of this agreement shall be the period from ......**April 1, 1993** ..................................

to .... **March. 31, 1998** ..... , and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of such initial period, or any such additional five (5) year period, upon notice by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any such term.

SECOND: As used in this agreement, the word "works" shall mean:

A. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership or copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

THIRD: Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, any part or all of the works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of the works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such work publicly by means of radio and television or for archive or audition purposes and not for sale to the public or for synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations.

C. The non-exclusive right to adapt or arrange any part or all of any of the works for performance purposes, and to license others to do so.

FOURTH:

A. The rights granted to BMI by subparagraph A of paragraph THIRD hereof shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta, or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof performances of works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for and performed as part of a theatrical or television film, (2) a score originally written for and performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher retains the right to issue non-exclusive licenses for performances of a work or works (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license BMI is given written notice of the titles of the works and the nature of the performances so licensed by Publisher.

FIFTH:

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the works in which BMI has performing rights:

(1) For performances of works on broadcasting stations in the United States, its territories and possessions BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

It is acknowledged that BMI licenses the works of its affiliates for performance by non-broadcasting means, but that unless and until such time as feasible methods can be devised for tabulation of and payment for such performances, payment will be based solely on broadcast performances. In the event that during the term of this agreement BMI shall establish a system of separate payment for non-broadcasting performances, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of works outside of the United States, its territories and possessions BMI will pay to Publisher all monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the works after the deduction of BMI's then current handling charge applicable to its affiliated publishers.

(3) In the case of works which, or rights in which, are owned by Publisher jointly with one or more other publishers who have granted performing rights therein to BMI, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the foregoing provisions of this paragraph FIFTH, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such work referred to in subparagraph A of paragraph TENTH hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph FOURTEENTH hereof, or (2) any performance as to which a direct license as de-

scribed in subparagraph C of paragraph FOURTH hereof has been granted by Publisher, its co-publisher or the writer.

**SIXTH:**  BMI will furnish statements to Publisher at least twice during each year of the term showing the number of performances of the works as computed pursuant to subparagraph A(1) of paragraph FIFTH hereof, and at least once during each year of the term showing the monies received by BMI referred to in subparagraph A(2) of paragraph FIFTH hereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for advances or amounts due to BMI from Publisher.

**SEVENTH:**

A.  Nothing in this agreement requires BMI to continue to license the works subsequent to the termination of this agreement. In the event that BMI continues to license any or all of the works, however, BMI shall continue to make payments to Publisher for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such works to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly on demand. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B.  BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by any of the works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers.

C.  In the event that BMI has reason to believe that Publisher will receive or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the works during a period when such works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI of the amount so paid to Publisher by such other organization or that Publisher has not been so paid. In the event that Publisher has been so paid, the monies payable by BMI to Publisher for such performances during such period shall be reduced by the amount of the payment from such other organization. In the event that Publisher does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such works during such period.

EIGHTH:  In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

**NINTH:**

A.  BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any work which in BMI's opinion (1) is similar to a previously existing composition and might constitute a copyright infringement, or (2) has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition, or (3) is offensive, in bad taste or against public morals, or (4) is not reasonably suitable for performance.

B.  In the case of works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such work from this agreement, or (2) to classify any such work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C.  In the event that any work is excluded from this agreement pursuant to subparagraph A or B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such work, to terminate all rights in such work granted to BMI herein and all such rights of BMI in such work shall revert to Publisher thirty (30) days after the date of such notice from Publisher to BMI.

**TENTH:**

A.  With respect to each of the works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1)  Two copies of a completed clearance sheet in the form supplied by BMI, unless a cue sheet with respect to such work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2)  If such work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such work setting forth the lyrics, if any, and music correctly metered, provided that with respect to all other works, such copy need be furnished only if requested by BMI pursuant to subsection (c) of subparagraph D(2) of this paragraph TENTH.

(3)  If such work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, composers, publisher and nature and duration of the use of the work in such film or tape.

B.  Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C.  The submission of each clearance sheet or cue sheet shall constitute a warranty by Publisher that all of the information contained therein is true and correct and that no performing rights in any of the works listed thereon has been granted to or reserved by others except as specifically set forth therein.

D.  Publisher agrees.

(1)  To secure and maintain copyright protection of the works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is

afforded; and to give BMI prompt written notice of the date and number of copyright registration and/or renewal of each work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To record in the United States Copyright Office in accordance with the Copyright Law of the United States any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish any of the works.

(c) To obtain and deliver to BMI copies of: unpublished and published works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any of the documents referred to in sub-section (b) above.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any such shall revert to the writer or the writer's representative, or (2) copyright protection of any work shall terminate.

ELEVENTH: Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance sheet or cue sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has exclusive performing rights in each of the works by virtue of written grants thereof to Publisher signed by all the authors and composers or other owners of such work.

TWELFTH:

A. Publisher agrees to defend, indemnify, save and hold B.M. its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any work by BMI or its licensees.

B. Upon the receipt by any of the parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

THIRTEENTH: Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher herein in, and to recover damages in respect of or for the infringement or other violation of the said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit.

FOURTEENTH:

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (hereinafter called "foreign territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the works for any foreign territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such foreign territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the works in any foreign territory as part of an agreement for the publication, exploitation or representation of such works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the works are granted for any foreign territory. Such notice shall set forth the title of the work, the country or countries involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the foreign territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any foreign territory.

C. In the event that BMI transmits to Publisher performance royalties designated as the writer's share of performance royalties earned by any of the works in any foreign territory, Publisher shall promptly pay such royalties to the writer or writers of the works involved. If Publisher is unable for any reason to locate and make payment to any of the writers involved within six (6) months from the date of receipt, the amounts due such writers shall be returned to BMI.

FIFTEENTH:

A. Publisher agrees that Publisher, its agents, employees, representatives or affiliated companies, will not directly or indirectly during the term of this agreement:

(1) Solicit or accept payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2) Solicit or accept manuscripts from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permit Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH.

(4) Submit to BMI, as one of the works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher agrees that Publisher, its agents, employees or representatives will not directly or indirectly during the term of this agreement make any effort to ascertain from, or offer any inducement or consideration to, anyone, including but not limited to any broadcasting licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C. Publisher agrees to notify BMI promptly in writing (1) of any change of firm name of Publisher, and (2) of any change of twenty percent (20%) or more in the ownership thereof.

D. In the event of the violation of any of the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall have the right, in its sole discretion, to terminate this agreement by giving Publisher at least thirty (30) days' notice by registered or certified mail. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH: In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by it pursuant to paragraph TWENTIETH hereof shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher pursuant to paragraph TWENTIETH hereof and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH: Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold absolute title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all works for which clearance sheets shall have theretofore been submitted to BMI and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said works in accordance with the terms and conditions of this agreement.

EIGHTEENTH: Any controversy or claim arising out of, or relating to, this agreement or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. Such award shall include the fixing of the expenses of the arbitration, including reasonable attorney's fees, which shall be borne by the unsuccessful party.

NINETEENTH: Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH: Publisher agrees to notify BMI's Department of Performing Rights Administration promptly in writing of any change in its address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address so furnished by Publisher.

TWENTY-FIRST: This agreement cannot be changed orally and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND: In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC.

By ~~Jack Hornhaus~~

~~Reg.~~ Vice President

THIS OUGHT TO GET ME A NEW GUITAR

By _____
(Title of Signer)     Owner

DAN RYAN JEWETT

R8172

**BMI**

AGREEMENT made on April 29, 1993 between BROADCAST MUSIC, INC.
("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019 and
Christopher C. Roldan

an individual doing business as **PORKCHOPS AND APPLESAUCE**
PUBLISHING. ("Publisher"), whose address is

## WITNESSETH:

**FIRST:** The term of this agreement shall be the period from January 1, 1993
to December 31, 1997 and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of such initial period, or any such additional five (5) year period, upon notice by registered or certified mail not more than six (6) months or less than three (3) months prior to the end of any such term.

**SECOND:** As used in this agreement, the word "works" shall mean:

A. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership or copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

**THIRD:** Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, any part or all of the works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of the works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such work publicly by means of radio and television or for archive or audition purposes and not for sale to the public or for synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations.

C. The non-exclusive right to adapt or arrange any part or all of any of the works for performance purposes, and to license others to do so.

**FOURTH:**

A. The rights granted to BMI by subparagraph A of paragraph THIRD hereof shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta, or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof performances of works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for and performed as part of a theatrical or television film, (2) a score originally written for and performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher retains the right to issue non-exclusive licenses for performances of a work or works (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license BMI is given written notice of the titles of the works and the nature of the performances so licensed by Publisher.

**FIFTH:**

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the works in which BMI has performing rights:

(1) For performances of works on broadcasting stations in the United States, its territories and possessions BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

It is acknowledged that BMI licenses the works of its affiliates for performance by non-broadcasting means, but that unless and until such time as feasible methods can be devised for tabulation of and payment for such performances, payment will be based solely on broadcast performances. In the event that during the term of this agreement BMI shall establish a system of separate payment for non-broadcasting performances, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of works outside of the United States, its territories and possessions BMI will pay to Publisher all monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the works after the deduction of BMI's then current handling charge applicable to its affiliated publishers.

(3) In the case of works which, or rights in which, are owned by Publisher jointly with one or more other publishers who have granted performing rights therein to BMI, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the foregoing provisions of this paragraph FIFTH, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such work referred to in subparagraph A of paragraph TENTH hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph FOURTEENTH hereof, or (2) any performance as to which a direct license as de-

scribed in subparagraph C of paragraph FOURTH hereof has been granted by Publisher, its co-publisher or the writer.

**SIXTH:** BMI will furnish statements to Publisher at least twice during each year of the term showing the number of performances of the works as computed pursuant to subparagraph A(1) of paragraph FIFTH hereof, and at least once during each year of the term showing the monies received by BMI referred to in subparagraph A(2) of paragraph FIFTH thereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for advances or amounts due to BMI from Publisher.

**SEVENTH:**

A. Nothing in this agreement requires BMI to continue to license the works subsequent to the termination of this agreement. In the event that BMI continues to license any or all of the works, however, BMI shall continue to make payments to Publisher for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such works to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly on demand. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by any of the works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers.

C. In the event that BMI has reason to believe that Publisher will receive or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the works during a period when such works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI of the amount so paid to Publisher by such other organization or that Publisher has not been so paid. In the event that Publisher has been so paid the monies payable by BMI to Publisher for such performances during such period shall be reduced by the amount of the payment from such other organization. In the event that Publisher does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such works during such period.

**EIGHTH:** In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

**NINTH:**

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any work which in BMI's opinion (1) is similar to a previously existing composition and might constitute a copyright infringement, or (2) has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition, or (3) is offensive, in bad taste or against public morals, or (4) is not reasonably suitable for performance.

B. In the case of works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such work from this agreement, or (2) to classify any such work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any work is excluded from this agreement pursuant to subparagraph A or B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such work, to terminate all rights in such work granted to BMI herein and all such rights of BMI in such work shall revert to Publisher thirty (30) days after the date of such notice from Publisher to BMI.

**TENTH:**

A. With respect to each of the works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) Two copies of a completed clearance sheet in the form supplied by BMI, unless a cue sheet with respect to such work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2) If such work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other works, such copy need be furnished only if requested by BMI pursuant to subsection (c) of subparagraph D(2) of this paragraph TENTH

(3) If such work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, composers, publisher and nature and duration of the use of the work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each clearance sheet or cue sheet shall constitute a warranty by Publisher that all of the information contained therein is true and correct and that no performing rights in any of the works listed thereon has been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is

afforded; and to give BMI prompt written notice of the date and number of copyright registration and/or renewal of each work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To record in the United States Copyright Office in accordance with the Copyright Law of the United States any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish any of the works.

(c) To obtain and deliver to BMI copies of: unpublished and published works; copyright registration and/or renewal certificates issued by the United States Copyright Office, any of the documents referred to in sub-section (b) above.

F. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any work shall revert to the writer or the writer's representative, or (2) copyright protection of any work shall terminate.

ELEVENTH: Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance sheet or cue sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has exclusive performing rights in each of the works by virtue of written grants thereof to Publisher signed by all the authors and composers or other owners of such work.

TWELFTH:

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any work by BMI or its licensees.

B. Upon the receipt by any of the parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

THIRTEENTH: Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher herein in, and to recover damages in respect of or for the infringement or other violation of the said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit.

FOURTEENTH:

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (hereinafter called "foreign territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the works for any foreign territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such foreign territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the works in any foreign territory as part of an agreement for the publication, exploitation or representation of such works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the works are granted for any foreign territory. Such notice shall set forth the title of the work, the country or countries involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the foreign territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any foreign territory.

C. In the event that BMI transmits to Publisher performance royalties designated as the writer's share of performance royalties earned by any of the works in any foreign territory, Publisher shall promptly pay such royalties to the writer or writers of the works involved. If Publisher is unable for any reason to locate and make payment to any of the writers involved within six (6) months from the date of receipt, the amounts due such writers shall be returned to BMI.

FIFTEENTH:

A. Publisher agrees that Publisher, its agents, employees, representatives or affiliated companies, will not directly or indirectly during the term of this agreement:

(1) Solicit or accept payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2) Solicit or accept manuscripts from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permit Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH.

(4) Submit to BMI, as one of the works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher agrees that Publisher, its agents, employees or representatives will not directly or indirectly during the term of this agreement make any effort to ascertain from, or offer any inducement or consideration to, anyone, including but not limited to any broadcasting licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C. Publisher agrees to notify BMI promptly in writing (1) of any change of firm name of Publisher, and (2) of any change of twenty percent (20%) or more in the ownership thereof.

D. In the event of the violation of any of the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall have the right, in its sole discretion, to terminate this agreement by giving Publisher at least thirty (30) days' notice by registered or certified mail. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH: In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by it pursuant to paragraph TWENTIETH hereof shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher pursuant to paragraph TWENTIETH hereof and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH: Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold absolute title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all works for which clearance sheets shall have theretofore been submitted to BMI and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said works in accordance with the terms and conditions of this agreement.

EIGHTEENTH: Any controversy or claim arising out of, or relating to, this agreement or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. Such award shall include the fixing of the expenses of the arbitration, including reasonable attorney's fees, which shall be borne by the unsuccessful party.

NINETEENTH: Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH: Publisher agrees to notify BMI's Department of Performing Rights Administration promptly in writing of any change in its address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address so furnished by Publisher.

TWENTY-FIRST: This agreement cannot be changed orally and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND: In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC.

By _____
Vice President
Vice President

PORKCHOPS AND APPLESAUCE PUBLISHING

By _____
(Title of Signer)     Owner

CHRISTOPHER C. ROLDAN

# CERTIFICATE OF COPYRIGHT REGISTRATION

## FORM PA



This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records

**REGISTER OF COPYRIGHTS**
United States of America

OFFICIAL SEAL



PA 532 894

AUG 14 1991

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**TITLE OF THIS WORK ▼**

SHE TALKS TO ANGELS  $92/287$

As Contained on The Black Crowes CD "SHAKE YOUR MONEY MAKER" Def American 24278

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**NATURE OF THIS WORK ▼** see instructions

WORDS AND MUSIC

---

**NAME OF AUTHOR ▼**

CHRIS ROBINSON

**DATES OF BIRTH AND DEATH**
Year Born ▼      Year Died ▼

**AUTHOR'S NATIONALITY OR DOMICILE**
Citizen of ▶
OR Domiciled in ▶ U.S.A.

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?  ☐ Yes ☒ No
Pseudonymous?  ☐ Yes ☒ No

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed ▼
WORDS & MUSIC

**NAME OF AUTHOR ▼**

RICH ROBINSON

**DATES OF BIRTH AND DEATH**
Year Born ▼      Year Died ▼

**AUTHOR'S NATIONALITY OR DOMICILE**
Citizen of ▶
OR Domiciled in ▶ U.S.A.

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?  ☐ Yes ☒ No
Pseudonymous?  ☐ Yes ☒ No

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed ▼
WORDS & MUSIC

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼      Year Died ▼

**AUTHOR'S NATIONALITY OR DOMICILE**
Citizen of ▶
OR Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?  ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No

**NATURE OF AUTHORSHIP** Briefly describe nature of the material created by this author in which copyright is claimed ▼

NOTE

044823543

---

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED**
1990

**DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
FEBRUARY ▶ 13th ▶ 1990
U.S.A.

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2 ▼

ENOUGH TO CONTEND WITH SONGS
9000 Sunset Blvd., PH
Los Angeles, CA 90069

APPLICATION RECEIVED
AUG 14 1991
ONE DEPOSIT RECEIVED
AUG 14 1991
TWO DEPOSITS RECEIVED
REMITTANCE NUMBER AND DATE

**TRANSFER** If the claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright ▼

BY ASSIGNMENT

**MORE ON BACK ▶**  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page
• See detailed instructions.    • Sign the form at line 8

DO NOT WRITE HERE
Page 2

EXAMINED BY

CHECKED BY

FORM PA

PA 532 894

☐ CORRESPONDENCE
   Yes

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**PREVIOUS REGISTRATION** Has registration for this work or for an earlier version of this work already been made in the Copyright Office?
☐ Yes ☒ No If your answer is Yes, why is another registration being sought? (Check appropriate box) ▼
☐ This is the first published edition of a work previously registered in unpublished form
☐ This is the first application submitted by this author as copyright claimant
☐ This is a changed version of the work as shown by space 6 on this application
If your answer is Yes, give **Previous Registration Number** ▼      **Year of Registration** ▼

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation
a **Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates ▼

b **Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed ▼

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account ▼
Name ▼                                          Account Number ▼

    WARNER BROS. MUSIC                          DA 063649

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼

                        WARNER BROS. MUSIC
                        9000 SUNSET BLVD. PENTHOUSE
                        LOS ANGELES, CALIF. 90069

- Area code & telephone number ▶

**CERTIFICATION** I, the undersigned, hereby certify that I am the
check only one ▼
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of ____ **ENOUGH TO CONTEND WITH SONGS**
                Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
            **KAREN CARTER**                                    date ▶    8/9/91

☞ Handwritten signature (X) ▼
                        Karen Carter

**MAIL CERTIFICATE TO**

Certificate will be mailed in window envelope

            WARNER BROS. MUSIC
            9000 SUNSET BLVD. PENTHOUSE
            LOS ANGELES, CALIF. 90069

**BMI**

Warner–Tamerlane Publishing Corp
Attn: Don Biederman Esq
C/O Warner/Chappell Music Inc
10585 Santa Monica Boulevard
Los Angeles. CA 90025-4950

May 8. 1995

Dear BMI Publisher:

This will confirm our understanding with respect to the modification of the agreement dated <u>June 14. 1982</u> between <u>Warner–Tamerlane Pub Corp A Delaware Corporation</u> (herein called the "former owner") and Broadcast Music. Inc.. as modified. (herein called the "basic agreement"):

1. You warrant and represent that all right. title and interest of the former owner in and to the basic agreement and in and to the works embraced thereby has been sold. assigned and transferred to <u>Warner–Tamerlane Publishing Corp A California Corporation</u> (herein called the "new owner").

2. Effective as of ___OCTOBER 1, 1994___ the new owner shall be deemed to have acquired all rights and assumed all obligations of the former owner in and to the basic agreement.

Except as herein specifically modified. all of the terms and conditions of the basic agreement are hereby ratified and affirmed.

ACCEPTED AND AGREED TO:

WARNER–TAMERLANE PUB CORP

By _____

Donald E Biederman (Vice President)

WARNER–TAMERLANE
PUBLISHING CORP

By _____

Donald E Biederman (Vice President)

BROADCAST MUSIC. INC.

By _____

Vice President

CPO-5/01/93

BMI

320 West 57th Street. New York, NY 10019-3790 (212) 586-2000 Fax: (212) 245-8986

04020077005

ENOUGH TO CONTEND WITH SONGS
c/o Pete Angelus
Angelus Entertainment
269 So. Beverly Drive, Suite 346
Beverly Hills, CA 90212

Dated: July 1, 1997

TO WHOM IT MAY CONCERN:

Re: NOTICE OF ASSIGNMENT OF COPYRIGHT AND INCOME

Gentlemen:

Please be advised that effective July 1, 1997, Warner-Tamerlane Publishing Corp. has acquired all right, title and interest in and to the compositions (or fractional shares thereof) set forth on the annexed Schedule (the "Compositions").

All income of any nature, regardless of when earned, in respect of said Compositions is payable, on and after the date hereof to Warner/Chappell Music, Inc. (Federal I.D.#: ▮▮▮▮▮▮▮) on behalf of Warner-Tamerlane Publishing Corp.

All statements, checks and correspondence relevant to the foregoing Compositions are to be directed to Warner-Tamerlane Publishing Corp., c/o Warner/Chappell Music, Inc., 10585 Santa Monica Boulevard, Los Angeles, CA 90025-4950.

Please mark your records accordingly.

Very truly yours,

ENOUGH TO CONTEND WITH SONGS
a Georgia partnership
consisting of general partners
Chris Robinson and Rich Robinson

By: _____
Chris Robinson

By: _____
Rich Robinson

IMG:PURCHASE:CROWESPS.AGT:092497

10

50    921285 SEEING THINGS

| WRITER/PUBLISHER | EFB | W/R | SOC | TERR | LINE ADM | COLLECTIONS OWNZ | MECH/OTHER PERF |
|---|---|---|---|---|---|---|---|
| ROBINSON, CHRISTOPHER MARK | B | WR | BRI | W100-Y | 50.000 | 25.000 | 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | WR | BRI | W100-Y | 50.000 | 25.000 | 50.000 |
| ROBINSON, RICH | B | WR | BMI | W100-Y | 50.000 | 25.000 | 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | WR | SAI | W100-Y | 50.000 | 25.000 | 50.000 |

UCM TOTAL                                     100.000 100.000

PUBL.: PA5532-892 - 88/14/1991   REN.:
WORLD: WARNER-TAMERLANE PUBLISHING CORP. (BMI) CLAIMS 100.00%
       FOR ALL TYPES OF ROYALTIES OBO ALL PARTIES INVOLVED

51    377685 SHARE THE RIDE

| WRITER/PUBLISHER | EFB | W/R | SOC | TERR | LINE ADM | COLLECTIONS OWNZ | MECH/OTHER PERF |
|---|---|---|---|---|---|---|---|
| ROBINSON, CHRISTOPHER MARK | B | CA | BRI | W100-Y | 1 | 25.000 | 0.000 | 25.000 |
| ROBINSON, RICH | B | CA | BMI | W100-Y | 1 | 25.000 | 0.000 | 25.000 |
| ENOUGH TO CONTEND WITH SONGS | | O | BMI | W100-Y | 1 | 50.000 | 0.000 | 0.000 |
| WARNER-TAMERLANE PUBLISHING CORP. | | AR | BMI | W100-Y | 1 * | 0.000 | 100.000 | 50.000 |

UCM TOTAL                                     100.000  50.000

TERR: W100  WORLD

52    950822 SHE GAVE GOOD SUNFLOWER

| WRITER/PUBLISHER | EFB | W/R | SOC | TERR | LINE ADM | COLLECTIONS OWNZ | MECH/OTHER PERF |
|---|---|---|---|---|---|---|---|
| ROBINSON, RICH | B | WR | BRI | W100-Y | 50.000 | 25.000 | 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | | BMI | W100-Y | 50.000 | 25.000 | 50.000 |
| ROBINSON, CHRISTOPHER MARK | B | WR | BMI | W100-Y | 50.000 | 25.000 | 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | | BMI | W100-Y | 50.000 | 25.000 | 50.000 |

UCM TOTAL                                     100.000 100.000

UNPUBL.: PAU1817498 - 11/24/1993   REN.:
PUBL.:   PA  738881 - 01/19/1995   REN.:
WORLD: WARNER-TAMERLANE PUBLISHING CORP. CLAIMS 100% FOR ALL
       TYPES OF ROYALTIES OBO ALL PARTIES INVOLVED.

53    921287 SHE TALKS TO ANGELS

| WRITER/PUBLISHER | EFB | W/R | SOC | TERR | LINE ADM | COLLECTIONS OWNZ | MECH/OTHER PERF |
|---|---|---|---|---|---|---|---|
| ROBINSON, CHRISTOPHER MARK | B | WR | BMI | W100-Y | 50.000 | 25.000 | 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | WR | BMI | W100-Y | 50.000 | 25.000 | 50.000 |

SCHEDULE "A" TO AGREEMENT WITH
ENOUGH TO CONTEND WITH SONGS
DATED AS OF JULY 1, 1997

ROBINSON, RICH

**1    995738 (ONLY) HALFWAY TO EVERYWHERE**

| WRITER/PUBLISHER | EFR | W/R | SOC | TERR | LINK ADM | OWN% | COLLECTIONS MECH/OTHER | PERF |
|---|---|---|---|---|---|---|---|---|
| ROBINSON, CHRISTOPHER MARE | B | CA | BMI | W100-Y | 1 | 25.000 | 0.000 | 25.000 |
| ROBINSON, RICH | B | CA | BMI | W100-Y | 1 | 25.000 | 0.000 | 25.000 |
| ENOUGH TO CONTEND WITH SONGS | | O | BMI | W100-Y | 1 | 50.000 | 0.000 | 0.000 |
| WARNER-TAMERLANE PUBLISHING CORP. | | AM | BMI | W100-Y | 1 * | 0.000 | 100.000 | 50.000 |
| MCR TOTAL | | | | | | | 100.000 | 50.000 |

TERR: W100   WORLD

PUBL.: PA 812 918 -  10/09/1996    REN.:

**2    950826 ACOUSTIC #1**

| WRITER/PUBLISHER | EFR | W/R | SOC | TERR | LINK ADM | OWN% | COLLECTIONS MECH/OTHER | PERF |
|---|---|---|---|---|---|---|---|---|
| ROBINSON, RICH | B | M | BMI | W100-Y | | 100.000 | 50.000 | 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | | BMI | W100-Y | | 100.000 | 50.000 | 100.000 |
| MCR TOTAL | | | | | | | 100.000 | 100.000 |

UNPUBL.: PAU182C780 -  11/26/1993    REN.:
WORLD; WARNER-TAMERLANE PUBLISHING CORP. CLAIMS 100% FOR ALL
        TYPES OF ROYALTIES OBO ALL PARTIES INVOLVED

**3    950827 ACOUSTIC #2**

| WRITER/PUBLISHER | EFR | W/R | SOC | TERR | LINK ADM | OWN% | COLLECTIONS MECH/OTHER | PERF |
|---|---|---|---|---|---|---|---|---|
| ROBINSON, RICH | B | M | BMI | W100-Y | | 100.000 | 50.000 | 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | | BMI | W100-Y | | 100.000 | 50.000 | 100.000 |
| MCR TOTAL | | | | | | | 100.000 | 100.000 |

UNPUBL.: PAU1817499 -  11/26/1993    REN.:
WORLD; WARNER-TAMERLANE PUBLISHING CORP. CLAIMS 100% FOR ALL
        TYPES OF ROYALTIES OBO ALL PARTIES INVOLVED

**4    985557 APPALACHIAN OPERA MINUS THE OPERA**

| WRITER/PUBLISHER | EFR | W/R | SOC | TERR | LINK ADM | OWN% | COLLECTIONS MECH/OTHER | PERF |
|---|---|---|---|---|---|---|---|---|
| ROBINSON, CHRIS | B | CA | ASCAP | W100-Y | 1 | 25.000 | 0.000 | 25.000 |
| ROBINSON, RICH | B | CA | BMI | W100-Y | 1 | 25.000 | 0.000 | 25.000 |
| ENOUGH TO CONTEND WITH SONGS | | O | BMI | W100-Y | 1 | 50.000 | 0.000 | 0.000 |
| WARNER-TAMERLANE PUBLISHING CORP. | | AM | BMI | W100-Y | 1 * | 0.000 | 100.000 | 50.000 |
| MCR TOTAL | | | | | | | 100.000 | 50.000 |

SCHEDULE "A" TO AGREEMENT WITH
ENOUGH TO CONTEND WITH SONGS
DATED AS OF JULY 1, 1997

04020377906

**53   921287 SEE TALES TO ANGELS**

| WRITER/PUBLISHER | EFB | W/R | SOC | TERR | LINK ADM | COLLECTIONS OWN% | MECH/OTHER PERF |
|---|---|---|---|---|---|---|---|
| ROBINSON, RICH | R | WR | BMI | W100-Y | | 50.000 | 25.000 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | WR | BMI | W100-Y | | 50.000 | 25.000 50.000 |
| WCM TOTAL | | | | | | 100.000 | 100.000 |

PUBL.: PA532-894 - 08/16/1991   REN.:
WORLD: WARNER-TAMERLANE PUBLISHING CORP. (BMI) CLAIMS 100.00%
       FOR ALL TYPES OF ROYALTIES OBO ALL PARTIES INVOLVED

**54   921283 SISTER LUCK**

| WRITER/PUBLISHER | EFB | W/R | SOC | TERR | LINK ADM | COLLECTIONS OWN% | MECH/OTHER PERF |
|---|---|---|---|---|---|---|---|
| ROBINSON, CHRISTOPHER MARK | R | WR | BMI | W100-Y | | 50.000 | 25.000 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | WR | BMI | W100-Y | | 50.000 | 25.000 50.000 |
| ROBINSON, RICH | R | WR | BMI | W100-Y | | 50.000 | 25.000 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | WR | BMI | W100-Y | | 50.000 | 25.000 50.000 |
| WCM TOTAL | | | | | | 100.000 | 100.000 |

PUBL.: PA532-890 - 08/16/1991   REN.:
WORLD: WARNER-TAMERLANE PUBLISHING CORP. (BMI) CLAIMS 100.00%
       FOR ALL TYPES OF ROYALTIES OBO ALL PARTIES INVOLVED

**55   930588 SOMETIMES SALVATION**

| WRITER/PUBLISHER | EFB | W/R | SOC | TERR | LINK ADM | COLLECTIONS OWN% | MECH/OTHER PERF |
|---|---|---|---|---|---|---|---|
| ROBINSON, RICH | R | R | BMI | W100-Y | | 50.000 | 25.000 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | | BMI | W100-Y | | 50.000 | 25.000 50.000 |
| ROBINSON, CHRISTOPHER MARK | R | WR | BMI | W100-Y | | 50.000 | 25.000 0.000 |
| ENOUGH TO CONTEND WITH SONGS | | | BMI | W100-Y | | 50.000 | 25.000 50.000 |
| WCM TOTAL | | | | | | 100.000 | 100.000 |

UNPUBL.: PAU613-586 - 04/02/1992   REN.:
PUBL.: PA 577 817 - 04/19/1992   REN.:
WORLD: WARNER-TAMERLANE PUBLISHING CORP. (BMI) CLAIMS 100% FOR
       ALL TYPES OF ROYALTIES ON BEHALF OF ALL PARTIES INVOLVED.

**56   983555 SONG OF THE FLESH**

| WRITER/PUBLISHER | EFB | W/R | SOC | TERR | LINK ADM | COLLECTIONS OWN% | MECH/OTHER PERF |
|---|---|---|---|---|---|---|---|
| ROBINSON, CHRIS | R | CA | ASCAP | W100-Y | 1 | 25.000 | 0.000 25.000 |
| ROBINSON, RICH | R | CA | BMI | W100-Y | 1 | 25.000 | 0.000 25.000 |

0402007702

SCHEDULE "A" TO AGREEMENT WITH
ENOUGH TO CONTEND WITH SONGS
DATED AS OF JULY 1, 1997



#361763

AGREEMENT made on February 25, 2004, between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019-3790 and Warner-Tamerlane Publishing Corp., a California corporation ("Publisher"), whose address is c/o Warner Chappell Music, Inc., 10585 Santa Monica Boulevard, Los Angeles, CA 90025.

### W I T N E S S E T H :

1.  The term of this agreement shall be the period from April 1, 2004 to March 31, 2007, and continuing thereafter for additional periods of three (3) years each unless terminated by either party at the end of said initial period or any additional period, upon notice sent by registered, certified or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such period.

2.  As used in this agreement, the word "Work" or "Works" shall mean:

A.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B.  All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

3.  Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A.  All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

B.  The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

C.  The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

4.  Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

A.  The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,

*THIS PAGE INTENTIONALLY LEFT BLANK*

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B.  Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C.  Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A.  As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1)  For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2)  For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3)  In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B.  Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6.  In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.

Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7.

A. Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8. In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9.

A. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

B. The termination of this agreement shall be deemed subject to any rights or obligations existing between BMI and its licensees under licenses then in effect. As a result thereof, notwithstanding such termination, BMI shall have the right to continue to license all of Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination, until such licenses expire.

10. Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which may continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

B. In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A. With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other · written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

13.  Publisher warrants and represents that:

A.  Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B.  Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A.  Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B.  Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense.  Publisher agrees to cooperate with BMI in all such matters.

C.  In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15.  Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder. In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A.  It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by

any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

17.  BMI shall have the right, in its sole discretion, to terminate this agreement if:

A.  Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

(1) Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2) Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (1) and A (2) of this paragraph 17.

(4) Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (1) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

C. Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

18.  In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

19.  Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against

P800                                                                                                                          Page 7 of 10

Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20. All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21. Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22. Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's postal or electronic ("e-mail") address, or facsimile number. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last postal or electronic address or facsimile number so furnished by Publisher.

23. This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24. Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25. Publisher authorizes the inclusion of Publisher's name, likeness and biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26. This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27. In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28. Any prior agreements, as modified, between Publisher and BMI are canceled and superseded as of the effective date of this agreement. All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC

By .......................................................................................................................................................
                          Vice President

"PUBLISHER"

By .............................................................................Leslie Bider, President..........................
        (Authorized Signatory)                                    (Print Name and Title of Signer)

**If your company structure is a PARTNERSHIP, all other partners must sign below:**

By ...........................................................................................................................................
                Partner                                            Printed Name

By ...........................................................................................................................................
                Partner                                            Printed Name

By ...........................................................................................................................................
                Partner                                            Printed Name

By ...........................................................................................................................................
                Partner                                            Printed Name

By ...........................................................................................................................................
                Partner                                            Printed Name

*THIS PAGE INTENTIONALLY LEFT BLANK*

Certificate  CO 0 3 2 0 0 3 7 0 0 4 4
9 0 3 1 1 3 7 0 0 4 4

Registration of a Claim to Copyright

Eu 718047

**CLASS E**

DO NOT WRITE HERE

In a musical composition the author of which is a citizen or domiciliary
of the United States of America or which was first published
in the United States of America

This Is To Certify that the statements set forth in this certificate have been made
a part of the records of the Copyright Office. In witness whereof the seal of the
Copyright Office is hereto affixed.

*Register of Copyrights*
*United States of America*

**1. Copyright Claimant(s) and Address(es):**

Name: EQUINOX MUSIC
9220 Sunset Boulevard, Suite 224, Los Angeles, Calif. 90069

Address: _____

Name: _____

Address: _____

**2. Title:** "TAINTED LOVE"
(Title of the musical composition)

_____

**3. Authors:**

Name: Ed Cobb
(Legal name followed by pseudonym if latter appears on the copies)
Citizenship: U.S.A. X  Other _____
(Check if U.S. citizen)  (Name of country)

Domiciled in U.S.A. Yes X  No ___  Address: 9220 Sunset Blvd., Suite 224
L.A., Calif. 90069
Author of WORDS and MUSIC
(State which: words, music, arrangement, etc.)

Name: _____
(Legal name followed by pseudonym if latter appears on the copies)
Citizenship: U.S.A. ___  Other _____
(Check if U.S. citizen)  (Name of country)

Domiciled in U.S.A. Yes ___  No ___  Address: _____
Author of _____
(State which: words, music, arrangement, etc.)

Name: _____
(Legal name followed by pseudonym if latter appears on the copies)
Citizenship: U.S.A. ___  Other _____
(Check if U.S. citizen)  (Name of country)

Domiciled in U.S.A. Yes ___  No ___  Address: _____
Author of _____
(State which: words, music, arrangement, etc.)

**4. (a) Date of Publication:**

_____
(Month)  (Day)  (Year)

**(b) Place of Publication:**

_____
(Name of country)

**5. Previous Registration or Publication:**

Was work previously registered? Yes ___  No ___  Date of registration _____  Registration number _____

Was work previously published? Yes ___  No ___  Date of publication _____  Registration number _____

Is there any substantial NEW MATTER in this version? Yes ___  No ___  If your answer is "Yes," give a brief general
statement of the nature of the NEW MATTER in this version.

_____

EXAMINER

*Complete all applicable spaces on next page*

Case 2:11-cv-08611 Document 28-2 Filed 06/20/2012 in TXSD Page 155 of 182

Deposit account:

THE FILMTRACK CORPORATION

0 0 3 2 0 1 8 6 0 0 0 5 5

Send correspondence to:

Name  Equinox Music

Address  9220 Sunset Blvd., Suite 224
L.A., Calif.  90069

8. Send certificate to:

(Type or print name and address)

Name  EQUINOX MUSIC

Address  9220 Sunset Blvd., Suite 224
(Number and street)

Los Angeles, California          90069
(City)              (State)              (ZIP code)

## Information concerning copyright in musical compositions

*When to Use Form E.* Form E is appropriate for unpublished and published musical compositions by authors who are U.S. citizens or domiciliaries, and for musical compositions first published in the United States.

*What Is a "Musical Composition"?* The term "musical composition" includes compositions consisting of music alone, or of words and music combined. It also includes arrangements and other versions of earlier compositions, if new copyrightable work of authorship has been added.

—*Song Lyrics Alone.* The term "musical composition" does not include song poems and other works consisting of words without music. Works of that type are not registrable for copyright in unpublished form.

*How to Register a Claim.* To obtain copyright registration, mail to the Register of Copyrights, Library of Congress, Washington, D.C. 20559, one complete copy of the musical composition, an application Form E, properly completed and signed, and a fee of $6. Manuscripts are not returned, so do not send your only copy.

—*Sound Recordings.* Phonograph records, tape recordings, and other sound recordings are not regarded as "copies" of the musical compositions recorded on them, and are not acceptable for copyright registration of musical compositions. For purposes of deposit, the musical compositions should be written in some form of legible notation. If the composition contains words, they should be written above or beneath the notes to which they are sung.

*Duration of Copyright.* Statutory copyright begins on the date the work was first published, or, if the work was registered for copyright in unpublished form, copyright begins on the date of registration. In either case, copyright lasts for 28 years, and may be renewed for a second 28-year term.

### Unpublished musical compositions

*How to Register a Claim.* To obtain copyright registration, mail to the Register of Copyrights, Library of Congress, Washington, D.C. 20559, one complete copy of the musical composition, an application Form E, properly completed and signed, and a fee of $6. Manuscripts are not returned, so do not send your only copy.

*Procedure to Follow if Work Is Later Published.* If the work is later reproduced in copies and published, it is necessary to make a second registration, following the procedure outlined below. To maintain copyright protection, all copies of the published edition must contain a copyright notice in the required form and position.

### Published musical compositions

*What Is "Publication"?* Publication, generally, means the sale, placing on sale, or public distribution of copies. Limited distribution of so-called "professional" copies ordinarily would not constitute publication. However, since the dividing line between a preliminary distribution and actual publication may be difficult to determine, it is wise for the author to affix notice of copyright to copies that are to be circulated beyond his control.

*How to Secure Copyright in a Published Musical Composition:*

1. *Produce copies with copyright notice,* by printing or other means of reproduction.
2. *Publish the work.*
3. *Register the copyright claim,* following the instructions on page 1 of this form.

*The Copyright Notice.* In order to secure and maintain copyright protection for a published work, it is essential that all copies published in the United States contain the statutory copyright notice. This notice shall appear on the title page or first page of music and must consist of three elements:

1. *The word "Copyright," the abbreviation "Copr.," or the symbol* ©. Use of the symbol © may result in securing copyright in countries which are parties to the Universal Copyright Convention.

2. *The year date of publication.* This is ordinarily the date when copies were first placed on sale, sold, or publicly distributed. However, if the work has been registered for copyright in unpublished form, the notice should contain the year of registration; or, if there is new copyrightable matter in the published version, it should include both dates.

3. *The name of the copyright owner (or owners).* Example: © John Doe 1973

NOTE: If copies are published without the required notice the right to secure copyright is lost and cannot be restored.

| FOR COPYRIGHT OFFICE USE ONLY | | |
|---|---|---|
| Application received AUG 30 1976 | | |
| Fee copy received AUG 30 1976 | | |
| Two copies received | | |
| Fee received | | |

U.S. GOVERNMENT PRINTING OFFICE 1973—O—497-488          May 1973—500,000          Page 4

Case 2:15-cv-06649 Document 10-2 Filed on 03/20/17 in TXSD Page 156 of 182



# Tainted Love

Words and Music by
ED COBB







© Copyright 1975 Burlington Music Co. Ltd., 40 South Audley Street, London, W.1Y 5DH
International Copyright Secured          All Rights Reserved          Made in England

'04-0-22

0 0 3 2 0 0 6 7 0 0 1
0 0 3 1 1 1 8 1 0 0 1



Case 3:05-cr-00045   Document 28-1   Filed on 03/2011 in TXSD   Page 158 of 182







Case 5:11-cv-00849 Document 22-2 Filed on 03/20/11 in TXSD Page 159 of 182



AGREEMENT made this April 2, 1985 between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y. 10019 and

EMBASSY MUSIC CORPORATION,

a New York corporation,

("Publisher") whose address is: C/O Music Sales Corporation, 24 East 22nd Street, New York, New York 10010.

WITNESSETH:

FIRST: The term of this agreement shall be the period from July 1, 1934 to March 31, 1986 and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of such initial period, or any such additional five (5) year period, upon notice by registered or certified mail not more than six (6) months nor less than three (3) months prior to the end of any such term.

SECOND: As used in this agreement, the word "works" shall mean:

A. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership or copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

THIRD: Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, any part or all of the works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of the works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such work publicly by means of radio and television or for archive or audition purposes and not for sale to the public or for synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations.

C. The non-exclusive right to adapt or arrange any part or all of any of the works for performance purposes, and to license others to do so.

FOURTH:

A. The rights granted to BMI by subparagraph A of paragraph THIRD hereof shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera, operetta, or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph THIRD hereof performances of works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for and performed as part of a theatrical or television film, (2) a score originally written for and performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher retains the right to issue non-exclusive licenses for performances of a work or works (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license BMI is given written notice of the titles of the works and the nature of the performances so licensed by Publisher.

FIFTH:

A. As full consideration for all rights granted to BMI, hereunder, and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the works in which BMI has performing rights:

(1) For performances of works on broadcasting stations in the United States, its territories and possessions BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

It is acknowledged that BMI licenses the works of its affiliates for performances by non-broadcasting means, but that unless and until such time as feasible methods can be devised for tabulation of and payment for such performances, payment will be based solely on broadcast performances. In the event that during the term of this agreement BMI shall establish a system of separate payment for non-broadcasting performances, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of works outside of the United States, its territories and possessions BMI will pay to Publisher all monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the works after the deduction of BMI's then current handling charge applicable to its affiliated publishers.

(3) In the case of works which, or rights in which, are owned by Publisher jointly with one or more other publishers who have granted performing rights therein to BMI, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the foregoing provisions of this paragraph FIFTH, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a work which occurs prior to the date on which BMI shall have received from Publisher II of the material with respect to such work referred to in subparagraph A of paragraph TENTH hereof, and in the case of foreign performances, the information referred to in subparagraph D of paragraph FOURTEENTH hereof, or (2) any performance as to which a direct license as de-

scribed in subparagraph C of paragraph, FOURTH, hereof, has been granted by Publisher, its co-publisher or the other.

SIXTH. BMI will furnish statements to Publisher at least twice during each year of the term showing the number of performances of the works as computed pursuant to subparagraph A(1) of paragraph FIFTH hereof, and at least once during each year of the term showing the monies received by BMI, referred to in subparagraph A(2) of paragraph FIFTH hereof. Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher subject to all proper deductions, if any, for advances or amounts due to BMI from Publisher. BMI shall have the right to deduct from any sums payable to Publisher the amount of any unpaid indebtedness of Publisher to BMI.

SEVENTH.

Nothing in this agreement requires BMI to continue to license the works subsequent to the termination of this agreement, in the event that BMI continues to license any or all of the works, however, BMI shall continue to make payments to Publisher for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such works to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant, or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly on demand. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations, as the publisher's share of foreign performance royalties earned by any of the works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers.

C. In the event that BMI has reason to believe that Publisher will receive or is receiving payment from a performing rights licensing organization other than BMI, for, or based on United States performances of one or more of the works during a period when such works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI of the amount so paid to Publisher by such other organization or that Publisher has not been so paid. In the event that Publisher has been so paid, the monies payable by BMI to Publisher for such performances during such period shall be reduced by the amount of the payment from such other organization. In the event that Publisher does not supply such evidence within eighteen (18) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such works during such period.

EIGHTH. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI, such termination shall not be effective until the close of the calendar, quarterly period during which (A) Publisher shall repay such unearned balance of advances, or (B) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances has been fully recouped by BMI.

NINTH. A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement at any time any work which in BMI's opinion (1) is similar to a previously existing composition and might constitute a copyright infringement, or (2) has a title, or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition, or (3) is offensive, in bad taste or against public morals, or (4) is not reasonably suitable for performance.

B. In the case of works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such work from this agreement, or (2) to classify any such work as entitled to receive only, a stated fraction of the full credit that would otherwise be given to performances thereof.

C. In the event that any work is excluded from this agreement pursuant to subparagraph A or, B of this paragraph NINTH, or pursuant to subparagraph C of paragraph TWELFTH hereof, all rights of BMI in such work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a work is classified for less than full credit under subparagraph B(2) of this paragraph NINTH, Publisher shall have the right by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such work, to terminate all rights in such work granted to BMI herein and all such rights of BMI in such work shall revert to Publisher thirty (30) days after the date of such notice from Publisher to BMI.

TENTH.

A. With respect to each of the works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI

(1) Two copies of a completed clearance sheet in the form supplied by BMI, unless a cue sheet with respect to such work is furnished pursuant to subparagraph A(3) of this paragraph TENTH.

(2) If such work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such work setting forth the lyrics, if any, and music correctly metered; provided that, with respect to all other works, such copy need be furnished only if requested by BMI pursuant to subsection (c) of subparagraph D(2) of this paragraph TENTH.

(3) If such work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, composers, publisher and nature and duration of the use of the work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph TENTH with respect to works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each clearance sheet or cue sheet shall constitute a warranty by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the works listed thereon has been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees

(1) To secure and maintain copyright protection of the works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is

BMI

afforded; and to give BMI prompt written notice of the date and number of copyright registration and/or renewal of each work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To record in the United States Copyright Office in accordance with the Copyright Law of the United States any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish any of the works.

(c) To obtain and deliver to BMI copies of: unpublished and published works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any of the documents referred to in sub-section (b) above.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any work shall revert to the writer or the writer's representative, or (2) copyright protection of any work shall terminate.

**ELEVENTH: Publisher warrants and represents that:**

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a clearance sheet or cue sheet submitted to BMI pursuant to subparagraph A of paragraph TENTH hereof, Publisher has exclusive performing rights in each of the works by virtue of written grants thereof to Publisher signed by all the authors and composers or other owners of such work.

**TWELFTH:**

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement: provided, however, that the obligations of Publisher under this paragraph TWELFTH shall not apply to any matter added to, or changes made in, any work by BMI or its licensees.

B. Upon the receipt by any of the parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced, against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate in counsel of its own choice in all such matters at its own expense. Publisher agrees to cooperate with BMI in all such matters.

In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to exclude the work with respect to which a claim is made from this agreement and/or to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

**THIRTEENTH:** Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name or otherwise, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder; and to recover damages in respect of or for the infringement or other violation of the said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph THIRTEENTH shall be at its sole expense and for its sole benefit.

**FOURTEENTH:**

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement, enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (hereinafter called "foreign territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the works for any foreign territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such foreign territory, and shall have notified Publisher thereof. Nothing herein contained, however, shall, be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by any or all of the works in any foreign territory as part of an agreement for the publication, exploitation or representation of such works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the works are granted for any foreign territory. Such notice shall set forth the title of the work, the country or countries involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the foreign territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher' performance royalties earned in any foreign territory.

C. In the event that BMI transmits to Publisher performance royalties designated as the writer's share of performance royalties earned by any of the works in any foreign territory, Publisher shall promptly pay such royalties to the writer or writers of the works involved. If Publisher is unable for any reason to locate and make payment to any of the writers involved within six (6) months from the date of receipt, the amounts due such writers shall be returned to BMI.

**FIFTEENTH:**

A. Publisher agrees that Publisher, its agents, employees, representatives or affiliated companies, will not directly or indirectly during the term of this agreement:

(1) Solicit or accept payment from or on behalf of authors for composing music for, lyrics, or from or on behalf of composers for writing lyrics to music.

(2) Solicit or accept manuscripts from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording of any other services connected with the exploitation of any composition.

(3) Permit Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH.

(4) Submit to BMI, as one of the works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A(1) and A(2) of this paragraph FIFTEENTH have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher agrees that Publisher, its agents, employees or representatives will not directly or indirectly during the term of this agreement make any effort to ascertain from, or offer any inducement or consideration to, anyone, including but not limited to any broadcasting licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or logging performances.

C. Publisher agrees to notify BMI promptly in writing (1) of any change of firm name of Publisher, and (2) of any change of twenty percent (20%) or more in the ownership thereof.

D. In the event of the violation of any of the provisions of subparagraphs A, B or C of this paragraph FIFTEENTH, BMI shall have the right, in its sole discretion, to terminate this agreement by giving Publisher at least thirty (30) days' notice by registered or certified mail. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph SEVENTH hereof.

SIXTEENTH: In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by it pursuant to paragraph TWENTIETH hereof shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph FIFTH hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail addressed to the last address furnished by Publisher pursuant to paragraph TWENTIETH hereof and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. In the event of such termination, no payments shall be due Publisher pursuant to paragraph SEVENTH hereof.

SEVENTEENTH: Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold absolute title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all works for which clearance sheets shall have, theretofore been submitted to BMI and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said works in accordance with the terms and conditions of this agreement.

EIGHTEENTH: Any controversy or claim arising out of, or relating to, this agreement or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. Such award shall include the fixing of the expenses of the arbitration, including reasonable attorney's fees, which shall be borne by the unsuccessful party.

NINETEENTH: Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

TWENTIETH: Publisher agrees to notify BMI's Department of Performing Rights Administration promptly in writing of any change in its address. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last address so furnished by Publisher.

TWENTY-FIRST: This agreement cannot be changed orally and shall be governed and construed pursuant to the laws of the State of New York.

TWENTY-SECOND: In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

TWENTY-THIRD: This agreement, as of its effective date, cancels and supersedes the agreement between the parties dated May 9, 1972 and all modifications thereof (herein called the "Superseded Agreement"). All works embraced by the Superseded Agreement shall be deemed embraced by this agreement.

It is agreed that any part of any advances heretofore made to Publisher pursuant to the Superseded Agreement which shall not have been recouped by performances of works up to the effective date of this agreement shall be deemed to be an advance against all monies which may become payable to Publisher pursuant to this agreement and any extensions or modifications thereof or substitutions therefor.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC.

By ................................................

Assistant Vice President

EMBASSY MUSIC CORPORATION

By ................................................

(Title of Signer) President

5/81 A

# MUSIC SALES CORPORATION

257 Park Avenue South
New York, NY 10010
(212) 254-2100
Fax: (212) 254-2013
jd@musicsales.com



Date:     December 7, 2001

To:       Minerva Taron
          BMI
          212-830-3865

From:     Joe Dipinto

Re:       TAINTED LOVE

Copies:

Pages: 3

Dear Minerva:

Per your request, I am faxing the December 13, 1996 assignment from Equinox Music to Embassy Music Corp. and the page of the schedule containing the above title. If you require anything else, please let me know.

Sincerely,

Joe Dipinto
Copyright Administration Manager
Music Sales Corp./Embassy Music Corp.
Phone: 212-254-2100
Fax: 212-254-2013
jd@musicsales.com

## ASSIGNMENT

### KNOW ALL MEN BY THESE PRESENTS:

THAT, for and in consideration of the sum of One Dollar $1.00) and other good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned, AVI MUSIC PUBLISHING GROUP, INC. doing business as EXCELLOREC MUSIC, EQUINOX MUSIC, DELIRIOUS MUSIC, CO-JAC MUSIC and NORFOLK MUSIC ("Assignor"), hereby bargains, sells, grants, transfers, assigns and sets over unto EMBASSY MUSIC CORPORATION ("Assignee"), its successors and assigns, everywhere and forever, all of its right, title and interest in and to all musical compositions now owned or controlled by Assignor, including but without limitation all the musical compositions listed on Schedule A, annexed hereto and made a part hereof but excluding only musical compositions in the catalogs of James W Music and John W Music, and all adaptations, arrangements, translations and versions thereof together with all rights and interests therein and thereto now or hereafter known or in existence, including all copyrights therein throughout the world, and all renewals and extensions thereof, with the right in Assignee of copyrighting the same and with the full right, power and authority in the sole discretion of Assignee to utilize for any and every use and purpose whatsoever the whole and each and every part thereof.

IN WITNESS WHEREOF, Assignor has executed this instrument this 13th day of December, 1996.

> AVI MUSIC PUBLISHING GROUP, INC.,
> doing business as EXCELLOREC MUSIC,
> EQUINOX MUSIC, DELIRIOUS MUSIC,
> CO-JAC MUSIC and NORFOLK MUSIC
>
> By: _____
> HARRY ANGER, President

### ACKNOWLEDGMENT

STATE OF CALIFORNIA      )
                               ) ss.:
COUNTY OF LOS ANGELES   )

On December __, 1996 before me personally came Harry Anger to me known, who, by me duly sworn, did depose and say that deponent is the President of AVI Music Publishing Group, Inc. the corporation described in, and which executed the foregoing agreement, that deponent knows the seal of the corporation, that the seal affixed to the agreement is the corporate seal, that it was affixed by order of the board of the corporation; and that deponent signed deponent's name by like order.

_____
Notary Public



| SONG NO. | SONG TITLE CO-PUBLISHER(S) | COPY-RIGHT | SONG WRITER(S) |
|---|---|---|---|
| 328 | TAINTED LOVE | 1965 | COBB, ED |
| 333 | TAKE A LOAD OFF ME | 1981 | THOMAS, EDDIE<br>KRANEN, HENRY |
| 330 | TAKE A LOOK INSIDE MY HEART<br>FORSYTHE MUSIC, 55% | 1982 | BENOIT, DAVID<br>RIORDAN, MONICA<br>CHAN, ARLO |
| 331 | TAKE EACH DAY AS IT COMES<br>TRICYCLE MUSIC, 50% | | BURGAN, JERRY |
| 332 | TAKE IT FOR WHAT IT'S WORTH | | LEWIS, MICHAEL<br>RINDER, LAUREN |
| 516 | TAKE ME ON YOUR MAGIC RIDE | 1969 | BENNETT, DONALD |
| 517 | TAKING THE PLUNGE<br>MINOR SATRYON | | WILLIAMS, DAVE<br>SIGMAN, JEFF<br>DUCKET, THOMAS |
| 334 | TASTE OF GHOSTS<br>LAND-BURG MUSIC, 66 2/3% | 1977 | LEWIS, MICHAEL<br>RINDER, LAUREN |
| 518 | TEARS OF JOY | 1975 | BRYSON, MARK DULSKI |
| 335 | TELL ME<br>QUALITY MUSIC, 50% | 1982 | PAULIN, N. |

# FORM CORDS

**For a Work of the Performing Arts**
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

## PA 1-167-183

EFFECTIVE DATE OF REGISTRATION

### March 15, 2007

| Application received: | 16Mar07 |
|---|---|
| Fee received: | 16Mar07 |
| Deposit received: | 15Mar07 |

**TITLE OF WORK:**
YOU KNOW I'M NO GOOD as contained in "BACK TO BLACK"| ISLAND RECORDS GROUP #171 304 1

**NATURE OF WORK:**
WORDS AND MUSIC

| Name of Author: | AMY WINEHOUSE |
|---|---|
| "Work made for hire"? | No |
| Anonymous contribution? | No |
| Pseudonymous contribution? | No |
| Citizen of: | UNITED KINGDOM |
| Domiciled in: | |
| Nature of authorship: | WORDS & MUSIC |

**YEAR OF CREATION:**
2006

**PUBLICATION:**
Date:      October 30, 2006
Nation:    UNITED KINGDOM

**COPYRIGHT CLAIMANT(S):**
Claimant #1:
EMI MUSIC PUB. LTD. (C/O EMI BLACKWOOD MUSIC INC.)
810 7TH AVENUE, 36TH FLOOR
NEW YORK, NY 10019

**TRANSFER:**
BY VIRTUE OF WRITTEN AGREEMENT

**PREVIOUS REGISTRATION: Has registration for this work or for an earlier version of this work already been made in the Copyright Office?**
No.

**DEPOSIT ACCOUNT: The fee for this registration has been charged to the following account:**
Name:            EMI MUSIC PUBLISHING (CORDS)
Account Number:  090557

**Copyright Office Annotations:**

Examined by:        db
Correspondence:  No

**CORRESPONDENCE:** Correspondence about this application may be addressed to:
EMI MUSIC PUBLISHING
810 7TH AVENUE, 36TH FLOOR
NEW YORK, NY 10019

**Daytime phone number:**      212-830-5107
**Evening phone number:**      212-830-5107
**FAX number:**                212-830-5198
**Email address:**             rcabiltes@emimusicpub.com

**PERSON TO CONTACT FOR RIGHTS AND PERMISSIONS:**
EMI MUSIC PUBLISHING
Attn: RON CABILTES
810 7TH AVENUE, 36TH FLOOR
NEW YORK, NY 10019

**Daytime phone number:**      212-830-5107
**FAX number:**                212-830-5198
**Email address:**             rcabiltes@emimusicpub.com

I, the undersigned, hereby certify that I have the authority to submit this application and that the statements made herein are correct to the best of my knowledge.
/C=US/ST=AL/O=EMI Music Publishing/OU=Copyright/CN=Ronald Cabiltes/
The digital signature of the applicant is on file.

*End of Copyright Registration Data*

*This space is intentionally left blank.*

**MAIL CERTIFICATE TO:**
EMI MUSIC PUBLISHING
ATTN: RON CABILTES
810 7TH AVENUE, 36TH FLOOR
NEW YORK, NY 10019

* 17 U.S.C. § 506(e):Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.



AGREEMENT made on January 23, 2006 between BROADCAST MUSIC, INC. ("BMI"), a New York corporation, whose address is 320 West 57th Street, New York, N.Y.10019-3790 and EMI Blackwood Music Inc., a Connecticut corporation ("Publisher"), whose address is c/o EMI Entertainment World Inc., 810 Seventh Avenue, New York, NY 10019-5818

## WITNESSETH:

1. The term of this agreement shall be the period from April 1, 2005 to December 31, 2008, and continuing thereafter for additional periods of five (5) years each unless terminated by either party at the end of said initial period or any additional period, upon notice sent by registered, certified or Express mail, or other sending method that requires that the date that the item is sent be recorded by the courier (e.g., overnight mail or messenger service), not more than six (6) months or less than three (3) months prior to the end of any such period.

2. As used in this agreement, the word "Work" or "Works" shall mean:

A. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, now owned or copyrighted by Publisher or in which Publisher owns or controls performing rights, and

B. All musical compositions (including the musical segments and individual compositions written for a dramatic or dramatico-musical work) whether published or unpublished, in which hereafter during the term Publisher acquires ownership of copyright or ownership or control of the performing rights, from and after the date of the acquisition by Publisher of such ownership or control.

3. Except as otherwise provided herein, Publisher hereby sells, assigns and transfers to BMI, its successors or assigns, for the term of this agreement:

A. All the rights which Publisher owns or acquires publicly to perform, and to license others to perform, anywhere in the world, in any and all places and in any and all media, now known or which hereafter may be developed, any part or all of the Works.

B. The non-exclusive right to record, and to license others to record, any part or all of any of the Works on electrical transcriptions, wire, tape, film or otherwise, but only for the purpose of performing such Work publicly by means of radio and television or for archive or audition purposes. This right does not include recording for the purpose of sale to the public or for the purpose of synchronization (1) with motion pictures intended primarily for theatrical exhibition or (2) with programs distributed by means of syndication to broadcasting stations, cable systems or other similar distribution outlets.

C. The non-exclusive right to adapt or arrange any part or all of any of the Works for performance purposes, and to license others to do so.

4. Notwithstanding the provisions of subparagraph A of paragraph 3 hereof:

A. The rights granted to BMI by said subparagraph A shall not include the right to perform or license the performance of more than one song or aria from a dramatic or dramatico-musical work which is an opera,

THIS PAGE INTENTIONALLY LEFT BLANK

operetta or musical show or more than five (5) minutes from a dramatic or dramatico-musical work which is a ballet, if such performance is accompanied by the dramatic action, costumes or scenery of that dramatic or dramatico-musical work.

B. Publisher, together with all the writers and co-publishers, if any, shall have the right jointly, by written notice to BMI, to exclude from the grant made by subparagraph A of paragraph 3 hereof performances of Works comprising more than thirty (30) minutes of a dramatic or dramatico-musical work, but this right shall not apply to such performances from (1) a score originally written for or performed as part of a theatrical or television film, (2) a score originally written for or performed as part of a radio or television program, or (3) the original cast, sound track or similar album of a dramatic or dramatico-musical work.

C. Publisher, the writers and/or co-publishers, if any, retain the right to issue non-exclusive licenses for performances of a Work or Works in the United States, its territories and possessions (other than to another performing rights licensing organization), provided that within ten (10) days of the issuance of such license or within three (3) months of the performance of the Work or Works so licensed, whichever is earlier, BMI is given written notice thereof and a copy of the license is supplied to BMI.

5.

A. As full consideration for all rights granted to BMI hereunder and as security therefor, BMI agrees to make the following payments to Publisher with respect to each of the Works in which BMI has performing rights:

(1) For radio and television performances of Works in the United States, its territories and possessions, BMI will pay amounts calculated pursuant to BMI's then standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. The number of performances for which Publisher shall be entitled to payment shall be estimated by BMI in accordance with its then current system of computing the number of such performances.

Publisher acknowledges that BMI licenses performances of the Works of its affiliates by means other than on radio and television, but that unless and until such time as methods are adopted for tabulation of and payment for such performances, payment will be based solely on performances in those media and locations then currently surveyed. In the event that during the term of this agreement BMI shall establish a system of separate payment for performances by means other than radio and television, BMI shall pay Publisher upon the basis of the then current performance rates generally paid by BMI to its other affiliated publishers for similar performances of similar compositions.

(2) For performances of Works outside of the United States, its territories and possessions, BMI will pay to Publisher monies received by BMI in the United States from any performing rights licensing organization which are designated by such organization as the publisher's share of foreign performance royalties earned by any of the Works after the deduction of BMI's then current handling charge applicable to its affiliated publishers and in accordance with BMI's then standard practices of payment for such performances.

(3) In the case of Works which, or rights in which, are owned by Publisher jointly with one or more other publishers, the sum payable to Publisher under this subparagraph A shall be a pro rata share determined on the basis of the number of publishers, unless BMI shall have received from Publisher a copy of an agreement or other document signed by all of the publishers providing for a different division of payment.

B. Notwithstanding the provisions of subparagraph A of this paragraph 5, BMI shall have no obligation to make payment hereunder with respect to (1) any performance of a Work which occurs prior to the date on which BMI shall have received from Publisher all of the material with respect to such Work referred to in subparagraph A of paragraph 12 hereof, and in the case of foreign performances, the information referred to in subparagraph B of paragraph 16 hereof, or (2) any performance of a Work as to which a direct license as described in subparagraph C of paragraph 4 hereof has been granted by Publisher, its co-publishers or the writers, or (3) any performance for which no license fees shall be collected by BMI, or (4) any performance of a Work which Publisher claims was either omitted from or miscalculated on a royalty statement and for which BMI shall not have received written notice from Publisher of such claimed omission or miscalculation within nine (9) months of the date of the royalty distribution seeking to be adjusted.

6. In accordance with BMI's then current standard practices, BMI will furnish periodic statements to Publisher during each year of the term showing the monies due pursuant to subparagraph A of paragraph 5 hereof.

Each such statement shall be accompanied by payment of the sum thereby shown to be due to Publisher, subject to all proper deductions, if any, for taxes, advances or amounts due to BMI from Publisher.

7.

A. Nothing in this agreement requires BMI to continue to license the Works subsequent to the termination of this agreement. In the event that BMI continues to license Publisher's interest in any Work, however, BMI shall continue to make payments to Publisher for such Work for so long as Publisher does not make or purport to make directly or indirectly any grant of performing rights in such Work to any other licensing organization. The amounts of such payments shall be calculated pursuant to BMI's then current standard practices upon the basis of the then current performance rates generally paid by BMI to its affiliated publishers for similar performances of similar compositions. Publisher agrees to notify BMI by registered or certified mail of any grant or purported grant by Publisher directly or indirectly of performing rights to any other performing rights organization within ten (10) days from the making of such grant or purported grant and if Publisher fails so to inform BMI thereof and BMI makes payments to Publisher for any period after the making of any such grant or purported grant, Publisher agrees to repay to BMI all amounts so paid by BMI promptly with or without demand by BMI. In addition, if BMI inquires of Publisher by registered or certified mail, addressed to Publisher's last known address, whether Publisher has made any such grant or purported grant and Publisher fails to confirm to BMI by registered or certified mail within thirty (30) days of the mailing of such inquiry that Publisher has not made any such grant or purported grant, BMI may, from and after such date, discontinue making any payments to Publisher.

B. BMI's obligation to continue payment to Publisher after the termination of this agreement for performances outside of the United States, its territories and possessions, of Works which BMI continues to license after such termination shall be dependent upon BMI's receipt in the United States of payments designated by foreign performing rights licensing organizations as the publisher's share of foreign performance royalties earned by the Works. Payment of such foreign royalties shall be subject to deduction of BMI's then current handling charge applicable to its affiliated publishers and shall be in accordance with BMI's then standard practices of payment for such performances.

8. In the event that BMI has reason to believe that Publisher will receive, or is entitled to receive, or is receiving payment from a performing rights licensing organization other than BMI for or based on United States performances of one or more of the Works during a period when such Works were licensed by BMI pursuant to this agreement, BMI shall have the right to withhold payment for such performances from Publisher until receipt of evidence satisfactory to BMI that Publisher was not or will not be so paid by such other organization. In the event that Publisher was or will be so paid or does not supply such evidence within twelve (12) months from the date of BMI's request therefor, BMI shall be under no obligation to make any payment to Publisher for performances of such Works during such period.

9.

A. In the event that this agreement shall terminate at a time when, after crediting all earnings reflected by statements rendered to Publisher prior to the effective date of such termination, there remains an unearned balance of advances paid to Publisher by BMI or any other indebtedness owed to BMI by Publisher, such termination shall not be effective until the close of the calendar quarterly period during which (1) Publisher shall repay such unearned balance of advances or indebtedness, or (2) Publisher shall notify BMI by registered or certified mail that Publisher has received a statement rendered by BMI at its normal accounting time showing that such unearned balance of advances or indebtedness has been fully recouped by BMI.

~~B. The termination of this agreement shall be deemed subject to any rights and obligations existing between BMI and its licensees under licenses then in effect, as a result thereof, notwithstanding such termination, BMI shall have the right to continue to license any of Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination until such licenses expire.~~

*you may choose to*

10. Notwithstanding the termination of this agreement, all of the terms and conditions of this agreement shall continue to apply subsequent to such termination with respect to any Works which ~~may~~ continue to be licensed by BMI and any monies payable to Publisher by BMI pursuant to the provisions of this agreement.

11.

A. BMI shall have the right, upon written notice to Publisher, to exclude from this agreement, at any time, any Work which in BMI's opinion is similar to a previously existing composition and might constitute a copyright infringement, or has a title or music or lyric similar to that of a previously existing composition and might lead to a claim of unfair competition.

B. In the case of Works which in the opinion of BMI are based on compositions in the public domain, BMI shall have the right, at any time, upon written notice to Publisher, either (1) to exclude any such Work from this agreement, or (2) to classify any such Work as entitled to receive only a stated fraction of the full credit that would otherwise be given for performances thereof.

C. In the event that any Work is excluded from this agreement pursuant to subparagraph A or B of this paragraph 11, or pursuant to subparagraph C of paragraph 14 hereof, all rights of BMI in such Work shall automatically revert to Publisher ten (10) days after the date of the notice of such exclusion given by BMI to Publisher. In the event that a Work is classified for less than full credit under subparagraph B (2) of this paragraph 11, Publisher shall have the right, by giving notice to BMI within ten (10) days after the date of BMI's notice to Publisher of the credit allocated to such Work, to terminate all rights in such Work granted to BMI herein and all such rights of BMI in such Work shall thereupon revert to Publisher.

12.

A. With respect to each of the Works which has been or shall be published or recorded commercially or synchronized with motion picture or television film or tape or which Publisher considers likely to be performed, Publisher agrees to furnish to BMI:

(1) A completed work registration form available in blank from BMI, unless a cue sheet with respect to such Work is furnished pursuant to subparagraph A (3) of this paragraph 12.

(2) If such Work is based on a composition in the public domain, a legible lead sheet or other written or printed copy of such Work setting forth the lyrics, if any, and music correctly metered; provided that with respect to all other Works, such copy need be furnished only if requested by BMI pursuant to subsection (b) of subparagraph D (2) of this paragraph 12.

(3) If such Work has been or shall be synchronized with or otherwise used in connection with motion picture or television film or tape, a cue sheet showing the title, writers, publisher and nature and duration of the use of the Work in such film or tape.

B. Publisher shall submit the material described in subparagraph A of this paragraph 12 with respect to Works heretofore published, recorded or synchronized within ten (10) days after the execution of this agreement and with respect to any of the Works hereafter so published, recorded, synchronized or likely to be performed prior to the date of publication or release of the recording, film or tape or anticipated performance.

C. The submission of each work registration form or cue sheet shall constitute a warranty and representation by Publisher that all of the information contained thereon is true and correct and that no performing rights in any of the Works listed thereon have been granted to or reserved by others except as specifically set forth therein.

D. Publisher agrees:

(1) To secure and maintain copyright protection of the Works pursuant to the Copyright Law of the United States and pursuant to the laws of such other nations of the world where such protection is afforded; and to give BMI, upon request, prompt written notice of the date and number of copyright registration and/or renewal of each Work registered in the United States Copyright Office.

(2) At BMI's request:

(a) To register each unpublished and published Work in the United States Copyright Office pursuant to the Copyright Law of the United States.

(b) To obtain and deliver to BMI copies of: unpublished and published Works, including any commercial recording of such Works; copyright registration and/or renewal certificates issued by the United States Copyright Office; any agreements, assignments, instruments or documents of any kind by which Publisher obtained the right to publicly perform and/or the right to publish, co-publish or sub-publish and/or the right to administer the performing rights in and/or collect the royalties for any of the Works.

E. Publisher agrees to give BMI prompt notice by registered or certified mail in each instance when, pursuant to the Copyright Law of the United States, (1) the rights granted to BMI by Publisher in any Work shall revert to the writer or the writer's representative, or (2) copyright protection of any Work shall terminate.

13. Publisher warrants and represents that:

A. Publisher has the right to enter into this agreement; Publisher is not bound by any prior commitments which conflict with its undertakings herein; the rights granted by Publisher to BMI herein are the sole and exclusive property of Publisher and are free from all adverse encumbrances and claims; and exercise of such rights will not constitute infringement of copyright or violation of any right of, or unfair competition with, any person, firm, corporation or association.

B. Except with respect to Works in which the possession of performing rights by another person, firm, corporation or association is specifically set forth on a work registration form or cue sheet submitted to BMI pursuant to subparagraph A of paragraph 12 hereof, Publisher has performing rights in each of the Works by virtue of written grants thereof to Publisher signed by the authors and composers or other owners of such Work.

14.

A. Publisher agrees to defend, indemnify, save and hold BMI, its licensees, the advertisers of its licensees and their respective agents, servants and employees, free and harmless from and against any and all demands, loss, damage, suits, judgments, recoveries and costs, including counsel fees, resulting from any claim of whatever nature arising from or in connection with the exercise of any of the rights granted by Publisher in this agreement; provided, however, that the obligations of Publisher under this paragraph 14 shall not apply to any matter added to, or changes made in, any Work by BMI or its licensees.

B. Upon the receipt by BMI or any of the other parties herein indemnified of any notice, demand, process, papers, writ or pleading, by which any such claim, demand, suit or proceeding is made or commenced against them, or any of them, which Publisher shall be obliged to defend hereunder, BMI shall, as soon as may be practicable, give Publisher notice thereof and deliver to Publisher such papers or true copies thereof, and BMI shall have the right to participate and direct such defense on behalf of BMI and/or its licensees by counsel of its own choice, at its own expense. Publisher agrees to cooperate with BMI in all such matters.

C. In the event of such notification of claim or service of process on any of the parties herein indemnified, BMI shall have the right, from the date thereof, to withhold payment of all sums which may become due pursuant to this agreement or any modification thereof and/or to exclude the Work with respect to which a claim is made from this agreement until receipt of satisfactory written evidence that such claim has been withdrawn, settled or adjudicated.

15. Publisher makes, constitutes and appoints BMI, or its nominee, Publisher's true and lawful attorney, irrevocably during the term hereof, in the name of BMI or that of its nominee, or in Publisher's name, or otherwise, in BMI's sole judgment, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in BMI's sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by Publisher hereunder, and to recover damages in respect of or for the infringement or other violation of said rights, and in BMI's sole judgment to join Publisher and/or others in whose names the copyrights to any of the Works may stand, and to discontinue, compromise or refer to arbitration, any such actions or proceedings or to make any other disposition of the disputes in relation to the Works; provided that any action or proceeding commenced by BMI pursuant to the provisions of this paragraph 15 shall be at its sole expense and for its sole benefit. Notwithstanding the foregoing, nothing in this paragraph 15 requires BMI to take any proceeding or other action against any person, firm, partnership or other entity or any writer or publisher, whether or not affiliated with BMI, who Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder. In addition, Publisher understands and agrees that the licensing by BMI of any musical compositions which Publisher claims may be infringing Publisher's Works or otherwise violating the rights granted by Publisher hereunder shall not constitute an infringement of Publisher's Works on BMI's part.

16.

A. It is acknowledged that BMI has heretofore entered into, and may during the term of this agreement enter into, contracts with performing rights licensing organizations for the licensing of public performing rights controlled by BMI in territories outside of the United States, its territories and possessions (herein called "Foreign Territories"). Upon Publisher's written request, BMI agrees to permit Publisher to grant performing rights in any or all of the Works for any Foreign Territory for which, at the time such request is received, BMI has not entered into any such contract with a performing rights licensing organization; provided, however, that any such grant of performing rights by Publisher shall terminate at such time when BMI shall have entered into such a contract with a performing rights licensing organization covering such Foreign Territory and shall have notified Publisher thereof. Nothing herein contained, however, shall be deemed to restrict Publisher from assigning to its foreign publisher or representative the right to collect a part or all of the publishers' performance royalties earned by

any or all of the Works in any Foreign Territory as part of an agreement for the publication, exploitation or representation of such Works in such territory, whether or not BMI has entered into such a contract with a performing rights licensing organization covering such territory.

B. Publisher agrees to notify BMI promptly in writing in each instance when publication, exploitation or other rights in any or all of the Works are granted for any Foreign Territory. Such notice shall set forth the title of the Work, the Foreign Territory or Territories involved, the period of such grant, the name of the person, firm, corporation or association entitled to collect performance royalties earned in the Foreign Territory and the amount of such share. Within ten (10) days after the execution of this agreement Publisher agrees to submit to BMI, in writing, a list of all Works as to which Publisher has, prior to the effective date of this agreement, granted to any person, firm, corporation or association performing rights and/or the right to collect publisher performance royalties earned in any Foreign Territory.

17. BMI shall have the right, in its sole discretion, to terminate this agreement if:

A. Publisher, its agents, employees, representatives or affiliated companies, directly or indirectly during the term of this agreement:

(1) Solicits or accepts payment from or on behalf of authors for composing music for lyrics, or from or on behalf of composers for writing lyrics to music.

(2) Solicits or accepts music and/or lyrics from composers or authors in consideration of any payments to be made by or on behalf of such composers or authors for reviewing, arranging, promotion, publication, recording or any other services connected with the exploitation of any composition.

(3) Permits Publisher's name, or the fact of its affiliation with BMI, to be used by any other person, firm, corporation or association engaged in any of the practices described in subparagraphs A (1) and A (2) of this paragraph 17.

(4) Submits to BMI, as one of the Works to come within this agreement, any musical composition with respect to which any payments described in subparagraphs A (1) and A (2) of this paragraph 17 have been made by or on behalf of a composer or author to any person, firm, corporation or association.

B. Publisher, its agents, employees or representatives directly or indirectly during the term of this agreement makes any effort to ascertain from, or offers any inducement or consideration to, anyone, including but not limited to any radio or television licensee of BMI or to the agents, employees or representatives of BMI or of any such licensee, for information regarding the time or times when any such BMI licensee is to report its performances to BMI, or to attempt in any way to manipulate performances or affect the representative character or accuracy of BMI's system of sampling or monitoring performances.

C. Publisher fails to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change of firm name, ownership or address of Publisher.

In the event BMI exercises its right to terminate this agreement pursuant to the provisions of subparagraphs A, B or C of this paragraph 17, BMI shall give Publisher at least thirty (30) days' notice by registered or certified mail of such termination. In the event of such termination, no payments shall be due to Publisher pursuant to paragraph 7 hereof.

18. In the event that during the term of this agreement (1) mail addressed to Publisher at the last address furnished by Publisher pursuant to paragraph 22 shall be returned by the post office, or (2) monies shall not have been earned by Publisher pursuant to paragraph 5 hereof for a period of two consecutive years or more, or (3) the proprietor, if Publisher is a sole proprietorship, shall die, BMI shall have the right to terminate this agreement on at least thirty (30) days' notice by registered or certified mail, electronic mail ("e-mail") or facsimile number addressed to the last postal or electronic address or transmitted to the last facsimile number furnished by Publisher in writing to BMI's Department of Writer/Publisher Administration and, in the case of the death of a sole proprietor, to the representative of said proprietor's estate, if known to BMI. If Publisher failed to maintain a current address with BMI and BMI has made reasonable good-faith efforts in attempting to locate Publisher without success, BMI shall have the right to terminate this agreement pursuant to this paragraph 18 by regular first-class U.S. mail, in lieu of the means otherwise specified, regardless of anything in paragraph 17 to the contrary. In the event of such termination, no payments shall be due Publisher pursuant to paragraph 7 hereof.

19. Publisher acknowledges that the rights obtained by it pursuant to this agreement constitute rights to payment of money and that during the term BMI shall hold title to the performing rights granted to BMI hereunder. In the event that during the term Publisher shall file a petition in bankruptcy, such a petition shall be filed against

Publisher, Publisher shall make an assignment for the benefit of creditors, Publisher shall consent to the appointment of a receiver or trustee for all or part of its property, Publisher shall file a petition for corporate reorganization or arrangement under the United States bankruptcy laws, or Publisher shall institute or shall have instituted against it any other insolvency proceeding under the United States bankruptcy laws or any other applicable law, or, in the event Publisher is a partnership, all of the general partners of said partnership shall be adjudged bankrupts, BMI shall retain title to the performing rights in all Works the rights to which are granted to BMI hereunder and shall subrogate Publisher's trustee in bankruptcy or receiver and any subsequent purchasers from them to Publisher's right to payment of money for said Works in accordance with the terms and conditions of this agreement.

20. All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten (10) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten (10) days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and shall include the fixing of the costs, expenses and reasonable attorneys' fees of arbitration, which shall be borne by the unsuccessful party. Judgment may be entered in New York State Supreme Court or any other court having jurisdiction.

21. Publisher agrees that it shall not, without the written consent of BMI, assign any of its rights hereunder. No rights of any kind against BMI will be acquired by the assignee if any such purported assignment is made by Publisher without such written consent.

22. Publisher agrees to notify BMI's Department of Writer/Publisher Administration promptly in writing of any change in Publisher's postal or electronic ("e-mail") address, or facsimile number. Any notice sent to Publisher pursuant to the terms of this agreement shall be valid if addressed to Publisher at the last postal or electronic address or facsimile number so furnished by Publisher.

23. This agreement shall be subject to BMI's standard practices and procedures which are in effect as of the effective date of this agreement and as they may be modified and/or supplemented from time to time.

24. Publisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

25. Publisher authorizes the inclusion of Publisher's name, likeness and biographical information, and those of Publisher's executive employees, in publicly-distributed material relating to Publisher's association with BMI.

26. This agreement constitutes the entire agreement between BMI and Publisher, cannot be changed except in a writing signed by BMI and Publisher and shall be governed and construed pursuant to the laws of the State of New York.

27. In the event that any part or parts of this agreement are found to be void by a court of competent jurisdiction, the remaining part or parts shall nevertheless be binding with the same force and effect as if the void part or parts were deleted from this agreement.

28. Any prior agreements, as modified, between Publisher and BMI are canceled and superseded as of the effective date of this agreement. All works that were embraced by any prior agreement between Publisher and BMI and in which no other licensing organization controls Publisher's performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to Publisher by BMI or unpaid indebtedness owed to BMI by Publisher shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications. If Publisher has acquired the works of the former BMI affiliate who is indicated on the attached terminated agreement, then all works which were embraced by that agreement and in which no other licensing organization controls the performing right interest shall be deemed embraced by this agreement. Any unearned balance of advances previously paid to said former affiliate by BMI or unpaid indebtedness owed by said former affiliate to BMI shall be deemed to be recoupable by BMI from any monies which become payable to Publisher pursuant to this agreement and any extensions, renewals or modifications.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed as of the day and year first above written.

BROADCAST MUSIC, INC

By ........................................................................................................................................
        Vice President
        President

"PUBLISHER"

By ........................................................................ Martin Bandier, Chairman and CEO...................
        (Authorized Signatory)                                    (Print Name and Title of Signer)

**If your company structure is a PARTNERSHIP, all other partners must sign below:**

By ..............................................................................................................................................
        Partner                                                      Printed Name

By ..............................................................................................................................................
        Partner                                                      Printed Name

By ..............................................................................................................................................
        Partner                                                      Printed Name

By ..............................................................................................................................................
        Partner                                                      Printed Name

By ..............................................................................................................................................
        Partner                                                      Printed Name

THIS PAGE INTENTIONALLY LEFT BLANK



AGREEMENT made as of this 2nd day of June 1989 BETWEEN EMI MUSIC PUBLISHING LIMITED of 127 Charing Cross Road, London WC2H OEA, England ("the Owner") of the one part and EMI APRIL MUSIC INC. and EMI BLACKWOOD MUSIC INC. both of 1290 Avenue of the Americas, New York, NY 10104, U.S.A. ("the Publisher") of the other part.

WHEREAS IT IS AGREED as follows:-

1.    DEFINITIONS:-

In this Agreement the following terms shall where the context so requires or admits have the following meanings:-

(a)  "the Owner" shall mean EMI Music Publishing Limited together with all of its subsidiary companies and its and their trading names as set out in the Schedule hereto and marked Annexure 'A' including, without limitation, EMI Songs Limited and EMI United Partnership Limited (together "NewCos"), which list may be added to or reduced during the Term.

(b)  "the Term" shall mean the initial period of 1 (one) month commencing on the date hereof. The Term shall be automatically renewed for additional periods of 1 (one) month each from the expiration of the initial period unless either party shall sent notice to the other prior to the expiration of any such 1 (one) month period. In the event that such notice is sent the term will expire on the last day of the month in which it was given.

(c)  "the Compositions" shall mean:

    (i)   the Prior Compositions, and

    (ii)  the words and music of all musical compositions hereafter acquired or controlled by the Owner during the Term pursuant to agreements entered into on or after 2nd June 1989 other than in the case of the NewCos insofar as the Owner has acquired rights therein for the Licensed Territory, and

    (iii) the words and music of any other musical compositions presently owned or controlled by the Owner which the Owner and the Publisher agree during the Term shall be made available to the Publisher for the Licensed Territory, and

    (iv)  notwithstanding anything to the contrary contained herein the words and music of the musical compositions included or to be included in the KPM Music Limited Recorded Music Library, the Berry Music Company Limited Conroy Library, the Themes International (Music) Limited Recorded Music Library and the Francis Day and Hunter Limited Mood Music Recorded Library are excluded from this Agreement.

(d)  "the Prior Compositions" shall mean all those musical compositions which are the subject matter of all agreements between

NewCos and EMI Entertainment World Inc. prior to this Agreement, the rights in which have reverted to the Owner upon the expiry of the said prior agreements.

(e) "the Licensed Territory" shall mean the territory of the United States of America, Canada and save in the case of Compositions owned and/or controlled by the NewCos, Israel.

(f) "IMP" shall mean International Music Publications of Southend Road, Woodford Green, Essex IG8 8HN, England.

(g) "Videogram" shall mean audio visual records or similar contrivances where the audio-visual content is 50% (or more) of the running time of such contrivance (including but without limitation computer software incorporating not only sonic reproduction of the Compositions but also visual reproduction of the lyrics thereto on a screen or by a print out).

2. GRANT OF RIGHTS:-

In consideration of the royalties hereinafter agreed to be paid and of the obligations on the Publisher's part contained herein the Owner hereby grants by way of licence only to the Publisher subject to the terms and conditions hereof (and in particular to Clauses 4 and 9 hereof) the following rights in and to the Compositions and each of them to the extent that the Owner owns or controls the Compositions for the Licensed Territory for the Term.

(a) (i) The non-exclusive right to print publish and sell the same in any and all parts of the Licensed Territory and the non-exclusive right to include any of the Compositions in any album book or folio. The only third party having the right to print publish and sell copies of the Compositions in the Licensed Territory is IMP.

(ii) In the event that the Publisher or the Publisher's licensee in the Licensed Territory should reject any particular printed project of the Owner then the Owner shall be free to appoint a third party in place of the Publisher or the Publisher's licensee insofar as it is necessary to comply with Owner's prior contractual commitments with third parties.

(iii) The Owner shall from time to time inform the Publisher of Compositions which may not be included in any album, book, folio, newspaper, magazine or periodical or where such right is limited in which case the Publisher agrees to abide by the direction of the Owner in each case.

(iv) Subject to any pre-existing arrangements or agreements entered into by the Owner with any third party and sub-clause (i) above the Publisher shall have the exclusive right to import publications containing the Compositions or any of them into the Licensed Territory for sale in the Licensed Territory only.

OCT 22 '93 08:59AM EMI COPYRIGHT DEP

(v)    The grant of rights made in this sub-clause (a) does not
include the Copyright in the artwork and the compilation (if any)
in respect of publications produced by or on behalf of the Owner
outside the Licensed Territory.  In the event that the Publisher
should wish to use any such artwork and/or compilation in its own
publications the Publisher may do so having first obtained the
prior written permission of the relevant Copyright owner in each
case.

(b)  The exclusive right to collect all monies arising from the
local performing right societies in the Licensed Territory from the
issuance of licences for public performance, including broadcasting
or television (whether by conventional means or by cable or
satellite or such other means as may be devised).  For the avoidance
of doubt no person firm or company (including but without
limitation the Publisher) other than the appropriate performing
right societies in the Licensed Territory has any right to deal in
performing and broadcast rights.

(c)  The exclusive right to authorise mechanical or electrical
reproduction in the making of audio gramophone records or similar
contrivances or such other media for audio only reproduction as may
be devised or utilised (including any audio-visual record or
similar contrivance where the audio-visual content is less than 50%
of the running time) for sale to the public in the Licensed
Territory and to collect all mechanical royalties and fees payable
on audio gramophone records or similar contrivances or such other
media for audio only reproduction as may be devised or utilised
sold in the Licensed Territory wherever manufactured.

(d)  (i)    The exclusive right to authorise mechanical or
electrical reproduction in the manufacture of copies of Videograms
in the Licensed Territory and to collect all royalties and fees
payable on such Videograms regardless of where the same may be
sold, PROVIDED THAT the Publisher shall obtain the Owner's prior
written permission in respect of each such licence granted for the
use of any of the Compositions and PROVIDED FURTHER THAT the
Publisher shall forthwith send to the Owner details of all video
licences issued by the Publisher or on its behalf.

     (ii)    The Owner reserves unto itself the exclusive right to
authorise mechanical or electrical reproduction in the manufacture
of copies of Videograms in all countries of the world outside the
Licensed Territory for sale to the public (including in the
Licensed Territory) and to collect all royalties and fees payable
on such Videograms aforesaid.

(e)  The exclusive right to grant non-exclusive world licences for
the recording, reproduction and use of the Compositions in and in
connection with motion pictures or television productions
(including but without limitation commercials and advertisements)
intended to be used in any media now known or hereafter devised
(including but without limitation cable and satellite television)
produced in the Licensed Territory and the making of copies
thereof, of exporting such copies to all countries of the world,

OCT 22 '93 09:08AM EMI COPYRIGHT DEP

Publisher. This Agreement constitutes the entire agreement between Owner and Publisher at the date hereof with regard to the sub-publishing of the Compositions and the parties hereto enter into it solely on that basis without reliance on any other representations whatsoever.

24. PROPER LAW: –

(a) This Agreement shall be governed by the laws of England and the High Court of Justice in England shall be the Court of Jurisdiction.

(b) Nothing contained in this Agreement shall in any way restrict the Owner's and the Publisher's rights pursuant to the Treaty of Rome and any subsidiary or amending legislation or agreements relating thereto.

SIGNED by                            ) ........................................
                                     )
                                     )
                                     )
AND by                               ) ........................................
Directors for and on behalf          )
of EMI MUSIC PUBLISHING              )
                LIMITED              )


SIGNED by                            ) ........................................
                                     )
                                     )
                                     )
AND by                               ) ........................................
Directors for and on behalf          )
of EMI APRIL MUSIC INC.              )


SIGNED by                            ) ........................................
                                     )
                                     )
                                     )
AND by                               ) ........................................
Directors for and on behalf          )
of EMI BLACKWOOD MUSIC INC.          )